**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1351**

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself; HIAS, INC., on behalf of itself and its clients; MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members; MUHAMMED METEAB; PAUL HARRISON; IBRAHIM AHMED MOHOMED; JOHN DOES #1 & 3; JANE DOE #2,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; DANIEL R. COATS, in his official capacity as Director of National Intelligence,

Defendants - Appellants.

------------------------------

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF WEST VIRGINIA; PHIL BRYANT, Governor of the State of Mississippi; AMERICAN CENTER FOR LAW AND JUSTICE; SOUTHERN LEGAL FOUNDATION, INC.; AMERICAN CIVIL RIGHTS UNION; IMMIGRATION REFORM LAW INSTITUTE; U.S. JUSTICE FOUNDATION; CITIZENS UNITED; CITIZENS UNITED FOUNDATION; ENGLISH FIRST FOUNDATION; ENGLISH FIRST; PUBLIC ADVOCATE OF THE UNITED STATES; GUN OWNERS FOUNDATION; GUN OWNERS OF AMERICA; CONSERVATIVE LEGAL

DEFENSE AND EDUCATION FUND; U.S. BORDER CONTROL FOUNDATION; POLICY ANALYSIS CENTER; VICTOR WILLIAMS,

Amici Supporting Appellants,

INTERFAITH COALITION; COLLEGES AND UNIVERSITIES; T.A.; COMMONWEALTH OF VIRGINIA; STATE OF MARYLAND; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE; STATE OF MASSACHUSETTS; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; DISTRICT OF COLUMBIA; CITY OF CHICAGO; CITY OF LOS ANGELES; CITY OF NEW YORK; CITY OF PHILADELPHIA; CITY COUNCIL OF NEW YORK; MAYOR OF THE CITY OF NEW YORK; CITY OF AUSTIN; CITY OF BOSTON; MARTIN J. WALSH, Mayor of Boston; TOWN OF CARRBORO; JAMES A. DIOSSA, Mayor of Central Falls, Rhode Island; COOK COUTNY, ILLINOIS; CITY OF GARY; CITY OF IOWA CITY; SVANTE L. MYRICK, Mayor of Ithaca; CITY OF JERSEY CITY; CITY OF MADISON; CITY OF MINNEAPOLIS; MONTGOMERY COUNTY; CITY OF NEW HAVEN; TONI N. HARP, Mayor of New Haven; CITY OF OAKLAND; CITY OF PORTLAND; CITY OF PROVIDENCE; JORGE O. ELORZA, Mayor of Providence; CITY OF ST. LOUIS; CITY OF SAINT PAUL; CITY OF SAN FRANCISCO; COUNTY OF SAN FRANCISCO; CITY OF SAN JOSE; SANTA CLARA COUNTY; CITY OF SANTA MONICA; CITY OF SEATTLE; VILLAGE OF SKOKIE; CITY OF SOUTH BEND; CITY OF TUCSON; CITY OF WEST HOLLYWOOD; FORMER NATIONAL SECURITY OFFICIALS; MEMBERS OF THE CLERGY; RIVERSIDE CHURCH IN THE CITY OF NEW YORK; AMERICANS UNITED FOR SEPARATION OF CHURCH & STATE; BEND THE ARC; A JEWISH PARTNERSHIP FOR JUSTICE; SOUTHERN POVERTY LAW CENTER; AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE; NEW YORK UNIVERSITY; RODERICK & SOLANGE MACARTHUR JUSTICE CENTER; HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; UNIVERSITY PROFESSORS & HIGHER EDUCATION ASSOCIATIONS; INTERNATIONAL LAW SCHOLARS; NONGOVERNMENTAL ORGANIZATIONS; ISMAIL ELSHIKH; ANT-DEFAMATION LEAGUE; JEWISH COUNCIL FOR PUCLIC AFFAIRS; UNION FOR REFORM JUDAISM; CENTRAL CONFERENCE OF AMERICAN RABBIS; WOMEN OF REFORM JUDAISM; AMERICAN BAR ASSOCIATION; MUSLIM JUSTICE LEAGUE; MUSLIM PUBLIC AFFAIRS COUNCIL; ISLAMIC CIRCLE OF NORTH AMERICA; COUNCIL ON AMERICAN-ISLAMIC RELATIONS; ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS; NATIONAL IMMIGRANT JUSTICE

2

CENTER; ASISTA; AMERICANS FOR IMMIGRANT JUSTICE; FUTURES WITHOUT VIOLENCE; NORTH CAROLINA COALITION AGAINST DOMESTIC VIOLENCE; SANCTUARY FOR FAMILIES; MEMBERS OF CONGRESS; SERVICE EMPLOYEES INTERNATIONAL UNION; AMERICAN FEDERATION OF STATE,COUNTY & MUNICIPAL EMPLOYEES, AMERICAN FEDERATION OF TEACHERS; HISTORY PROFESSORS & SCHOLARS; LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW; CENTER FOR REPRODUCTIVE RIGHTS; SOUTHERN COALITION FOR SOCIAL JUSTICE; NATIONAL CENTER FOR LESBIAN RIGHTS; JUDGE DAVID L. BAZELTON CENTER FOR MENTAL HEALTH LAW; CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW; MISSISSIPPI CENTER FOR JUSTICE; WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; TECHNOLOGY COMPANIES; FRED T. KOREMATSU CENTER FOR LAW & EQUALITY; JAY HIRABAYASHI; HOLLY YASUI; KAREN KOREMATSU; CIVIL RIGHTS ORGANIZATIONS; NATIONAL BAR ASSOCIATIONS OF COLOR; FOUNDATION FOR THE CHILDREN OF IRAN; IRANIAN ALLIANCES ACROSS BORDERS; MASSACHUSETTS TECHNOLOGY LEADERSHIP COUNCIL; EPISCOPAL BISHOPS; IMMIGRATION LAW SCHOLARS & CLINICIANS ON STATUTORY CLAIMS; FORMER FEDERAL IMMIGRATION & HOMELAND SECURITY OFFICIALS; CONSTITUTIONAL LAW SCHOLARS; MEDICAL INSTITUTIONS; ADVOCACY ORGANIZATIONS; INDIVIDUAL PHYSICIANS; TAHIRIH JUSTICE CENTER; ASIAN PACIFIC INSTITUTE ON GENDER-BASED VIOLENCE; CASA DE ESPERANZA; NATIONAL DOMESTIC VIOLENCE HOTLINE; INTERFAITH GROUP OF RELIGIOUS & INTERRELIGIOUS ORGANIZATIONS; OXFAM AMERICA, INC.; CONSTITUTIONAL LAW PROFESSORS; AMERICAN JEWISH COMMITTEE; MUSLIM RIGHTS, PROFESSIONAL & PUBLIC HEALTH ORGANIZATIONS; CATO INSTITUTE; NATIONAL ASSIAN PACIFIC AMERICAN BAR ASSOCIATION; ASSOCIATION OF ART MUSEUM DIRECTORS; AMERICAN ALLIANCE OF MUSEUMS; COLLEGE ART ASSOCIATION; 94 ART MUSEUMS; AMERICAN PROFESSIONAL SOCIETY ON THE ABUSE OF CHILDREN; ADVOCATES FOR HUMAN RIGHTS; ASIAN LAW ALLIANCE; ASIAN PACIFIC AMERICAN NETWORK OF OREGON; CASA; COMMUNITY REFUGEE & IMMIGRATION SERVICES; INTEGRATED REFUGEE & IMMIGRANT SERVICES; IMMIGRANT LAW CENTER OF MINNESOTA; SOUTHEAST ASIA RESOURCE ACTION CENTER; IMMIGRANT RIGHTS CLINIC OF WASHINGTON; SQUARE LEGAL SERVICES, INC.; AIRPORT ATTORNEYS COALITION,

Amici Supporting Appellees.

3

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge. (8:17-cv-00361-TDC)

Argued: May 8, 2017                                              Decided: May 25, 2017

Before GREGORY, Chief Judge, and NIEMEYER, MOTZ, TRAXLER, KING, SHEDD, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges.

Affirmed in part, vacated in part by published opinion. Chief Judge Gregory wrote the opinion, in which Judges Motz, King, Wynn, Diaz, Floyd, and Harris joined in full. Judge Traxler wrote an opinion concurring in the judgment. Judge Keenan wrote an opinion concurring in part and concurring in the judgment, in which Judge Thacker joined except as to Part II.A.i. Judge Wynn wrote a concurring opinion. Judge Thacker wrote a concurring opinion. Judge Niemeyer wrote a dissenting opinion, in which Judges Shedd and Agee joined. Judge Shedd wrote a dissenting opinion, in which Judges Niemeyer and Agee joined. Judge Agee wrote a dissenting opinion, in which Judges Niemeyer and Shedd joined.

**ARGUED:** Jeffrey Bryan Wall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Omar C. Jadwat, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for Appellees. **ON BRIEF:** Edwin S. Kneedler, Deputy Solicitor General, Chad A. Readler, Acting Assistant Attorney General, August E. Flentje, Special Counsel to the Assistant Attorney General, Douglas N. Letter, Sharon Swingle, H. Thomas Byron III, Lowell V. Sturgill, Jr., Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellants. Justin B. Cox, Atlanta, Georgia, Karen C. Tumlin, Nicholas Espíritu, Melissa S. Keaney, Esther Sung, Marielena Hincapié, NATIONAL IMMIGRATION LAW CENTER, Los Angeles, California; Lee Gelernt, Hina Shamsi, Hugh Handeyside, Sarah L. Mehta, Spencer E. Amdur, New York, New York, Cecillia D. Wang, Cody H. Wofsy, San Francisco, California, David Cole, Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C.; David Rocah, Deborah A. Jeon, Sonia Kumar, Nicholas Taichi Steiner, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland, for Appellees. Ken Paxton, Attorney General, Jeffrey C. Mateer, First Assistant Attorney General, Scott A. Keller, Solicitor General, J. Campbell Barker, Deputy Solicitor General, Ari Cuenin, Assistant Solicitor General, OFFICE OF THE ATTORNEY

GENERAL OF TEXAS, Austin, Texas; Steven T. Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama; Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona; Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas; Pamela Jo Bondi, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida; Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas; Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana; Tim Fox, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana; Mike Hunter, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina; Marty J. Jackley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota; Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia; Phil Bryant, Governor, OFFICE OF GOVERNOR PHIL BRYANT, Jackson, Mississippi, for Amici States of Texas, Alabama, Arizona, Arkansas, Florida, Kansas, Louisiana, Montana, Oklahoma, South Carolina, South Dakota, West Virginia, and Governor Phil Bryant of the State of Mississippi. Robert D. Fram, Alexandra P. Grayner, Kathryn Bi, San Francisco, California, Kevin B. Collins, William E. Zapf, Ligia M. Markman, Karun Tilak, Michael Baker, Andrew Guy, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Interfaith Coalition. Thomas J. Perrelli, Lindsay C. Harrison, Erica L. Ross, Tassity S. Johnson, JENNER & BLOCK LLP, Washington, D.C., for Amicus Colleges and Universities. Jay Alan Sekulow, Stuart J. Roth, Colby M. May, Andrew J. Ekonomou, Jordon Sekulow, Craig L. Parshall, Matthew R. Clark, Benjamin P. Sisney, Washington, D.C., Edward L. White III, Erik M. Zimmerman, Ann Arbor, Michigan, Francis J. Manion, Geoffrey R. Surtees, AMERICAN CENTER FOR LAW AND JUSTICE, New Hope, Kentucky, for Amicus American Center for Law and Justice. Kimberly S. Hermann, SOUTHEASTERN LEGAL FOUNDATION, Marietta, Georgia; William S. Consovoy, CONSOVOY MCCARTHY PARK PLLC, Arlington, Virginia, for Amicus Southeastern Legal Foundation. Kenneth A. Klukowski, AMERICAN CIVIL RIGHTS UNION, Alexandria, Virginia, for Amicus American Civil Rights Union. Joseph W. Miller, UNITED STATES JUSTICE FOUNDATION, Ramona, California, for Amicus U. S. Justice Foundation. Michael Boos, Washington, D.C., for Amici Citizens United and Citizens United Foundation. William J. Olson, Herbert W. Titus, Jeremiah L. Morgan, Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Amici U.S. Justice Foundation, Citizens United, Citizens United Foundation, English First Foundation, English First, Public Advocate of the United States, Gun Owners Foundation, Gun Owners of America, Conservative Legal Defense and Education Fund, U.S. Border Control Foundation, and Policy Analysis Center. Christopher J. Hajec, Michael M. Hethmon, Elizabeth A. Hohenstein, Mark S. Venezia, IMMIGRATION REFORM LAW INSTITUTE, Washington, D.C., for Amicus

5

Immigration Reform Law Institute. Terrance Nolan, General Counsel and Secretary, NEW YORK UNIVERSITY, New York, New York; Steven E. Obus, Seth D. Fiur, Tiffany M. Woo, PROSKAUER ROSE LLP, New York, New York, for Amicus New York University. Victor Williams, AMERICA FIRST LAWYERS ASSOCIATION, Bethesda, Maryland, Amicus Pro Se. Richard D. Bernstein, WILLKIE FARR & GALLAGHER LLP, Washington, D.C., for Amicus T.A. Harold Hongju Koh, Hope Metcalf, Rule of Law Clinic, YALE LAW SCHOOL, New Haven, Connecticut; William J. Murphy, John J. Connolly, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland; Jonathan M. Freiman, Tahlia Townsend, WIGGIN AND DANA LLP, New Haven, Connecticut, for Amicus Former National Security Officials. Amir H. Ali, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Amicus The Roderick and Solange MacArthur Justice Center. Elisabeth C. Frost, Amanda R. Callais, Washington, D.C., Joseph M. McMillan, Michelle L. Maley, PERKINS COIE LLP, Seattle, Washington; Aaron X. Fellmeth, ARIZONA STATE UNIVERSITY SANDRA DAY O'CONNOR COLLEGE OF LAW, Phoenix, Arizona; Jonathan Hafetz, SETON HALL UNIVERSITY SCHOOL OF LAW, Newark, New Jersey, for Amici International Law Scholars and Non-Governmental Organizations. Neal Kumar Katyal, Colleen Roh Sinzdak, Mitchell P. Reich, Elizabeth Hagerty, Washington, D.C., Sara Solow, Alexander B. Bowerman, Philadelphia, Pennsylvania, Thomas P. Schmidt, HOGAN LOVELLS US LLP, New York, New York, for Amicus Dr. Ismail Elshikh. David E. Mills, Alyssa T. Saunders, COOLEY LLP, Washington, D.C.; John B. Harris, Jeremy Goldman, Caren Decter, Jessica Smith, Rayna Lopyan, Lily Landsman-Roos, Lakendra Barajas, FRANKFURT KURNIT KLEIN & SELZ, P.C., New York, New York, for Amici Anti-Defamation League, Jewish Council for Public Affairs, Union for Reform Judaism, Central Conference of American Rabbis, and Women of Reform Judaism. Doron F. Ezickson, Washington, D.C., Steven M. Freeman, Lauren A. Jones, Melissa Garlick, Michael Lieberman, ANTI-DEFAMATION LEAGUE, New York, New York, for Amicus Anti-Defamation League. David Bohm, DANNA MCKINTRICK, P.C., St. Louis, Missouri, for Amicus Jewish Council for Public Affairs. Ryan P. Poscablo, Brian Neff, Eliberty Lopez, New York, New York, Nick Kahlon, RILEY SAFER HOLMES & CANCILA, LLP, Chicago, Illinois; Edward N. Siskel, Corporation Counsel, Benna Ruth Solomon, Deputy Corporation Counsel, CITY OF CHICAGO, Chicago, Illinois, for Amicus City of Chicago. Zachary W. Carter, Corporation Counsel, CITY OF NEW YORK, New York, New York, for Amicus Mayor and City Council of New York. Sozi Pedro Tulante, City Solicitor, CITY OF PHILADELPHIA LAW DEPARTMENT, Philadelphia, Pennsylvania, for Amicus City of Philadelphia. Anne L. Morgan, City Attorney, CITY OF AUSTIN LAW DEPARTMENT, Austin, Texas, for Amicus City of Austin. Eugene L. O'Flaherty, Corporation Counsel, CITY OF BOSTON, Boston, Massachusetts, for Amici City of Boston and Mayor Martin J. Walsh. G. Nicholas Herman, General Counsel, THE BROUGH LAW FIRM, PLLC, Chapel Hill, North Carolina, for Amicus Town of Carrboro. Matthew T. Jerzyk, City Solicitor, OFFICE OF THE CITY SOLICITOR, Central Falls, Rhode Island, for Amicus James A. Diossa. Kimberly M. Foxx, States Attorney for Cook County, Office of the States Attorney,

6

Chicago, Illinois, for Amicus Cook County, Illinois. Michael N. Feuer, City Attorney, CITY ATTORNEY'S OFFICE FOR THE CITY OF LOS ANGELES, Los Angeles, California, for Amicus City of Los Angeles. Gregory L. Thomas, City Attorney, CITY ATTORNEY'S OFFICE, Gary, Indiana, for Amicus City of Gary. Eleanor M. Dilkes, City Attorney, CITY ATTORNEY'S OFFICE, Iowa City, Iowa, for Amicus City of Iowa City. Aaron O. Lavine, City Attorney, CITY ATTORNEY'S OFFICE, Ithaca, New York, for Amicus Svante L. Myrick. Jeremy Farrell, Corporation Counsel, JERSEY CITY LAW DEPARTMENT, Jersey City, New Jersey, for Amicus City of Jersey City. Michael P. May, City Attorney, CITY ATTORNEY'S OFFICE, Madison, Wisconsin, for Amicus City of Madison. Susan L. Segal, City Attorney, CITY ATTORNEY'S OFFICE, Minneapolis, Minnesota, for Amicus City of Minneapolis. Marc P. Hansen, County Attorney, COUNTY ATTORNEY'S OFFICE, Rockville, Maryland, for Amicus Montgomery County. John Rose, Jr., Corporation Counsel, CITY OF NEW HAVEN, New Haven, Connecticut, for Amici City of New Haven and Mayor Toni N. Harp. Barbara J. Parker, City Attorney, CITY ATTORNEY'S OFFICE, Oakland, California, for Amicus Oakland. Tracy Reeve, City Attorney, CITY ATTORNEY'S OFFICE, Portland, Oregon, for Amicus Portland. Jeffrey Dana, City Solicitor, OFFICE OF THE CITY SOLICITOR, Providence, Rhode Island, for Amici City of Providence and Mayor Jorge O. Elorza. Michael A. Garvin, City Counselor, CITY OF ST. LOUIS LAW DEPARTMENT, St Louis, Missouri, for City of St. Louis. Samuel J. Clark, City Attorney, CITY ATTORNEY'S OFFICE, Saint Paul, Minnesota, for Amicus City of Saint Paul. Dennis J. Herrera, City Attorney, CITY ATTORNEY'S OFFICE, San Francisco, California, for Amici City and County of San Francisco. Richard Doyle, City Attorney, CITY ATTORNEY'S OFFICE, San José, California, for Amicus City of San José. James R. Williams, County Counsel, OFFICE OF THE COUNTY COUNSEL, San José, California, for Amicus Santa Clara County. Joseph Lawrence, Interim City Attorney, CITY OF SANTA MONICA, Santa Monica, California, for Amicus City of Santa Monica. Peter S. Holmes, Seattle City Attorney, CITY ATTORNEY'S OFFICE, Seattle, Washington, for Amicus City of Seattle. Michael M. Lorge, Corporation Counsel, VILLAGE OF SKOKIE, Skokie, Illinois, for Amicus Village of Skokie. Cristal Brisco, Corporation Counsel, CITY OF SOUTH BEND DEPARTMENT OF LAW, South Bend Indiana, for Amicus South Bend. Michael Rankin, City Attorney, CITY ATTORNEY'S OFFICE, Tucson, Arizona, for Amicus City of Tucson. Michael Jenkins, JENKINS & HOGIN, LLP, Manhattan Beach, California, for Amicus West Hollywood. Sidney S. Rosdeitcher, Aidan Synnott, Erin J. Morgan, Arianna Markel, Jared S. Stein, New York, New York; Linda A. Klein, President, AMERICAN BAR ASSOCIATION, Chicago, Illinois, for Amicus American Bar Association. Amy Briggs, John W. McGuinness, Sirena Castillo, Matthew Bottomly, Olufunmilayo Showole, Ketakee Kane, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, for Amici Muslim Justice League, Muslim Public Affairs Council, Islamic Circle of North America, Council on American-Islamic Relations, California, and Asian Americans Advancing Justice-Asian Law Caucus. Mark R. Herring, Attorney General, Stuart A. Raphael, Solicitor General, Trevor S. Cox, Deputy Solicitor General, Matthew

R. McGuire, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; Brian E. Frosh, Attorney General, Steven M. Sullivan, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Xavier Becerra, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California; Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon; George Jepson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut; Matthew P. Denn, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware; Lisa Madigan, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois; Tom Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa; Janet T. Mills, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine; Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts; Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico; Eric T. Schneiderman, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York; Josh Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina; Peter F. Kilmartin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island; Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont; Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington; Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amici Commonwealth of Virginia, States of Maryland, California, Connecticut, Delaware, Illinois, Iowa, Maine, Massachusetts, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia. Katherine K. Huang, Carlos A. Singer, HUANG YBARRA SINGER & MAY LLP, Los Angeles, California, for Amicus History Professors and Scholars. Charles Roth, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, Illinois; Robert N. Hochman, Nathaniel C. Love, SIDLEY AUSTIN LLP, Chicago, Illinois, for Amicus National Immigrant Justice Center. Gail Pendleton, ASISTA, Suffield, Connecticut, for Amicus ASISTA. Linda A. Seabrook, General Counsel, FUTURES WITHOUT VIOLENCE, Washington, D.C., for Amicus Futures Without Violence. Carmen Maria Rey, SANCTUARY FOR FAMILIES CENTER FOR BATTERED WOMEN'S LEGAL SERVICES, New York, New York, for Amicus Sanctuary for Families. Jennie Santos-Bourne, AMERICAN FOR IMMIGRANT JUSTICE, Miami, Florida, for Amicus Americans for Immigrant Justice. Amily K. McCool, NORTH CAROLINA COALITION AGAINST DOMESTIC VIOLENCE, Durham, North Carolina, for Amicus North Carolina Coalition Against Domestic Violence. Peter Karanjia, Jason Harrow, Washington, D.C., Victor A. Kovner, DAVIS WRIGHT TREMAINE LLP, New York, New York; Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, CONSTITUTIONAL ACCOUNTABILITY CENTER,

Washington, D.C.; Raymond H. Brescia, Associate Professor of Law, ALBANY LAW SCHOOL, Albany, New York, for Amicus 165 Members of Congress. Lynne Bernabei, Alan R. Kabat, BERNABEI & KABAT, PLLC, Washington, D.C.; Ted G. Dane, Thomas P. Clancy, MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Amici Lawyers' Committee for Civil Rights Under Law, Center for Reproductive Rights, Southern Coalition for Social Justice, National Center for Lesbian Rights, Judge David L. Bazelon Center for Mental Health Law, Chicago Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, and The Washington Lawyers' Committee for Civil Rights and Urban Affairs. Andrew J. Pincus, Paul W. Hughes, MAYER BROWN LLP, Washington, D.C., for Amicus Technology Companies. Robert S. Chang, Fred T. Korematsu Center for Law and Equality, SEATTLE UNIVERSITY SCHOOL OF LAW, Seattle, Washington; Eric Yamamoto, Fred T. Korematsu Professor of Law and Social Justice, UNIVERSITY OF HAWAII WILLIAM S. RICHARDSON SCHOOL OF LAW, Honolulu, Hawaii; Pratik A. Shah, Martine E. Cicconi, Washington, D.C., Jessica M. Weisel, Los Angeles, California, Robert A. Johnson, Alice Hsu, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York, for Amici The Fred T. Korematsu Center for Law and Equality, Jay Hirabayashi, Holly Yasui, Karen Korematsu, Civil Rights Organizations, and National Bar Associations of Color. Kevin P. Martin, Nicholas K. Mitrokostas, William B. Brady, Joshua M. Daniels, Alicia Rubio, Eileen L. Morrison, GOODWIN PROCTER LLP, Boston, Massachusetts, for Amici The Foundation for the Children of Iran and Iranian Alliances Across Borders. Nicole G. Berner, Claire Prestel, Deborah L. Smith, Leo Gertner, SERVICE EMPLOYEES INTERNATIONAL UNION, Washington, D.C.; Steve W. Berman, HAGENS BERMAN SOBOL SHAPIRO LLP, Seattle, Washington, for Amicus Service Employees International Union. Judith Rivlin, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, Washington, D.C., for Amicus American Federation of State, County and Municipal Employees. David J. Strom, Channing M. Cooper, AMERICAN FEDERATION OF TEACHERS, Washington, D.C., for American Federation of Teachers. Eli Glasser, Fort Lauderdale, Florida, Michael J. Gottlieb, Joshua Riley, Isra Bhatty, J. Wells Harrell, Cain Norris, Aaron E. Nathan, BOIES SCHILLER FLEXNER LLP, Washington, D.C., for Amicus Former Federal Immigration and Homeland Security Officials. Michael R. Scott, Amit D. Ranade, Lisa J. Chaiet Rahman, HILLIS CLARK MARTIN & PETERSON P.S., Seattle, Washington, for Amicus Episcopal Bishops. Joshua Matz, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP, Washington, D.C., for Amicus Constitutional Law Scholars. Scott L. Winkelman, Luke van Houwelingen, Avi Rutschman, Justin Kingsolver, CROWELL & MORING LLP, Washington, D.C., for Amici Tahirih Justice Center, The Asian Pacific Institute on Gender-Based Violence, Casa De Esperanza, and The National Domestic Violence Hotline. Jennifer K. Brown, Amanda Aikman, New York, New York, Bradley D. Wine, Sandeep N. Nandivada, McLean, Virginia, Marc A. Hearron, Washington, D.C., Purvi G. Patel, MORRISON & FOERSTER LLP, Los Angeles, California, for Amicus Interfaith Group of Religious and Interreligious Organizations. Christopher Mortweet, Menlo Park, California, Richard P. Bress, Elana

Nightingale Dawson, Alexandra P. Shechtel, LATHAM & WATKINS LLP, Washington, D.C., for Amicus Oxfam America, Inc.  Kristi L. Graunke, Gillian Gillers, SOUTHERN POVERTY LAW CENTER, Atlanta, Georgia; Richard B. Katskee, Eric Rothschild, Andrew L. Nellis, Kelly M. Percival, Bradley Girard, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amici Members of the Clergy, The Riverside Church in the City of New York, Americans United for Separation of Church and State, Bend the Arc, A Jewish Partnership for Justice, and The Southern Poverty Law Center.  Catherine Y. Kim, UNIVERSITY OF NORTH CAROLINA, Chapel Hill, North Carolina; Judith Resnik, YALE LAW SCHOOL, New Haven, Connecticut; Fred A. Rowley, Jr., John L. Schwab, Los Angeles, California, Aaron D. Pennekamp, MUNGER, TOLLES & OLSON, LLP, San Francisco, California, for Amicus Constitutional Law Professors.  Marc D. Stern, AMERICAN JEWISH COMMITTEE, New York, New York; Adam S. Lurie, Vijaya R. Palaniswamy, Caitlin K. Potratz, Sean M. Solomon, LINKLATERS LLP, Washington, D.C., for Amicus The American Jewish Committee.  Daniel Braun, Peter Jaffe, Lauren Kaplin, Washington, D.C., David Y. Livshiz, Karen Wiswall, FRESHFIELDS BRUCKHAUS DERINGER US LLP, New York, New York, for Amicus Cato Institute.  Farhana Khera, Johnathan J. Smith, Aziz Huq, MUSLIM ADVOCATES, Oakland, California; Robert A. DeRise, Washington, D.C., Anton Ware, ARNOLD & PORTER KAYE SCHOLER LLP, San Francisco, California, for Amicus Muslim Rights, Professional and Public Health Organizations.  Avi Gesser, Kelsey Clark, Joseph Garmon, Alex Messiter, Jennifer Prevete, Ilan Stein, DAVIS POLK & WARDWELL LLP,  New York, New York, for Amici The Association of Art Museum Directors, The American Alliance of Museums, The College Art Association, and 94 Art Museums.  Mary Kelly Persyn, PERSYN LAW & POLICY, San Francisco, California, for Amicus American Professional Society on the Abuse of Children.  Alina Das, WASHINGTON SQUARE LEGAL SERVICES, New York, New York, for Amici Advocates for Human Rights, Asian Law Alliance, Asian Pacific American Network of Oregon, CASA, Community Refugee & Immigration Services, Immigrant Law Center of Minnesota, Immigrant Rights Clinic of Washington Square Legal Services, Inc., Integrated Refugee and Immigrant Services, and The Southeast Asia Resource Action Center.  Michael B. Roberts, Karen Lee Lust, Kristin C. Davis, REED SMITH LLP, Washington, D.C.; Sirine Shebaya, Washington, D.C.; Mirriam Seddiq, SEDDIQ LAW FIRM, Upper Marlboro, Maryland, for Amicus Airport Attorneys Coalition.  Yolanda C. Rondon, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, Washington, D.C., for Amicus American-Arab Anti-Discrimination Committee.  Gare A. Smith, Michael B. Keating, Kristyn M. DeFilipp, Christopher E. Hart, Daniel L. McFadden, FOLEY HOAG LLP, Washington, D.C., for Amicus Massachusetts Technology Leadership Council, Inc.  Tina R. Matsuoka, Navdeep Singh, Meredith S.H. Higashi, Rachana Pathak, Albert Giang, NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION, Washington, D.C.; Joshua David Rogaczewski, James W. Kim, Philip J. Levine, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Amicus National Asian Pacific American Bar Association.  Fatma E. Marouf, Professor of Law, Director, Immigrant Rights Clinic,

10

TEXAS A&M UNIVERSITY SCHOOL OF LAW, Fort Worth, Texas, for Amicus Immigration Law Scholars and Clinicians on Statutory Claims. Manvin S. Mayell, Gregory J. Wallance, Steven G. Tepper, Jessica Heller, Colleen Lima, G. Alex Sinha, Thomas A. Bird, ARNOLD & PORTER KAYE SCHOLER LLP, New York, New York, for Amici Medical Institutions, Advocacy Organizations, and Individual Physicians. Karla McKanders, Civil Rights Clinic, Darin Johnson, Visiting Professor, HOWARD UNIVERSITY SCHOOL OF LAW, Washington, D.C., for Amicus University Professors and Higher Education Associations.

---

GREGORY, Chief Judge[1]:

The question for this Court, distilled to its essential form, is whether the Constitution, as the Supreme Court declared in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120 (1866), remains "a law for rulers and people, equally in war and in peace." And if so, whether it protects Plaintiffs' right to challenge an Executive Order that in text speaks with vague words of national security, but in context drips with religious intolerance, animus, and discrimination. Surely the Establishment Clause of the First Amendment yet stands as an untiring sentinel for the protection of one of our most cherished founding principles—that government shall not establish any religious orthodoxy, or favor or disfavor one religion over another. Congress granted the President broad power to deny entry to aliens, but that power is not absolute. It cannot go unchecked when, as here, the President wields it through an executive edict that stands to cause irreparable harm to individuals across this nation. Therefore, for the reasons that follow, we affirm in substantial part the district court's issuance of a nationwide preliminary injunction as to Section 2(c) of the challenged Executive Order.

---

[1] Judges Motz, King, Wynn, Diaz, Floyd, and Harris join this opinion in full, Judge Traxler concurs in the judgment, and Judges Keenan and Thacker concur in substantial part and concur in the judgment.

I.

A.

In the early evening of January 27, 2017—seven days after taking the oath of office—President Donald J. Trump signed Executive Order 13769, "Protecting the Nation From Foreign Terrorist Entry Into the United States" ("EO-1" or "First Executive Order"), 82 Fed. Reg. 8977 (Jan. 27, 2017). Referencing the past and present failings of the visa-issuance process, the First Executive Order had the stated purpose of "protect[ing] the American people from terrorist attacks by foreign nationals." EO-1, Preamble. To protect Americans, EO-1 explained, the United States must ensure that it does not admit foreign nationals who "bear hostile attitudes" toward our nation and our Constitution, who would "place violent ideologies over American law," or who "engage in acts of bigotry or hatred" (such as "'honor' killings"). *Id.* § 1.

To that end, the President invoked his authority under 8 U.S.C. § 1182(f) and immediately suspended for ninety days the immigrant and nonimmigrant entry of foreign aliens from seven predominantly Muslim countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.[2] *See* EO-1, § 3(c). During the ninety-day period, the Secretary of Homeland Security, Secretary of State, and Director of National Intelligence were to "immediately conduct a review to determine the information needed from any country" to assess whether individuals seeking entry from those countries posed a national security

---

[2] According to the Pew Research Center, Iraq's population is 99% Muslim, Iran's is 99.5%, Libya's is 96.6%, Sudan's is 90.7%, Somalia's is 99.8%, Syria's is 92.8%, and Yemen's is 99.1%. *See* Pew Res. Ctr., *The Global Religious Landscape* 45–50 (2012).

threat. Those cabinet officers were to deliver a series of reports updating the President as to that review and the implementation of EO-1. *See id.* § 3(a)–(b), (h).

The First Executive Order also placed several constraints on the admission of refugees into the country. It reduced the number of refugees to be admitted in fiscal year 2017 from 110,000 to 50,000 and barred indefinitely the admission of Syrian refugees. *Id.* § 5(c)–(d). It further ordered the Secretary of State to suspend for 120 days the United States Refugee Admissions Program ("USRAP"). *Id.* § 5(a). Upon resumption of USRAP, EO-1 directed the Secretary of State to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b).

Individuals, organizations, and states across the nation challenged the First Executive Order in federal court. A judge in the Western District of Washington granted a Temporary Restraining Order ("TRO"), enjoining enforcement nationwide of Sections 3(c), 5(a)–(c), and 5(e). *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017). The Ninth Circuit subsequently denied the Government's request to stay the TRO pending appeal and declined to "rewrite" EO-1 by narrowing the TRO's scope, noting that the "political branches are far better equipped" for that task. *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) (per curiam). At the Ninth Circuit's invitation, and in an effort to avoid further litigation concerning the First Executive Order, the President enacted a second order ("EO-2" or "Second Executive Order") on March 6, 2017. Exec. Order No. 13780, "Protecting the Nation

14

from Foreign Terrorist Entry Into the United States," 82 Fed. Reg. 13209 (Mar. 6, 2017). The Second Executive Order revoked and replaced the First Executive Order. *Id.* § 1(i).

Section 2(c) of EO-2—"Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period"—is at the heart of the dispute in this case. This section reinstated the ninety-day suspension of entry for nationals from six countries, eliminating Iraq from the list, but retaining Iran, Libya, Somalia, Sudan, Syria, and Yemen (the "Designated Countries"). EO-2, § 2(c). The President, again invoking 8 U.S.C. § 1182(f) and also citing 8 U.S.C. § 1185(a), declared that the "unrestricted entry" of nationals from these countries "would be detrimental to the interests of the United States." *Id.*[3]

The Second Executive Order, unlike its predecessor, states that nationals from the Designated Countries warrant "additional scrutiny" because "the conditions in these

---

[3] Section 2(c) reads in full:

> To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

15

countries present heightened threats." *Id.* § 1(d). In justifying the selection of the Designated Countries, EO-2 explains, "Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones."[4] *Id.* The Second Executive Order states that "until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high." *Id.* § 1(f).

The Second Executive Order also provides brief descriptions of the conditions in each of the Designated Countries. It notes, for instance, that "Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas[, and] . . . elements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country." *Id.* § 1(e)(iv). The Second Executive Order further states that "[s]ince 2001, hundreds of persons born abroad have

---

[4] As the Government notes, nationals from these six countries are ineligible for the Visa Waiver Program, which currently allows nationals of thirty-eight countries seeking temporary admission to the United States for tourism or certain business purposes to enter without a visa. *See* 8 U.S.C. § 1187(a). The program excludes nationals of or aliens who have recently visited Iraq or Syria and nationals of or recent visitors to countries designated as state sponsors of terror (Iran, Sudan, and Syria). *See* 8 U.S.C. § 1187(a)(12); *see* U.S. Dep't of State, *U.S. Visa Waiver Program* (Apr. 6, 2016), https://www.dhs.gov/visa-waiver-program (saved as ECF opinion attachment). It also excludes recent visitors to Libya, Somalia, and Yemen. U.S. Dep't of Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program (saved as ECF opinion attachment). Thus, nationals from the six countries identified in Section 2(c), like nationals from the vast majority of countries, must undergo the individualized vetting of the regular visa process.

been convicted of terrorism-related crimes in the United States." *Id.* § 1(h). It provides the following examples: two Iraqi refugees who were convicted of terrorism-related offenses in January 2013, and a naturalized citizen who came to this country as a child refugee from Somalia and who was sentenced for terrorism-related offenses in October 2014. *Id.* The Second Executive Order does not include any examples of individuals from Iran, Libya, Sudan, Syria, or Yemen committing terrorism-related offenses in the United States.

The Second Executive Order clarifies that the suspension of entry applies to foreign nationals who (1) are outside the United States on its effective date of March 16, 2017, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of EO-1—January 27, 2017. *Id.* § 3(a). Section 2(c) does not bar entry of lawful permanent residents, dual citizens traveling under a passport issued by a non-banned country, asylees, or refugees already admitted to the United States. *Id.* § 3(b). The Second Executive Order also includes a provision that permits consular officers, in their discretion, to issue waivers on a case-by-case basis to individuals barred from entering the United States. *Id.* § 3(c).

The Second Executive Order retains some—but not all—of the First Executive Order's refugee provisions. It again suspends USRAP for 120 days and decreases the number of refugee admissions for fiscal year 2017 by more than half, *id.* § 6(a), but it does not include the indefinite ban on Syrian refugees. The Second Executive Order also eliminates the provision contained in EO-1 that mandated preferential treatment of religious minorities seeking refugee status. It explains that this provision "applied to

17

refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion." *Id.* § 1(b)(iv). It further explains that EO-1 was "not motivated by animus toward any religion," but rather was designed to protect religious minorities. *Id.*

Shortly before the President signed EO-2, an unclassified, internal report from the Department of Homeland Security ("DHS") Office of Intelligence and Analysis dated March 2017 was released to the public. *See* J.A. 425–31. The report found that most foreign-born, U.S.-based violent extremists became radicalized many years after entering the United States, and concluded that increased screening and vetting was therefore unlikely to significantly reduce terrorism-related activity in the United States. J.A. 426. According to a news article, a separate DHS report indicated that citizenship in any country is likely an unreliable indicator of whether a particular individual poses a terrorist threat. J.A. 424. In a declaration considered by the district court, ten former national security, foreign policy, and intelligence officials who previously served in the White House, State Department, DHS, and Central Intelligence Agency—four of whom were aware of intelligence related to terrorist threats as of January 20, 2017—advised that "[t]here is no national security purpose for a total ban on entry for aliens from the [Designated Countries]." J.A. 91.

### B.

The First and Second Executive Orders were issued against a backdrop of public statements by the President and his advisors and representatives at different points in

18

time, both before and after the election and President Trump's assumption of office. We now recount certain of those statements.

On December 7, 2015, then-candidate Trump published a "Statement on Preventing Muslim Immigration" on his campaign website, which proposed "a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." J.A. 346.[5] That same day, he

---

[5] Trump's "Statement on Preventing Muslim Immigration" reads in full:

> (New York, NY) December 7th, 2015, -- Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing "25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad" and 51% of those polled "agreed that Muslims in America should have the choice of being governed according to Shariah." Shariah authorizes such atrocities as murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.

> Mr. Trump stated, "Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of the horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect of human life. If I win the election for President, we are going to Make America Great Again. –*Donald J. Trump*

J.A. 346. The district court noted that, as of February 12, 2017, this statement remained on Trump's campaign website. *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, 2017 WL 1018235, at *4 (D. Md. Mar. 16, 2017). The statement was subsequently (Continued)

19

highlighted the statement on Twitter, "Just put out a very important policy statement on the extraordinary influx of hatred & danger coming into our country. We must be vigilant!" J.A. 470. And Trump read from the statement at a campaign rally in Mount Pleasant, South Carolina, that evening, where he remarked, "I have friends that are Muslims. They are great people—but they know we have a problem." J.A. 472.

In an interview with CNN on March 9, 2016, Trump professed, "I think Islam hates us," J.A. 516, and "[W]e can't allow people coming into the country who have this hatred," J.A. 517. Katrina Pierson, a Trump spokeswoman, told CNN that "[w]e've allowed this propaganda to spread all through the country that [Islam] is a religion of peace." J.A. 518. In a March 22, 2016 interview with Fox Business television, Trump reiterated his call for a ban on Muslim immigration, claiming that this proposed ban had received "tremendous support" and stating, "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.A. 522. "You need surveillance," Trump explained, and "you have to deal with the mosques whether you like it or not." J.A. 522.

Candidate Trump later recharacterized his call to ban Muslims as a ban on nationals from certain countries or territories. On July 17, 2016, when asked about a tweet that said, "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional," then-candidate Trump responded, "So you call it territories. OK?

---

removed from the campaign website shortly before the May 8, 2017 oral argument in this case.

We're gonna do territories." J.A. 798. He echoed this statement a week later in an interview with NBC's Meet the Press. When asked whether he had "pulled back" on his "Muslim ban," Trump replied, "We must immediately suspend immigration from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place." J.A. 480. Trump added, "I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories. People were so upset when I used the word Muslim. Oh, you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." J.A. 481. Trump continued, "Our Constitution is great. . . . Now, we have a religious, you know, everybody wants to be protected. And that's great. And that's the wonderful part of our Constitution. I view it differently." J.A. 481.

On December 19, 2016, following a terrorist attack in Germany, President-Elect Trump lamented the attack on people who were "prepared to celebrate the Christmas holiday" by "ISIS and other Islamic terrorists [who] continually slaughter Christians in their communities and places of worship as part of their global jihad." J.A. 506. Two days later, when asked whether recent violence in Europe had affected his plans to bar Muslims from immigrating to the United States, President-Elect Trump commented, "You know my plans. All along, I've been proven to be right. 100% correct. What's happening is disgraceful." J.A. 506.

The President gave an interview to the Christian Broadcasting News on January 27, 2017, the same day he issued the First Executive Order. In that interview, the President explained that EO-1 would give preference to Christian refugees: "They've

21

been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . ." J.A. 461. He found that situation "very, very unfair." J.A. 461. Just before signing EO-1, President Trump stated, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.' We all know what that means." J.A. 403. The following day, former New York City Mayor and presidential advisor Rudolph Giuliani appeared on Fox News and was asked, "How did the President decide the seven countries?" J.A. 508. Giuliani answered, "I'll tell you the whole history of it. So when [the President] first announced it, he said 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" J.A. 508. Giuliani said he assembled a group of "expert lawyers" that "focused on, instead of religion, danger—the areas of the world that create danger for us. . . . It's based on places where there [is] substantial evidence that people are sending terrorists into our country." J.A. 508–09.

In response to the Ninth Circuit's decision not to stay enforcement of the nationwide injunction, the President stated at a news conference on February 16, 2017, that he intended to issue a new executive order tailored to that court's decision—despite his belief that the First Executive Order was lawful. *See* J.A. 334. In discussing the Ninth Circuit's decision and his "[e]xtreme vetting" proposal, the President stated, "I got elected on defense of our country. I keep my campaign promises, and our citizens will be very happy when they see the result." J.A. 352. A few days later Stephen Miller, Senior Policy Advisor to the President, explained that the new order would reflect "mostly minor

technical differences," emphasizing that it would produce the "same basic policy outcome for the country." J.A. 339. White House Press Secretary Sean Spicer stated, "The principles of the executive order remain the same." J.A. 379. And President Trump, in a speech at a rally in Nashville, Tennessee, described EO-2 as "a watered down version of the first order." Appellees' Br. 7 (citing Katie Reilly, *Read President Trump's Response to the Travel Ban Ruling: It 'Makes Us Look Weak,'* Time (Mar. 16, 2017), http://time.com/4703622/president-trump-speech-transcript-travel-ban-ruling/ (saved as ECF opinion attachment)).

At the March 6, 2017 press conference announcing the Second Executive Order, Secretary of State Rex Tillerson said, "This executive order is a vital measure for strengthening our national security." J.A. 376. That same day, Attorney General Jefferson Sessions and Secretary of Homeland Security John Kelly submitted a letter to the President detailing how weaknesses in our immigration system compromise our nation's security and recommending a temporary pause on entry of nationals from the Designated Countries. Appellants' Br. 8 n.3 (citing Letter from Jefferson B. Sessions III, Attorney Gen., and John Francis Kelly, Sec'y of Homeland Sec., to President Donald J. Trump (Mar. 6, 2017)). In a CNN interview the next day, Secretary Kelly specified that there are probably "13 or 14 countries" that have "questionable vetting procedures," not all of which are Muslim countries or in the Middle East. J.A. 411. He noted that there are "51 overwhelmingly Muslim countries" and rejected the characterization of EO-2 as a "Muslim ban." J.A. 412.

23

C.

This action was brought by six individuals, all American citizens or lawful permanent residents who have at least one family member seeking entry into the United States from one of the Designated Countries, and three organizations that serve or represent Muslim clients or members.

Four of the individual Plaintiffs—John Doe #1, Jane Doe #2, John Doe #3, and Paul Harrison—allege that EO-2 would impact their immediate family members' ability to obtain visas. J.A. 213–14, 245–52, 305, 308–09, 318–19. Collectively, they claim that Section 2(c) of EO-2, the provision that suspends entry for certain foreign nationals for ninety days, will prolong their separation from their loved ones. *See, e.g.*, J.A. 306. John Doe #1 has applied for a spousal immigration visa so that his wife, an Iranian national, can join him in the United States; the application was approved, and she is currently awaiting her visa interview. J.A. 305. Jane Doe #2, a college student in the United States, has a pending I-130 visa application on behalf of her sister, a Syrian refugee living in Saudi Arabia. J.A. 316, 318–19. Since the filing of the operative Complaint on March 10, 2017, two of Plaintiffs' family members have obtained immigrant visas. The Government informed the district court that Paul Harrison's fiancé secured and collected a visa on March 15, 2017, the day before EO-2 was to take effect. Appellants' Br. 19 n.6 (citing J.A. 711–12, 715). Doe #3's wife secured an immigrant visa on May 1, 2017, and Plaintiffs anticipate that she will arrive in the United States within the next eight weeks. J.A. 819. The remaining two individual Plaintiffs—Muhammed Meteab and Ibrahim

Ahmed Mohomed—allege that EO-2 would delay or deny the admission of their family members as refugees.  J.A. 214, 249–50, 252, 313–14, 321–22.

Beyond claiming injury to their family relationships, several of the individual Plaintiffs allege that the anti-Muslim message animating EO-2 has caused them feelings of disparagement and exclusion.  Doe #1, a scientist who obtained permanent resident status through the National Interest Waiver program for people with extraordinary abilities, references these "anti-Muslim views," worries about his safety in this country, and contemplates whether he should return to Iran to be with his wife.  J.A. 304, 306. Plaintiff Meteab relays that the "anti-Muslim sentiment" motivating EO-2 had led him to feel "isolated and disparaged in [his] community."  J.A. 314.  He explains that when he is in public with his wife, who wears a hijab, he "sense[s] a lot of hostility from people" and recounts that his nieces, who both wear a hijab, "say that people make mean comments and stare at them for being Muslim."  J.A. 314.  A classmate "pulled the hijab off" one of his nieces in class.  J.A. 314.

Two of the organizational Plaintiffs, the International Refugee Assistance Project and the Hebrew Immigrant Aid Society, primarily assist refugees with the resettlement process.  *See* J.A. 210–13, 235–43.  These organizations claim that they have already diverted significant resources to dealing with EO-2's fallout, and that they will suffer direct financial injury from the anticipated reduction in refugee cases.  J.A. 238, 243, 276–77.  They further claim that their clients, who are located in the United States and the Middle East, will be injured by the delayed reunification with their loved ones.  J.A. 268, 282–83.  The final Plaintiff, the Middle East Studies Association, an umbrella

25

organization dedicated to fostering awareness of the Middle East, asserts that EO-2 will, among other injuries, reduce attendance at its annual conference and cause the organization to lose $18,000 in registration fees. J.A. 243–45, 300–03.

D.

Plaintiffs initiated this suit on February 7, 2017, seeking declaratory and injunctive relief against enforcement of the First Executive Order. Plaintiffs claimed that EO-1 violated the Establishment Clause of the First Amendment; the equal protection component of the Due Process Clause of the Fifth Amendment; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537 (2012); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (2012); the Refugee Act, 8 U.S.C. §§ 1521–24 (2012); and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (2012). They named as Defendants the President, DHS, the Department of State, the Office of the Director of National Intelligence, the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence.

On March 10, 2017, four days after the President issued EO-2, Plaintiffs filed the operative Complaint, along with a motion for a TRO and/or preliminary injunction. Plaintiffs sought to enjoin implementation of EO-2 in its entirety, prior to its effective date. In quick succession, the Government responded to the motion, Plaintiffs filed a reply, and the parties appeared for a hearing.

The district court construed the motion as a request for a preliminary injunction, and on March 16, 2017, it granted in part and denied in part that motion. *Int'l Refugee Assistance Project*, 2017 WL 1018235, at *1. In its Memorandum Opinion, the district

court first found that three individual Plaintiffs (Doe #1, Doe #2, and Doe #3) had standing to bring the claim that Section 2(c) violates the INA's provision prohibiting discrimination on the basis of nationality in the issuance of immigrant visas, 8 U.S.C. § 1152(a)(1)(A). *Id.* at *6. The court also determined that at least three individual Plaintiffs (Meteab, Doe #1, and Doe #3) had standing to pursue the claim that EO-2 violates the Establishment Clause. *Id.* at *7.

After finding Plaintiffs' claims justiciable, the district court turned to the merits of their claims. The court determined that Plaintiffs are likely to succeed only in part on the merits of their INA claim. *Id.* at *10. It found that Section 2(c) likely violates § 1152(a)(1)(A), but only as to its effective bar on the issuance of *immigrant* visas, because § 1152(a)(1)(A) explicitly applies solely to immigrant visas. To the extent that Section 2(c) prohibits the issuance of nonimmigrant visas and bars entry on the basis of nationality, the court found that it was not likely to violate § 1152(a)(1)(A). *Id.* The court did not discuss this claim in addressing the remaining preliminary injunction factors.

The district court next found that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim. *Id.* at *16. It then considered the remaining preliminary injunction requirements, but only as to the Establishment Clause claim: it found that Plaintiffs would suffer irreparable injury if EO-2 were to take effect, that the balance of the equities weighed in Plaintiffs' favor, and that a preliminary injunction was in the public interest. *Id.* at *17. The district court concluded that a preliminary injunction was therefore proper as to Section 2(c) of EO-2 because Plaintiffs' claims

27

centered primarily on that provision's suspension of entry. The court accordingly issued a nationwide injunction barring enforcement of Section 2(c). *Id.* at *18.

Defendants timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II.

Because the district court enjoined Section 2(c) in its entirety based solely on Plaintiffs' Establishment Clause claim, we need not reach the merits of Plaintiffs' statutory claim under the INA.

In Section 2(c) of EO-2, the President suspended the entry of nationals from the six Designated Countries, pursuant to his power to exclude aliens under Section 212(f) of the INA, codified at 8 U.S.C. § 1182(f), and Section 215(a)(1) of the INA, codified at 8 U.S.C. § 1185(a)(1). The Government contends that Section 2(c)'s suspension of entry falls squarely within the "expansive authority" granted to the President by § 1182(f)[6] and

---

[6] Section 1182(f), entitled "Suspension of entry or imposition of restrictions by President," provides in pertinent part that

> [w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

§ 1185(a)(1).[7]  Appellants' Br. 28.  Plaintiffs, on the other hand, argue that Section 2(c) violates a separate provision of the INA, Section 202(a)(1)(A), codified at 8 U.S.C. § 1152(a)(1)(A), prohibiting discrimination on the basis of nationality "in the issuance of immigrant visas."[8]

The district court determined that Plaintiffs are likely to succeed on their claim under § 1152(a)(1)(A) only in limited part.  Because Section 2(c) has the practical effect of halting the issuance of immigrant visas on the basis of nationality, the court reasoned, it is inconsistent with § 1152(a)(1)(A).  To that extent—and contrary to the Government's position—the court found that Presidential authority under § 1182(f) and § 1185(a)(1) is cabined by the INA's prohibition on nationality-based discrimination in visa issuance.  But the district court's ruling was limited in two important respects.  First, because § 1152(a)(1)(A) applies only to the issuance of *immigrant* visas, the district court discerned no conflict between that provision and the application of Section 2(c) to persons seeking *non-immigrant* visas.  And second, the district court found that because § 1152(a)(1)(A) governs the issuance of visas rather than actual entry into the United

---

[7] Section 1185(a)(1) provides that "[u]nless otherwise ordered by the President, it shall be unlawful [] for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe . . . ." 8 U.S.C. § 1185(a)(1).

[8] Section 1152(a)(1)(A) provides, with certain exceptions not relevant here, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  8 U.S.C. § 1152(a)(1)(A).

States, it poses no obstacle to enforcement of Section 2(c)'s nationality-based entry bar. The district court summarized as follows:

> Plaintiffs have shown a likelihood of success on the merits of their claim that the Second Executive Order violates § 1152(a), but only as to the issuance of immigrant visas . . . . They have not shown a likelihood of success on the merits of the claim that § 1152(a) prevents the President from barring entry to the United States pursuant to § 1182(f), or the issuance of non-immigrant visas, on the basis of nationality.

*Int'l Refugee Assistance Project*, 2017 WL 1018235, at *10.

This narrow statutory ruling is not the basis for the district court's broad preliminary injunction enjoining Section 2(c) of EO-2 in all of its applications. Rather, Plaintiffs' constitutional claim, the district court determined, was what justified a nationwide preliminary injunction against any enforcement of Section 2(c). If we were to disagree with the district court that § 1152(a)(1)(A) partially restrains the President's authority under § 1182(f) and § 1185(a)(1), then we would be obliged to consider Plaintiffs' alternative Establishment Clause claim. And, importantly, even if we were to *agree* with the district court's statutory analysis, we still would be faced with the question of whether the scope of the preliminary injunction, which goes beyond the issuance of immigrant visas governed by § 1152(a)(1)(A) to enjoin Section 2(c) in its entirety, can be sustained on the basis of Plaintiffs' Establishment Clause claim.

In light of this posture, we need not address the merits of the district court's statutory ruling. We recognize, of course, the doctrine of constitutional avoidance, which counsels against the issuance of "unnecessary constitutional rulings." *Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) (per curiam). But as we have explained, the

district court's constitutional ruling was necessary to its decision, and review of that ruling is necessary to ours. Accordingly, we decline to reach the merits of Plaintiffs' claim under § 1152(a)(1)(A). The breadth of the preliminary injunction issued by the district court may be justified if and only if Plaintiffs can satisfy the requirements for a preliminary injunction based on their Establishment Clause claim. We therefore turn to consider that claim.

## III.

The Government first asks us to reverse the preliminary injunction on the grounds that Plaintiffs' Establishment Clause claim is non-justiciable. In its view, Plaintiffs have not satisfied the foundational Article III requirements of standing and ripeness, and in any event, the doctrine of consular nonreviewability bars judicial review of their claim. We consider these threshold challenges in turn.

## A.

The district court found that at least three individual Plaintiffs—Muhammed Meteab, Doe #1, and Doe #3—have standing to assert the claim that EO-2 violates the Establishment Clause. We review this legal determination de novo. *Peterson v. Nat'l Telecomms. & Info. Admin.*, 478 F.3d 626, 631 n.2 (4th Cir. 2007).

The Constitution's gatekeeping requirement that federal courts may only adjudicate "Cases" or "Controversies," U.S. Const. art. III, § 2, obligates courts to determine whether litigants have standing to bring suit, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). To demonstrate standing and thus invoke federal

31

jurisdiction, a party must establish that "(1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision." *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The parties' core dispute is whether Plaintiffs have suffered a cognizable injury. To establish a cognizable injury, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560); *see also Beck v. McDonald*, 848 F.3d 262, 270–71 (4th Cir. 2017).

In evaluating standing, "the court must be careful not to decide the question on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)); *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd by District of Columbia v. Heller*, 554 U.S. 570 (2008) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."). This means, for purposes of standing, we must assume that Section 2(c) violates the First Amendment's prohibition against governmental "establishment of religion."

"Standing in Establishment Clause cases may be shown in various ways," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 129 (2011), though as oft-repeated,

"the concept of injury for standing purposes is particularly elusive" in this context, *Suhre v. Haywood County*, 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991)). Nevertheless, the Supreme Court and this Circuit have developed a set of rules that guide our review.

To establish standing for an Establishment Clause claim, a plaintiff must have "*personal contact* with the *alleged* establishment of religion." *Id.* at 1086 (emphasis added). A "mere abstract objection to unconstitutional conduct is not sufficient to confer standing." *Id.* The Supreme Court has reinforced this principle in recent years: "plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion." *Winn*, 563 U.S. at 129. This "direct harm" can resemble injuries in other contexts. Merchants who suffered economic injury, for instance, had standing to challenge Sunday closing laws as violative of the Establishment Clause. *McGowan v. Maryland*, 366 U.S. 420, 430–31 (1961); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (noting that, in *McGowan*, appellants who were "fined $5 plus costs had standing"). But because Establishment Clause violations seldom lead to "physical injury or pecuniary loss," the standing inquiry has been adapted to also include "the kind of injuries Establishment Clause plaintiffs" are more "likely to suffer." *Suhre*, 131 F.3d at 1086. As such, "noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable." *Id.* "Feelings of marginalization and exclusion are cognizable forms of injury," we recently explained, "particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a

33

particular religion 'that they are *outsiders*, not full members of the political community.'"

*Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (quoting

*McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005)).

Doe #1—who is a lawful permanent resident of the United States, Muslim, and originally from Iran—filed a visa application on behalf of his wife, an Iranian national. Her application has been approved, and she is currently awaiting her consular interview. J.A. 305. If it took effect, EO-2 would bar the entry of Doe #1's wife. Doe #1 explains that because EO-2 bars his wife's entry, it "forces [him] to choose between [his] career and being with [his] wife," and he is unsure "whether to keep working here" as a scientist or to return to Iran. J.A. 306. Doe #1 adds that EO-2 has "created significant fear, anxiety, and insecurity" for him and his wife. He highlights the "statements that have been made about banning Muslims from entering, and the broader context," and states, "I worry that I may not be safe in this country." J.A. 306; *see also* J.A. 314 (Plaintiff Meteab describing how the "anti-Muslim sentiment motivating" EO-2 has led him to feel "isolated and disparaged in [his] community").

Doe #1 has therefore asserted two distinct injuries stemming from his "personal contact" with the alleged establishment of religion—EO-2. *Suhre*, 131 F.3d at 1086. First, EO-2 will bar his wife's entry into the United States and prolong their separation. And second, EO-2 sends a state-sanctioned message condemning his religion and causing him to feel excluded and marginalized in his community.

We begin with Doe #1's allegation that EO-2 will prolong his separation from his wife. This Court has found that standing can be premised on a "threatened rather than

34

actual injury," *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc), as long as this "threat of injury [is] both real and immediate," *Beck*, 848 F.3d at 277 (quoting *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012)). The purpose of the longstanding "imminence" requirement, which is admittedly "a somewhat elastic concept," is "to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'" *Lujan*, 504 U.S. at 564 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

The Government does not contest that, in some circumstances, the prolonged separation of family members can constitute an injury-in-fact. The Government instead argues that Doe #1's claimed injury is speculative and non-imminent, Appellants' Br. 19, such that it is not "legally and judicially cognizable." *Id.* at 18 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). According to the Government, Doe #1 has failed to show that his threatened injury—prolonged separation from his wife—is imminent. It asserts that Doe #1 has offered no reason to believe that Section 2(c)'s "short pause" on entry "will delay the issuance of [his wife's] visa." Appellants' Br. 19.

But this ignores that Section 2(c) appears to operate by design to delay the issuance of visas to foreign nationals. Section 2(c)'s "short pause" on entry effectively halts the issuance of visas for ninety days—as the Government acknowledges, it "would be pointless to issue a visa to an alien who the consular officer already knows is barred from entering the country." Appellants' Br. 32; *see also* Brief for Cato Institute as Amicus Curiae Supporting Appellees 25–28, ECF No. 185 (arguing that Section 2(c) operates as a ban on visa issuance). The Government also cites 8 U.S.C. § 1201(g),

which provides in relevant part that "[n]o visa or other documentation shall be issued to an alien if [] it appears to the consular officer . . . that such alien is ineligible to receive a visa or other documentation under section 1182 of this title." *See also* U.S. Dep't of State, 9 *Foreign Affairs Manual* 302.14–3(B) (2016). A ninety-day pause on issuing visas would seem to necessarily inject at least some delay into any pending application's timeline. And in fact, the Government suggests that pending visa applications might not be delayed, but *denied. See* Appellants' Br. 33 (explaining that "when an alien subject to the Order is denied an immigrant visa, . . . he is being denied a visa because he has been validly barred from entering the country"). A denial on such grounds would mean that once the entry suspension period concludes, an alien would have to restart *from the beginning* the lengthy visa application process. What is more, Section 2(c) is designed to "reduce investigative burdens on relevant agencies" to facilitate *worldwide* review of the current procedures for "screening and vetting of foreign nationals." Logically, dedicating time and resources to a global review process will further slow the adjudication of pending applications.

Here, Doe #1 has a pending visa application on behalf of his wife, seeking her admission to the United States from one of the Designated Countries. Prior to EO-2's issuance, Doe #1 and his wife were nearing the end of the lengthy immigrant visa process, as they were waiting for her consular interview to be scheduled. J.A. 305. They had already submitted a petition, received approval of that petition, begun National Visa Center ("NVC") Processing, submitted the visa application form, collected and submitted the requisite financial and supporting documentation to NVC, and paid the appropriate

36

fees.    J.A. 305; *see* U.S. Dep't of State, *The Immigrant Visa Process*, https://travel.state.gov/content/visas/en/immigrate/immigrant-process.html  (last visited May 14, 2017) (saved as ECF opinion attachment) (diagramming steps of the immigrant-visa application process).  If Section 2(c) were in force—restricting the issuance of visas to nationals in the Designated Countries for ninety days and initiating the worldwide review of existing visa standards—we find a "real and immediate" threat that it would prolong Doe #1's separation from his wife, either by delaying the issuance of her visa or denying her visa and forcing her to restart the application process.  *Beck*, 848 F.3d at 277 (quoting *Lebron*, 670 F.3d at 560).

This prolonged family separation is not, as the Government asserts, a remote or speculative possibility.   Unlike threatened injuries that rest on hypothetical actions a plaintiff may take "some day," *Lujan*, 504 U.S. at 564, or on a "highly attenuated chain of possibilities," *Clapper*, 133 S. Ct. at 1148, the threatened injury here is imminent, sufficiently "real" and concrete, *Spokeo*, 136 S. Ct. at 1549, and would harm Doe #1 in a personal and "particularized" way, *id.* at 1548.  The progression of Doe #3's wife's visa application illustrates this.  Doe #3's wife received a visa on May 1, 2017, while Section 2(c) was enjoined.  If Section 2(c) had been in effect, she would have been ineligible to receive a visa until after the expiration of the ninety-day period.  *See* 8 U.S.C. § 1201(g). Put simply, Section 2(c) would have delayed the issuance of Doe #3's wife's visa.  This cuts directly against the Government's assertion that it is uncertain whether or how Section 2(c) would affect visa applicants.  Clearly Section 2(c) will delay and disrupt pending visa applications.

Even more, flowing from EO-2 is the alleged state-sanctioned message that foreign-born Muslims, a group to which Doe #1 belongs, are "outsiders, not full members of the political community." *Moss*, 683 F.3d at 607 (quoting *McCreary*, 545 U.S. at 860).[9] Doe #1 explains how the Second Executive Order has caused him to fear for his personal safety in this country and wonder whether he should give up his career in the United States and return to Iran to be with his wife. J.A. 306. This harm is consistent with the "[f]eelings of marginalization and exclusion" injury we recognized in *Moss*. 683 F.3d at 607.

In light of these two injuries, we find that Doe #1 has had "personal contact with the alleged establishment of religion." *Suhre*, 131 F.3d at 1086. Regardless of whether EO-2 actually violates the Establishment Clause's command not to disfavor a particular religion, a merits inquiry explored in Section IV.A, his injuries are on par with, if not greater than, injuries we previously deemed sufficient in this context. *See Moss*, 683 F.3d at 607 (finding Jewish daughter and father who received letter describing public school policy of awarding academic credit for private, Christian religious instruction suffered

_____

[9] The Government would have us, in assessing standing, delve into whether EO-2 sends a sufficiently religious message such that it violates the Establishment Clause. But this "put[s] the merits cart before the standing horse." *Cooksey*, 721 F.3d at 239 (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006)). The question of whether EO-2 "conveys a message of endorsement or disapproval [of religion]" is a merits determination. *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. 2003) (quoting *Wallace v. Jaffree*, 472 U.S. 38, 56 n.42 (1985)). And both parties address it as a merits question in their briefs. Appellants' Br. 48 ("The Order, in contrast, conveys no religious message . . . ."); *id.* at 52 ("Here, the Order does not convey a religious message . . . ."); Appellees' Br. 38 ("The Order's purpose to exclude Muslims conveys the exact same message . . . ."). Because we assume the merits of Plaintiffs' claim in assessing standing, we need not reach the Government's argument on this point.

injury in part because they were made to feel like "'outsiders' in their own community").[10]

The Government attempts to undercut these injuries in several ways. It first frames Plaintiffs' injuries as "stress." Appellants' Br. 23. That minimizes the psychological harm that flows from confronting official action preferring or disfavoring a particular religion and, in any event, does not account for the impact on families. The Government next argues that because the Second Executive Order "directly applies only to aliens abroad from the specified countries," it is "not directly targeted at plaintiffs," who are based in the United States, "in the way that local- or state-government messages are." Appellants' Reply Br. 3. An executive order is of course different than a local Sunday closing law or a Ten Commandments display in a state courthouse, but that does not mean its impact is any less direct. Indeed, because it emanates from the highest elected office in the nation, its impact is arguably felt even more directly by the individuals it affects. From Doe #1's perspective, the Second Executive Order does not apply to arbitrary or anonymous "aliens abroad." It applies to his wife.

More than abstractly disagreeing with the wisdom or legality of the President's policy decision, Plaintiffs show how EO-2 impacted (and continues to impact) them

_____

[10] Plaintiffs' injuries are also consistent with the injuries that other courts have recognized in Establishment Clause cases that do not involve religious displays or prayer. *See Awad v. Ziriax*, 670 F.3d 1111, 1122 (10th Cir. 2012) (recognizing injury stemming from amendment that "condemn[ed] [plaintiff's] religious faith and expose[d] him to disfavored treatment"); *Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 624 F.3d 1043, 1052 (9th Cir. 2010) (en banc) (finding "exclusion or denigration on a religious basis within the political community" to be sufficiently concrete injury).

*personally*. Doe #1 is not simply "roam[ing] the country in search of governmental wrongdoing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982). Rather, he is feeling the direct, painful effects of the Second Executive Order—both its alleged message of religious condemnation *and* the prolonged separation it causes between him and his wife—in his everyday life.[11] This case thus bears little resemblance to *Valley Forge*.

We likewise reject the Government's suggestion that Plaintiffs are seeking to vindicate the legal rights of third parties. The prudential standing doctrine includes a "general prohibition on a litigant's raising another person's legal rights." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (quoting *Allen v. Wright*, 468

---

[11] For similar reasons, this case is not, as the Government claims, comparable to *In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008). In that case, the court found that non-liturgical Protestant chaplains who were part of the Navy's Chaplain Corps lacked standing to bring a claim that the Navy preferred Catholic chaplains in violation of the Establishment Clause. *Id.* at 765. The court stated its holding as follows: "When plaintiffs are not themselves affected by a government *action* except through their abstract offense at the *message* allegedly conveyed by that action, they have not shown an injury-in-fact to bring an Establishment Clause claim." *Id.* at 764–65. The court repeatedly emphasized that plaintiffs were not themselves affected by the challenged action. *See id.* at 758 ("[T]he plaintiffs do not claim that the Navy actually discriminated against any of them."); *id.* at 760 ("But plaintiffs have conceded that they themselves did not suffer employment discrimination . . . . Rather, they suggest that *other* chaplains suffered discrimination."). In fact, plaintiffs' theory of standing was so expansive that their counsel conceded at oral argument that even the "judges on th[e] panel" would have standing to challenge the allegedly discriminatory conduct. *Id.* at 764. Here, by contrast, Doe #1 *is* directly affected by the government action—both its message and its impact on his family. Thus, contrary to the Government's assertion, Appellants' Br. 24, all Muslims in the United States do not have standing to bring this suit. Only those persons who suffer direct, cognizable injuries as a result of EO-2 have standing to challenge it.

U.S. 737, 751 (1984)).  This "general prohibition" is not implicated here, however, as

Doe #1 has shown that he himself suffered injuries as a result of the challenged Order.[12]

For all of these reasons, we find that Doe #1 has met his burden to establish an

Article III injury.  We further find that Doe #1 has made the requisite showing that his

claimed injuries are causally related to the challenged conduct—the Second Executive

Order—as opposed to "the independent action of some third party not before the court."

*Cooksey*, 721 F.3d at 238 (quoting *Frank Krasner Enters., Ltd. v. Montgomery County*,

401 F.3d 230, 234 (4th Cir. 2005)).  Enjoining enforcement of Section 2(c) therefore will

likely redress those injuries.  Doe #1 has thus met the constitutional standing

requirements with respect to the Establishment Clause claim.  And because we find that

at least one Plaintiff possesses standing, we need not decide whether the other individual

Plaintiffs or the organizational Plaintiffs have standing with respect to this claim.  *See*

*Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014).

---

[12] The district court here correctly recognized that the Supreme Court has on multiple occasions "reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner." *Int'l Refugee Assistance Project*, 2017 WL 1018235, at *5 (citing *Kerry v. Din*, 135 S. Ct. 2128, 2131, 2138–42 (2015) (reaching merits where American citizen challenged denial of husband's visa application); *Kleindienst v. Mandel*, 408 U.S. 753, 756, 762–65 (1972) (reaching merits where American scholars challenged denial of temporary nonimmigrant visa to Marxist Belgian journalist)); *see also Mandel*, 408 U.S. at 772 ("Even assuming, arguendo, that those on the outside seeking admission have no standing to complain, those who hope to benefit from the traveler's lectures do." (Douglas, J., dissenting)).  The Supreme Court's consideration of the merits in these cases suggests, at least at a general level, that Americans have a cognizable interest in the application of immigration laws to their foreign relatives.

Lastly, the Government asserts that Plaintiffs' Establishment Clause claim is unripe. It argues that under EO-2, Plaintiffs' relatives can apply for a waiver, and unless and until those waiver requests are denied, Plaintiffs' claims are dependent on future uncertainties. When evaluating ripeness, we consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). An action is fit for resolution "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). The "hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 199 (4th Cir. 2013) (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992)).

Our ripeness doctrine is clearly not implicated here. Plaintiffs have brought a facial challenge, alleging that EO-2 violates the Establishment Clause regardless of whether their relatives secure waivers. This legal question is squarely presented for our review and is not dependent on the factual uncertainties of the waiver process. What is more, Plaintiffs will suffer undue hardship, as explained above, were we to require their family members to attempt to secure a waiver before permitting Plaintiffs to challenge Section 2(c). We accordingly find the claim ripe for judicial decision.

B.

In one final justiciability challenge, the Government asserts that consular nonreviewability bars *any* review of Plaintiffs' claim. This Court has scarcely discussed the doctrine, so the Government turns to the District of Columbia Circuit, which has stated that "a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). But in the same opinion, the court explained that judicial review was proper in cases involving "claims by United States citizens rather than by aliens . . . and statutory claims that are accompanied by constitutional ones." *Id.* at 1163 (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1051 n.6 (D.C. Cir. 1986)). This is precisely such a case. More fundamentally, the doctrine of consular nonreviewability does not bar judicial review of constitutional claims. *See, e.g.*, *Din*, 135 S. Ct. at 2132 (reviewing visa denial where plaintiff asserted due process claim). The Government's reliance on the doctrine is therefore misplaced.

Behind the casual assertion of consular nonreviewability lies a dangerous idea—that this Court lacks the authority to review high-level government policy of the sort here. Although the Supreme Court has certainly encouraged deference in our review of immigration matters that implicate national security interests, *see infra* Section IV.A, it has not countenanced judicial abdication, especially where constitutional rights, values, and principles are at stake. To the contrary, the Supreme Court has affirmed time and again that "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803). This "duty will sometimes

43

involve the 'resolution of litigation challenging the constitutional authority of one of the three branches,' but courts cannot avoid their responsibility." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)). In light of this duty, and having determined that the present case is justiciable, we now proceed to consider whether the district court properly enjoined Section 2(c) of the Second Executive Order.

## IV.

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power" and is "to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). For a district court to grant a preliminary injunction, "a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The district court found that Plaintiffs satisfied all four requirements as to their Establishment Clause claim, and it enjoined Section 2(c) of EO-2. We evaluate the court's findings for abuse of discretion, *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 366 (4th Cir. 2012), reviewing its

factual findings for clear error and its legal conclusions de novo, *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

A.

The district court determined that Plaintiffs are likely to succeed on the merits of their claim that EO-2 violates the Establishment Clause. *Int'l Refugee Assistance Project*, 2017 WL 1018235, at *16. It found that because EO-2 is "facially neutral in terms of religion," *id.* at *13, the test outlined in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), governs the constitutional inquiry. And applying the *Lemon* test, the court found that EO-2 likely violates the Establishment Clause. The Government argues that the court erroneously applied the *Lemon* test instead of the more deferential test set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). And under *Mandel*, the Government contends, Plaintiffs' claim fails.

1.

We begin by addressing the Government's argument that the district court applied the wrong test in evaluating Plaintiffs' constitutional claim. The Government contends that *Mandel* sets forth the appropriate test because it recognizes the limited scope of judicial review of executive action in the immigration context. Appellants' Br. 42. We agree that *Mandel* is the starting point for our analysis, but for the reasons that follow, we find that its test contemplates the application of settled Establishment Clause doctrine in this case.

In *Mandel*, American university professors had invited Mandel, a Belgian citizen and revolutionary Marxist and professional journalist, to speak at a number of

45

conferences in the United States. 408 U.S. at 756. But Mandel's application for a nonimmigrant visa was denied under a then-existing INA provision that barred the entry of aliens "who advocate the economic, international, and governmental doctrines of world communism." 8 U.S.C. § 1182(a)(28)(D) (1964). The Attorney General had discretion to waive § 1182(a)(28)(D)'s bar and grant Mandel an individual exception, but declined to do so on the grounds that Mandel had violated the terms of his visas during prior visits to the United States. 408 U.S. at 759. The American professors sued, alleging, among other things, that the denial of Mandel's visa violated their First Amendment rights to "hear his views and engage him in a free and open academic exchange." *Id.* at 760.

The Supreme Court, citing "Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden,'" *id.* at 766 (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)), found that the longstanding principle of deference to the political branches in the immigration context limited its review of plaintiffs' challenge, *id.* at 767. The Court held that "when the Executive exercises this power [to exclude an alien] on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the [plaintiffs'] First Amendment interests." *Id.* at 770. The Court concluded that the Attorney General's

46

stated reason for denying Mandel's visa—that he had violated the terms of prior visas—satisfied this test.[13] It therefore did not review plaintiffs' First Amendment claim.

Courts have continuously applied *Mandel*'s "facially legitimate and bona fide" test to challenges to individual visa denials. *See Din*, 135 S. Ct. at 2139–40 (Kennedy, J., concurring in the judgment) (applying *Mandel*'s test to challenge to visa denial); *Cardenas v. United States*, 826 F.3d 1164, 1172–73 (9th Cir. 2016) (same); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 125 (2d Cir. 2009) (same). Subsequently, in *Fiallo v. Bell*, 430 U.S. 787 (1977), the Supreme Court applied *Mandel*'s test to a facial challenge to an immigration law, finding "no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. And in a case where plaintiffs brought a constitutional challenge to an immigration law, this Court has found that "we must apply the same standard as the *Fiallo* court and uphold the statute if a 'facially legitimate and bona fide reason' supports [it]." *Johnson*, 647 F.3d at 127.[14] *Mandel* is therefore the starting point for our review.

---

[13] The Court specifically declined to decide "what First Amendment or other grounds may be available for attacking exercise of discretion for which no justification whatsoever is advanced." *Id.*

[14] In *Johnson*, this Court considered an equal protection challenge to an immigration law. *Id.* at 126–27. Relying on several of our sister circuits, we equated *Mandel*'s "facially legitimate and bona fide" test with rational basis review. *Id.* at 127 (citing *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065–66 (9th Cir. 2003), *as amended* (June 9, 2003); *Wedderburn v. INS*, 215 F.3d 795, 800 (7th Cir. 2000)). But the *Johnson* Court's interpretation is incomplete. Rational basis review does build in deference to the government's reasons for acting, like *Mandel*'s "facially legitimate" requirement, but it (Continued)

But in another more recent line of cases, the Supreme Court has made clear that despite the political branches' plenary power over immigration, that power is still "subject to important constitutional limitations," *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001), and that it is the judiciary's responsibility to uphold those limitations. *Chadha*, 462 U.S. at 941 (stating that Congress and the Executive must "cho[ose] a constitutionally permissible means of implementing" their authority over immigration). These cases instruct that the political branches' power over immigration is not tantamount to a constitutional blank check, and that vigorous judicial review is required when an immigration action's constitutionality is in question.

We are bound to give effect to both lines of cases, meaning that we must enforce constitutional limitations on immigration actions while also applying *Mandel*'s deferential test to those actions as the Supreme Court has instructed. For the reasons that follow, however, we find that these tasks are not mutually exclusive, and that *Mandel*'s

---

does not call for an inquiry into an actor's "bad faith" and therefore does not properly account for *Mandel*'s "bona fide" requirement. Even more, *Johnson* and similar cases applying rational basis review did so in the context of equal protection challenges. *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008); *Breyer v. Meissner*, 214 F.3d 416, 422 n.6 (3d Cir. 2000). But courts do not apply rational basis review to Establishment Clause challenges, because that would mean dispensing with the purpose inquiry that is so central to Establishment Clause review. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("In our Establishment Clause cases we have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general."); *see also Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1255 n.2 (10th Cir. 2008) (suggesting that rational basis review cannot be used to evaluate an Establishment Clause claim) (citing *Heller*, 554 U.S. 570). We therefore decline to apply *Johnson*'s interpretation of *Mandel*'s "facially legitimate and bona fide" test to this case.

48

test still contemplates meaningful judicial review of constitutional challenges in certain, narrow circumstances, as we have here.

To begin, *Mandel*'s test undoubtedly imposes a heavy burden on plaintiffs, consistent with the significant deference we afford the political branches in the immigration context. *See Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (describing the "narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization"). The government need only show that the challenged action is "facially legitimate and bona fide" to defeat a constitutional challenge. *Mandel*, 408 U.S. at 770. These are separate and quite distinct requirements. To be "facially legitimate," there must be a valid reason for the challenged action stated on the face of the action. *Din*, 135 S. Ct. at 2140–41 (Kennedy, J., concurring in the judgment) (finding visa denial "facially legitimate" where government cited a statutory provision in support of the denial).

And as the name suggests, the "bona fide" requirement concerns whether the government issued the challenged action in good faith. In *Kerry v. Din*, Justice Kennedy, joined by Justice Alito, elaborated on this requirement. *Id.* at 2141.[15] Here, the burden is

---

[15] The Ninth Circuit has found that Justice Kennedy's concurrence is the controlling opinion in *Din*. It relied on the Supreme Court's holding in *Marks v. United States*, which stated that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Cardenas*, 826 F.3d at 1171 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). We agree that Justice Kennedy's opinion sets forth the narrowest grounds for the Court's holding in *Din* and likewise recognize it as the controlling opinion.

49

on the plaintiff. Justice Kennedy explained that where a plaintiff makes "an affirmative showing of bad faith" that is "plausibly alleged with sufficient particularity," courts may "look behind" the challenged action to assess its "facially legitimate" justification. *Id.* (suggesting that if plaintiff had sufficiently alleged that government denied visa in bad faith, court should inquire whether the government's stated statutory basis for denying the visa was the actual reason for the denial). In the typical case, it will be difficult for a plaintiff to make an affirmative showing of bad faith with plausibility and particularity. *See, e.g.*, *Cardenas*, 826 F.3d at 1173 (applying *Din* and finding that plaintiff who alleged that consular officer refused to consider relevant evidence and acted based on racial bias had failed to make an affirmative showing of bad faith). And absent this affirmative showing, courts must defer to the government's "facially legitimate" reason for the action.

*Mandel* therefore clearly sets a high bar for plaintiffs seeking judicial review of a constitutional challenge to an immigration action. But although *Mandel*'s "facially legitimate and bona fide" test affords significant deference to the political branches' decisions in this area, it does not completely insulate those decisions from *any* meaningful review. Where plaintiffs have seriously called into question whether the stated reason for the challenged action was provided in good faith, we understand *Mandel*, as construed by Justice Kennedy in his controlling concurrence in *Din*, to require that we step away from our deferential posture and look behind the stated reason for the challenged action. In other words, *Mandel*'s requirement that an immigration action be "bona fide" may in some instances compel more searching judicial review. Plaintiffs ask

50

this Court to engage in such searching review here under the traditional Establishment Clause test, and we therefore turn to consider whether such a test is warranted.

We start with *Mandel*'s requirement that the challenged government action be "facially legitimate." EO-2's stated purpose is "to protect the Nation from terrorist activities by foreign nationals admitted to the United States." EO-2, Preamble. We find that this stated national security interest is, on its face, a valid reason for Section 2(c)'s suspension of entry. EO-2 therefore satisfies *Mandel*'s first requirement. Absent allegations of bad faith, our analysis would end here in favor of the Government. But in this case, Plaintiffs have alleged that EO-2's stated purpose was given in bad faith. We therefore must consider whether they have made the requisite showing of bad faith.

As noted, Plaintiffs must "plausibly allege[] with sufficient particularity" that the reason for the government action was provided in bad faith. *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment). Plaintiffs here claim that EO-2 invokes national security in bad faith, as a pretext for what really is an anti-Muslim religious purpose. Plaintiffs point to ample evidence that national security is not the true reason for EO-2, including, among other things, then-candidate Trump's numerous campaign statements expressing animus towards the Islamic faith; his proposal to ban Muslims from entering the United States; his subsequent explanation that he would effectuate this ban by targeting "territories" instead of Muslims directly; the issuance of EO-1, which targeted certain majority-Muslim nations and included a preference for religious minorities; an advisor's statement that the President had asked him to find a way to ban Muslims in a legal way; and the issuance of EO-2, which resembles EO-1 and which

51

President Trump and his advisors described as having the same policy goals as EO-1. *See, e.g.*, J.A. 339, 346, 370, 379, 403, 470, 472, 480, 481, 506, 508, 516–18, 522, 798. Plaintiffs also point to the comparably weak evidence that EO-2 is meant to address national security interests, including the exclusion of national security agencies from the decisionmaking process, the post hoc nature of the national security rationale, and evidence from DHS that EO-2 would not operate to diminish the threat of potential terrorist activity.

Based on this evidence, we find that Plaintiffs have more than plausibly alleged that EO-2's stated national security interest was provided in bad faith, as a pretext for its religious purpose. And having concluded that the "facially legitimate" reason proffered by the government is not "bona fide," we no longer defer to that reason and instead may "look behind" EO-2. *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment).

Since Justice Kennedy's concurrence in *Din*, no court has confronted a scenario where, as here, plaintiffs have plausibly alleged with particularity that an immigration action was taken in bad faith. We therefore have minimal guidance on what "look[ing] behind" a challenged immigration action entails. *See id.* In addressing this issue of first impression, the Government does not propose a framework for this inquiry. Rather, the Government summarily asserts that because EO-2 states that it is motivated by national security interests, it therefore satisfies *Mandel*'s test. But this only responds to *Mandel*'s "facially legitimate" requirement—it reads out *Mandel*'s "bona fide" test altogether. Plaintiffs, for their part, suggest that we review their claim using our normal

constitutional tools. And in the Establishment Clause context, our normal constitutional tool for reviewing facially neutral government actions is the test in *Lemon v. Kurtzman*.

We find for several reasons that because Plaintiffs have made an affirmative showing of bad faith, applying the *Lemon* test to analyze EO-2's constitutionality is appropriate. First, as detailed above, the Supreme Court has unequivocally stated that the political branches' immigration actions are still "subject to important constitutional limitations." *Zadvydas*, 533 U.S. at 695; *see also Chadha*, 462 U.S. at 941–42. The constitutional limitation in this case is the Establishment Clause, and this Court's duty to uphold the Constitution even in the context of a presidential immigration action counsels in favor of applying our standard constitutional tool. Second, that Plaintiffs have satisfied *Mandel*'s heavy burden to plausibly show that the reason for the challenged action was proffered in bad faith further supports the application of our established constitutional doctrine. The deferential framework set forth in *Mandel* is based in part on general respect for the political branches' power in the immigration realm. Once plaintiffs credibly call into question the political branches' motives for exercising that power, our reason for deferring is severely undermined. In the rare case where plaintiffs plausibly allege bad faith with particularity, more meaningful review—in the form of constitutional scrutiny—is proper. And third, in the context of this case, there is an obvious symmetry between *Mandel*'s "bona fide" prong and the constitutional inquiry established in *Lemon*. Both tests ask courts to evaluate the government's purpose for acting.

Because Plaintiffs have made a substantial and affirmative showing that the government's national security purpose was proffered in bad faith, we find it appropriate to apply our longstanding Establishment Clause doctrine. Applying this doctrine harmonizes our duty to engage in the substantial deference required by *Mandel* and its progeny with our responsibility to ensure that the political branches choose constitutionally permissible means of exercising their immigration power. We therefore proceed to "look behind" EO-2 using the framework developed in *Lemon* to determine if EO-2 was motivated by a primarily religious purpose, rather than its stated reason of promoting national security.

2.

To prevail under the *Lemon* test, the Government must show that the challenged action (1) "ha[s] a secular legislative purpose," (2) that "its principal or primary effect [is] one that neither advances nor inhibits religion," and (3) that it does "not foster 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13 (quoting *Walz v. Tax Comm'n of the City of New York*, 397 U.S. 664, 674 (1970)) (citation omitted). The Government must satisfy all three prongs of *Lemon* to defeat an Establishment Clause challenge. *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987). The dispute here centers on *Lemon*'s first prong.

In the Establishment Clause context, "purpose matters." *McCreary*, 545 U.S. at 866 n.14. Under the *Lemon* test's first prong, the Government must show that the challenged action "ha[s] a secular legislative purpose." *Lemon*, 403 U.S. at 612. Accordingly, the Government must show that the challenged action has a secular purpose

54

that is "genuine, not a sham, and not merely secondary to a religious objective."

*McCreary*, 545 U.S. at 864; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.'" (quoting *Wallace*, 472 U.S. at 75 (O'Connor, J., concurring in the judgment)). The government cannot meet this requirement by identifying *any* secular purpose for the challenged action. *McCreary*, 545 U.S. at 865 n.13 (noting that if any secular purpose sufficed, "it would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action"). Rather, the government must show that the challenged action's *primary* purpose is secular. *Edwards*, 482 U.S. at 594 (finding an Establishment Clause violation where the challenged act's "primary purpose . . . is to endorse a particular religious doctrine," notwithstanding that the act's stated purpose was secular).

When a court considers whether a challenged government action's primary purpose is secular, it attempts to discern the "official objective . . . from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *McCreary*, 545 U.S. at 862. The court acts as a reasonable, "objective observer," taking into account "the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." *Id.* (quoting *Santa Fe*, 530 U.S. at 308). It also considers the action's "historical context" and "the specific sequence of events leading to [its] passage." *Edwards*, 482 U.S. at 595. And as a

reasonable observer, a court has a "reasonable memor[y]," and it cannot "'turn a blind eye to the context in which [the action] arose.'" *McCreary*, 545 U.S. at 866 (quoting *Santa Fe*, 530 U.S. at 315).

The evidence in the record, viewed from the standpoint of the reasonable observer, creates a compelling case that EO-2's primary purpose is religious. Then-candidate Trump's campaign statements reveal that on numerous occasions, he expressed anti-Muslim sentiment, as well as his intent, if elected, to ban Muslims from the United States. For instance, on December 7, 2015, Trump posted on his campaign website a "Statement on Preventing Muslim Immigration," in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on" and remarked, "[I]t is obvious to anybody that the hatred is beyond comprehension. . . . [O]ur country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect for human life." J.A. 346. In a March 9, 2016 interview, Trump stated that "Islam hates us," J.A. 516, and that "[w]e can't allow people coming into this country who have this hatred," J.A. 517. Less than two weeks later, in a March 22 interview, Trump again called for excluding Muslims, because "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.A. 522. And on December 21, 2016, when asked whether recent attacks in Europe affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.A. 506.

As a candidate, Trump also suggested that he would attempt to circumvent scrutiny of the Muslim ban by formulating it in terms of nationality, rather than religion. On July 17, 2016, in response to a tweet stating, "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional," Trump said, "So you call it territories. OK? We're gonna do territories." J.A. 798. One week later, Trump asserted that entry should be "immediately suspended[ed] . . . from any nation that has been compromised by terrorism." J.A. 480. When asked whether this meant he was "roll[ing ]back" his call for a Muslim ban, he said his plan was an "expansion" and explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." J.A. 481.

Significantly, the First Executive Order appeared to take this exact form, barring citizens of seven predominantly Muslim countries from entering the United States. And just before President Trump signed EO-1 on January 27, 2017, he stated, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.' We all know what that means." J.A. 403. The next day, presidential advisor and former New York City Mayor Giuliani appeared on Fox News and asserted that "when [Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'" J.A. 508.

Shortly after courts enjoined the First Executive Order, President Trump issued EO-2, which the President and members of his team characterized as being substantially similar to EO-1. EO-2 has the same name and basic structure as EO-1, but it does not include a preference for religious-minority refugees and excludes Iraq from its list of

Designated Countries. EO-2, § 1(e). It also exempts certain categories of nationals from the Designated Countries and institutes a waiver process for qualifying individuals. EO-2, § 3(b), (c). Senior Policy Advisor Miller described the changes to EO-2 as "mostly minor technical differences," and said that there would be "the same basic policy outcomes for the country." J.A. 339. White House Press Secretary Spicer stated that "[t]he principles of the [second] executive order remain the same." J.A. 379. And President Trump, in a speech at a rally, described EO-2 as "a watered down version of the first order." Appellees' Br. 7 (citing Reilly, *supra*). These statements suggest that like EO-1, EO-2's purpose is to effectuate the promised Muslim ban, and that its changes from EO-1 reflect an effort to help it survive judicial scrutiny, rather than to avoid targeting Muslims for exclusion from the United States.

These statements, taken together, provide direct, specific evidence of what motivated both EO-1 and EO-2: President Trump's desire to exclude Muslims from the United States. The statements also reveal President Trump's intended means of effectuating the ban: by targeting majority-Muslim nations instead of Muslims explicitly. And after courts enjoined EO-1, the statements show how President Trump attempted to preserve its core mission: by issuing EO-2—a "watered down" version with "the same basic policy outcomes." J.A. 339. These statements are the exact type of "readily discoverable fact[s]" that we use in determining a government action's primary purpose. *McCreary*, 545 U.S. at 862. They are explicit statements of purpose and are attributable either to President Trump directly or to his advisors. We need not probe anyone's heart of hearts to discover the purpose of EO-2, for President Trump and his aides have

58

explained it on numerous occasions and in no uncertain terms. *See Glassroth v. Moore*, 335 F.3d 1282, 1296 (11th Cir. 2003) ("Besides, no psychoanalysis or dissection is required here, where there is abundant evidence, including his own words, of the [government actor's] purpose."). EO-2 cannot be read in isolation from the statements of planning and purpose that accompanied it, particularly in light of the sheer number of statements, their nearly singular source, and the close connection they draw between the proposed Muslim ban and EO-2 itself.[16] *See McCreary*, 545 U.S. at 866 (rejecting notion that court could consider only "the latest news about the last in a series of governmental actions, however close they may all be in time and subject"). The reasonable observer could easily connect these statements to EO-2 and understand that its primary purpose appears to be religious, rather than secular.

The Government argues, without meaningfully addressing Plaintiffs' proffered evidence, that EO-2's primary purpose is in fact secular because it is facially neutral and operates to address the risks of potential terrorism without targeting any particular religious group. Appellants' Br. 42–44. That EO-2's stated objective is religiously neutral is not dispositive; the entire premise of our review under *Lemon* is that even facially neutral government actions can violate the Establishment Clause. *See Lemon*, 403 U.S. at 612 (recognizing that "a law 'respecting' . . . the establishment of religion[] is

---

[16] We reject the government's contentions that none of these statements "in substance corresponds to [Section 2(c)]," Appellants' Br. 52, and that Section 2(c) "bears no resemblance to a 'Muslim ban,'" *id.* at 53. These statements show that President Trump intended to effectuate his proposed Muslim ban by targeting predominantly Muslim nations, rather than Muslims explicitly. Section 2(c) does precisely that.

not always easily identifiable as one," and creating a three-part test for discerning when a facially neutral law violates the Establishment Clause); *see also Santa Fe*, 530 U.S. at 315 ("Our examination [under *Lemon*'s purpose prong] . . . need not stop at an analysis of the text of the policy."). We therefore reject the Government's suggestion that EO-2's facial neutrality might somehow fully answer the question of EO-2's primary purpose.[17]

The Government's argument that EO-2's primary purpose is related to national security, Appellants' Br. 43–44, is belied by evidence in the record that President Trump issued the First Executive Order without consulting the relevant national security agencies, J.A. 397, and that those agencies only offered a national security rationale after EO-1 was enjoined. Furthermore, internal reports from DHS contradict this national security rationale, with one report stating that "most foreign-born, US-based violent

---

[17] Plaintiffs suggest that EO-2 is not facially neutral, because by directing the Secretary of Homeland Security to collect data on "honor killings" committed in the United States by foreign nationals, EO-2 incorporates "a stereotype about Muslims that the President had invoked in the months preceding the Order." Appellees' Br. 5, 7; *see* J.A. 598 (reproducing Trump's remarks in a September 2016 speech in Arizona in which he stated that applicants from countries like Iraq and Afghanistan would be "asked their views about honor killings," because "a majority of residents [in those countries] say that the barbaric practice of honor killings against women are often or sometimes justified"). Numerous amici explain that invoking the specter of "honor killings" is a well-worn tactic for stigmatizing and demeaning Islam and painting the religion, and its men, as violent and barbaric. *See, e.g.*, Brief for New York University as Amicus Curiae Supporting Appellees 21, ECF No. 82-1; Brief for Muslim Justice League, et al., as Amici Curiae Supporting Appellees 17-18, ECF No. 152-1; Brief for History Professors and Scholars as Amici Curiae Supporting Appellees 2–3, ECF No. 154-1; Brief for Constitutional Law Scholars as Amici Curiae Supporting Appellees 19 n.3, ECF No. 173-1; Brief for Members of the Clergy, et al., as Amici Curiae Supporting Appellees 13, ECF No. 179-1. The Amici Constitutional Law Scholars go so far as to call the reference to honor killings "anti-Islamic dog-whistling." Brief for Constitutional Law Scholars 19 n.3. We find this text in EO-2 to be yet another marker that its national security purpose is secondary to its religious purpose.

extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry because of national security concerns." J.A. 426. According to former National Security Officials, Section 2(c) serves "no legitimate national security purpose," given that "not a single American has died in a terrorist attack on U.S. soil at the hands of citizens of these six nations in the last forty years" and that there is no evidence of any new security risks emanating from these countries. Corrected Brief for Former National Security Officials as Amici Curiae Supporting Appellees 5–8, ECF No. 126-1.[18] Like the district court, we think this strong evidence that any national security justification for EO-2 was secondary to its primary religious purpose and was offered as more of a "litigating position" than as the actual purpose of EO-2. *See McCreary*, 545 U.S. at 871 (describing the government's "new statements of purpose . . . as a litigating position" where they were offered to explain the third iteration of a previously enjoined religious display). And EO-2's text does little to bolster any national security rationale: the only examples it provides of immigrants born abroad and convicted of terrorism-related crimes in the United States include two Iraqis—Iraq is not a designated country in EO-2—and a Somalian refugee who entered the United States as a child and was radicalized here as an adult. EO-2, § 1(h). The Government's asserted national security purpose is therefore no more convincing as applied to EO-2 than it was to EO-1.

---

[18] A number of amici were current on the relevant intelligence as of January 20, 2017. *Id.* at 9.

61

Relatedly, the Government argues that EO-2's operation "confirms its stated purpose." Appellants' Br. 43. "[I]t applies to six countries based on risk, not religion; and in those six countries, the suspension applies irrespective of any alien's religion." *Id.* In support of its argument that EO-2 does not single out Muslims, the Government notes that these six countries are either places where ISIS has a heavy presence (Syria), state sponsors of terrorism (Iran, Sudan, and Syria), or safe havens for terrorists (Libya, Somalia, and Yemen). Appellants' Br. 5–6. The Government also points out that the six Designated Countries represent only a small proportion of the world's majority-Muslim nations, and EO-2 applies to everyone in those countries, even non-Muslims. *Id.* at 44. This shows, the Government argues, that EO-2's primary purpose is secular. The trouble with this argument is that EO-2's practical operation is not severable from the myriad statements explaining its operation as intended to bar Muslims from the United States. And that EO-2 is underinclusive by targeting only a small percentage of the world's majority-Muslim nations and overinclusive for targeting all citizens, even non-Muslims, in the Designated Countries, is not responsive to the purpose inquiry. This evidence might be relevant to our analysis under *Lemon*'s second prong, which asks whether a government act has the primary *effect* of endorsing or disapproving of religion, *see Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring), but it does not answer whether the government acted with a primarily religious purpose to begin with. If we limited our purpose inquiry to review of the operation of a facially neutral order, we would be caught in an analytical loop, where the order would always survive scrutiny. It is for this precise reason that when we attempt to discern purpose, we look to more than

62

just the challenged action itself. And here, when we consider the full context of EO-2, it is evident that it is likely motivated primarily by religion. We do not discount that there may be a national security concern motivating EO-2; we merely find it likely that any such purpose is secondary to EO-2's religious purpose.

The Government separately contends that our purpose inquiry should not extend to "extrinsic evidence" that is beyond EO-2's relevant context. Appellants' Br. 45. The Government first argues that we should not look beyond EO-2's "text and operation." *Id.* at 45–46. But this is clearly incorrect, as the Supreme Court has explicitly stated that we review more than just the face of a challenged action. *See, e.g.*, *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 699 (1994) ("[O]ur [Establishment Clause] analysis does not end with the text of the statute at issue.") (citing *Church of the Lukumi Babalu Aye*, 508 U.S. at 534).[19]

---

[19] The Government separately suggests that we should limit our review to EO-2's text and operation based on "the Constitution's structure and its separation of powers," and the "'presumption of regularity' that attaches to all federal officials' actions." Appellants' Br. 45 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14 (1926)). In support of this point, the Government relies on pre-*McCreary* cases discussing, variously, judicial deference to an executive official's decision to deport an alien who had violated the terms of his admission to the United States, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999), the President's absolute immunity from damages liability based on his or her official acts, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), and the presumptive privilege we afford a President's conversations and correspondence, *United States v. Nixon*, 418 U.S. 683, 708 (1974). These cases suggest that in certain circumstances, we insulate the President and other executive officials from judicial scrutiny in order to protect and promote the effective functioning of the executive branch. But these cases do not circumscribe our review of Establishment Clause challenges or hold that when a President's official acts violate the Constitution, the acts themselves are immune from judicial review. We find no support in this line of cases for the Government's argument that our review of EO-2's context is so limited. In fact, the (Continued)

The Government next argues that even if we do look beyond EO-2 itself, under *McCreary*, we are limited to considering only "the operative terms of governmental action and official pronouncements," Appellants' Br. 46, which we understand to mean only EO-2 itself and a letter signed by the Attorney General and the Secretary of State that largely echoes EO-2's text, *id.* at 8 n.3 (citing Letter, *supra*). We find no support for this view in *McCreary*. The *McCreary* Court considered "the traditional external signs that show up in the 'text, legislative history, and implementation of the [challenged action],'" 545 U.S. at 862 (quoting *Santa Fe*, 530 U.S. at 308), but it did not limit other courts' review to those particular terms. *Id.* Nor did it make such an artificial distinction between "official" and "unofficial" context. Rather, it relied on principles of "common sense" and the "reasonable observer[']s . . . reasonable memor[y]" to cull the relevant context surrounding the challenged action. *Id.* at 866. The Government would have us abandon this approach in favor of an unworkable standard that is contrary to the well-established framework for considering the context of a challenged government action.

And finally, the Government argues that even if we could consider unofficial acts and statements, we should not rely on campaign statements. Appellants' Br. 49. Those statements predate President Trump's constitutionally significant "transition from private life to the Nation's highest public office," and as such, they are less probative than

---

Supreme Court has suggested quite the opposite. *See Zadvydas*, 533 U.S. at 695 ("Executive and Legislative Branch decisionmaking . . . power is subject to important constitutional limitations." (citing *Chadha*, 462 U.S. at 941–42)).

official statements, the Government contends. *Id.* at 51.[20] We recognize that in many cases, campaign statements may not reveal all that much about a government actor's purpose. But we decline to impose a bright-line rule against considering campaign statements, because as with any evidence, we must make an individualized determination as to a statement's relevancy and probative value in light of all the circumstances. The campaign statements here are probative of purpose because they are closely related in time, attributable to the primary decisionmaker, and specific and easily connected to the challenged action. *See Glassroth*, 335 F.3d at 1297 (reviewing an elected judge's campaign materials that proclaimed him the "Ten Commandment's Judge" as part of its inquiry into the constitutionality of a Ten Commandments display he installed); *see also Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 463 (1982) (considering facially

_____

[20] The government also suggests that we can never rely on private communications to impute an improper purpose to a government actor. *See, e.g.*, *Modrovich v. Allegheny County*, 385 F.3d 397, 411–12 (3d Cir. 2004) (limiting its review to statements made by the elected officials who oversaw the government action). But this is incorrect. These cases merely establish that the motives of people not involved in the decisionmaking process cannot *alone* evince the government's motive. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not *direct* evidence of discrimination." (emphasis added)). But when those statements reveal something about the government's purpose, they are certainly part of the evidence we review for purpose. In *McCreary*, the Court noted that a pastor had delivered a religious message at the ceremony for the challenged religious display. 545 U.S. at 869. Based on this and other evidence of purpose, the Court concluded that "[t]he reasonable observer could only think that the [government] meant to emphasize and celebrate the [display's] religious message." *Id.* In any event, none of these cases contemplate the situation here, where the private speaker and the government actor are one and the same. We need not impute anyone's purpose to anyone else, for the same person has espoused these intentions all along. The distinction between candidate and elected official is thus an artificial one where the inquiry is only whether the reasonable observer would understand the candidate's statements to explain the purpose of his actions once elected.

65

neutral campaign statements related to bussing in an equal protection challenge); *California v. United States*, 438 U.S. 645, 663–64 (1978) (referring to candidates' political platforms when considering the Reclamation Act of 1902); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (explaining that in the equal protection context, "[w]hen there is [] proof that a discriminatory purpose has been a motivating factor in the decision," a court may consider "contemporary statements by members of the decisionmaking body").

Just as the reasonable observer's "world is not made brand new every morning," *McCreary*, 545 U.S. at 866, nor are we able to awake without the vivid memory of these statements. We cannot shut our eyes to such evidence when it stares us in the face, for "there's none so blind as they that won't see." Jonathan Swift, *Polite Conversation* 174 (Chiswick Press ed., 1892). If and when future courts are confronted with campaign or other statements proffered as evidence of governmental purpose, those courts must similarly determine, on a case-by-case basis, whether such statements are probative evidence of governmental purpose. Our holding today neither limits nor expands their review.[21]

The Government argues that reviewing campaign statements here would encourage scrutiny of all religious statements ever made by elected officials, even remarks from before they assumed office. Appellants' Br. 49–50. But our review creates

---

[21] This finding comports with the *McCreary* Court's observation that "past actions [do not] forever taint" a government action, 545 U.S. at 873–74. Whether a statement continues to taint a government action is a fact-specific inquiry for the court evaluating the statement.

66

no such sweeping implications, because as the Supreme Court has counseled, our purpose analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights*, 429 U.S. at 266; *see also Lee v. Weisman*, 505 U.S. 577, 597 (1992) ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one . . . ."). Just as a reasonable observer would not understand general statements of religious conviction to inform later government action, nor would we look to such statements as evidence of purpose. A person's particular religious beliefs, her college essay on religious freedom, a speech she gave on the Free Exercise Clause—rarely, if ever, will such evidence reveal anything about that person's actions once in office. For a past statement to be relevant to the government's purpose, there must be a substantial, specific connection between it and the challenged government action. And here, in this highly unique set of circumstances, there is a direct link between the President's numerous campaign statements promising a Muslim ban that targets territories, the discrete action he took only one week into office executing that exact plan, and EO-2, the "watered down" version of that plan that "get[s] just about everything," and "in some ways, more." J.A. 370.

For similar reasons, we reject the Government's argument that our review of these campaign statements will "inevitably 'chill political debate during campaigns.'" Appellants' Br. 50 (quoting *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995)). Not all—not even most—political debate will have any relevance to a challenged government action. Indeed, this case is unique not because we are considering campaign statements, but because we have such directly relevant and probative statements of

67

government purpose at all. *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) (observing that government actors "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate"). To the extent that our review chills campaign promises to condemn and exclude entire religious groups, we think that a welcome restraint.

Lastly, the Government contends that we are ill-equipped to "attempt[] to assess what campaign statements reveal about the motivation for later action." Appellants' Br. 50. The Government argues that to do so would "mire [us] in a swamp of unworkable litigation," *id.* (quoting Amended Order, *Washington v. Trump*, No. 17-35105, slip op. at 13 (9th Cir. Mar. 17, 2017) (Kozinski, J., dissenting from denial of reconsideration en banc)), and "forc[e us] to wrestle with intractable questions," such as "the level of generality at which a statement must be made, by whom, and how long after its utterance the statement remains probative." *Id.* But discerning the motives behind a challenged government action is a well-established part of our purpose inquiry. *McCreary*, 545 U.S. at 861 ("Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country, and governmental purpose is a key element of a good deal of constitutional doctrine." (citations omitted)). As part of this inquiry, courts regularly evaluate decisionmakers' statements that show their purpose for acting. *See, e.g.*, *Green v. Haskell Cty. Bd. of Comm'rs*, 568 F.3d 784, 801 (10th Cir. 2009) (considering news reports quoting county commissioners who described both their determination to keep challenged religious display at issue and the strength of their religious beliefs); *Glassroth*, 355 F.3d at 1297 (reviewing elected judge's campaign

materials for evidence of his purpose in installing religious display); *Brown v. Gilmore*, 258 F.3d 265, 277 (4th Cir. 2001) (reviewing state legislators' statements in discerning purpose of statute challenged under the Establishment Clause); *see also Edwards*, 482 U.S. at 586–87 (looking to statute's text together with its sponsor's public comments to discern its purpose). And the purpose inquiry is not limited to Establishment Clause challenges; we conduct this analysis in a variety of contexts. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (striking down federal statute based in part on "strong evidence" that "the congressional purpose [was] to influence or interfere with state sovereign choices about who may be married"); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279–80 (1979) (upholding public hiring preferences based in part on finding that government had not created preferences with purpose of discriminating on the basis of sex); *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 219 (4th Cir. 2016), *cert. denied sub nom. North Carolina v. N.C. State Conference of NAACP*, No. 16-833, 2017 WL 2039439 (U.S. May 15, 2017) (concluding that challenged voting restrictions were unconstitutional because they were motivated by racially discriminatory intent). We therefore see nothing "intractable" about evaluating a statement's probative value based on the identity of the speaker and how specifically the statement relates to the challenged government action, for this is surely a routine part of constitutional analysis. And this analysis is even more straightforward here, because we are not attempting to discern motive from many legislators' statements, as in *Brown*, but rather are looking primarily to one person's statements to discern that person's motive for taking a particular action once in office.

The Government has repeatedly asked this Court to ignore evidence, circumscribe our own review, and blindly defer to executive action, all in the name of the Constitution's separation of powers. We decline to do so, not only because it is the particular province of the judicial branch to say what the law is, but also because we would do a disservice to our constitutional structure were we to let its mere invocation silence the call for meaningful judicial review. The deference we give the coordinate branches is surely powerful, but even it must yield in certain circumstances, lest we abdicate our own duties to uphold the Constitution.

EO-2 cannot be divorced from the cohesive narrative linking it to the animus that inspired it. In light of this, we find that the reasonable observer would likely conclude that EO-2's primary purpose is to exclude persons from the United States on the basis of their religious beliefs. We therefore find that EO-2 likely fails *Lemon*'s purpose prong in violation of the Establishment Clause.[22] Accordingly, we hold that the district court did not err in concluding that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.

---

[22] What is more, we think EO-2 would likely fail any purpose test, for whether religious animus motivates a government action is a fundamental part of our Establishment Clause inquiry no matter the degree of scrutiny that applies. *See, e.g.*, *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1826 (2014) (upholding town's legislative prayer policy in part because "[i]n no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished"); *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 696 (1989) (finding that the challenged statute satisfied *Lemon*'s purpose prong in part because "there is no allegation that [it] was born of animus"); *Lynch*, 465 U.S. at 673 (stating that the Establishment Clause "forbids hostility toward any [religion]"); *see also* Brief for Constitutional Law Scholars 6–11. There is simply too much evidence that EO-2 was motivated by religious animus for it to survive any measure of constitutional review.

B.

Because we uphold the district court's conclusion that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim, we next consider whether Plaintiffs have demonstrated that they are likely to suffer irreparable harm in the absence of a preliminary injunction. *Winter*, 555 U.S. at 22; *Musgrave*, 553 F.3d at 298. As we have previously recognized, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 190 (4th Cir. 2013) (en banc) (quoting *Centro Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 471 (D. Md. 2011)). Accordingly, our finding that Plaintiffs are likely to succeed on the merits of their constitutional claim counsels in favor of finding that in the absence of an injunction, they will suffer irreparable harm.

Indeed, the Supreme Court has stated in no uncertain terms that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury."). Though the *Elrod* Court was addressing freedom of speech and association, our sister circuits have interpreted it to apply equally to Establishment Clause violations. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986); *ACLU of Ill. v. City of St. Charles*, 794 F.2d 265, 274

71

(7th Cir. 1986). We agree with these courts that because of "the inchoate, one-way nature of Establishment Clause violations," they create the same type of immediate, irreparable injury as do other types of First Amendment violations. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303; *see also id.* ("[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place . . . ."). We therefore find that Plaintiffs are likely to suffer irreparable harm if Section 2(c) of EO-2 takes effect.

C.

Even if Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction, we still must determine that the balance of the equities tips in their favor, "pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). This is because "courts of equity may go to greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)). As the district court did, we consider the balance of the equities and the public interest factors together.

The Government first contends that "the injunction causes [it] direct, irreparable injury" that outweighs the irreparable harm to Plaintiffs because "'no governmental interest is more compelling than the security of the Nation.'" Appellants' Br. 54 (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)). When it comes to national security, the

Government argues, the judicial branch "should not second-guess" the President's "'[p]redictive judgment[s].'" Appellants' Br. 55 (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988)). The Government further argues that the injunction causes institutional injury, because according to two single-Justice opinions, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). The Government contends that this principle applies here because the President "represents the people of all 50 states." Appellants' Reply Br. 25.

At the outset, we reject the notion that the President, because he or she represents the entire nation, suffers irreparable harm whenever an executive action is enjoined. This Court has held that the Government is "in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Centro Tepeyac*, 722 F.3d at 191 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). "If anything," we said, "the system is improved by such an injunction." *Id.* (quoting *Giovani Carandola*, 303 F.3d at 521). Because Section 2(c) of EO-2 is likely unconstitutional, allowing it to take effect would therefore inflict the greater institutional injury. And we are not persuaded that the general deference we afford the political branches ought to nevertheless tip the equities in the Government's favor, for even the President's actions are not above judicial scrutiny,

73

and especially not where those actions are likely unconstitutional. *See Zadvydas*, 533 U.S. at 695; *Chadha*, 462 U.S. at 941–42.

We are likewise unmoved by the Government's rote invocation of harm to "national security interests" as the silver bullet that defeats all other asserted injuries. *See United States v. Robel*, 389 U.S. 258, 264 (1967) ("Th[e] concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. . . . [O]ur country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile."). National security may be the most compelling of government interests, but this does not mean it will always tip the balance of the equities in favor of the government. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (agreeing with the dissent that the government's "authority and expertise in [national security and foreign relations] matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals" (quoting *id.* at 61 (Breyer, J., dissenting))). A claim of harm to national security must still outweigh the competing claim of injury. Here and elsewhere, the Government would have us end our inquiry without scrutinizing either Section 2(c)'s stated purpose or the Government's asserted interests, but "unconditional deference to a government agent's invocation of 'emergency' . . . has a lamentable place in our history,"

74

*Patrolmen's Benevolent Ass'n of New York v. City of New York*, 310 F.3d 43, 53–54 (2d. Cir. 2002) (citing *Korematsu v. United States*, 323 U.S. 214, 223 (1944)), and is incompatible with our duty to evaluate the evidence before us.

As we previously determined, the Government's asserted national security interest in enforcing Section 2(c) appears to be a post hoc, secondary justification for an executive action rooted in religious animus and intended to bar Muslims from this country. We remain unconvinced that Section 2(c) has more to do with national security than it does with effectuating the President's promised Muslim ban. We do not discount that EO-2 may have some national security purpose, nor do we disclaim that the injunction may have some impact on the Government. But our inquiry, whether for determining Section 2(c)'s primary purpose or for weighing the harm to the parties, is one of balance, and on balance, we cannot say that the Government's asserted national security interest outweighs the competing harm to Plaintiffs of the likely Establishment Clause violation.

For similar reasons, we find that the public interest counsels in favor of upholding the preliminary injunction. As this and other courts have recognized, upholding the Constitution undeniably promotes the public interest. *Giovani Carandola*, 303 F.3d at 521 ("[U]pholding constitutional rights surely serves the public interest."); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002))); *Dayton Area Visually Impaired Pers., Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("[T]he public as a

75

whole has a significant interest in ensuring . . . protection of First Amendment liberties."). These cases recognize that when we protect the constitutional rights of the few, it inures to the benefit of all. And even more so here, where the constitutional violation injures Plaintiffs and in the process permeates and ripples across entire religious groups, communities, and society at large.

When the government chooses sides on religious issues, the "inevitable result" is "hatred, disrespect and even contempt" towards those who fall on the wrong side of the line. *Engel v. Vitale*, 370 U.S. 421, 431 (1962). Improper government involvement with religion "tends to destroy government and to degrade religion," *id.*, encourage persecution of religious minorities and nonbelievers, and foster hostility and division in our pluralistic society. The risk of these harms is particularly acute here, where from the highest elected office in the nation has come an Executive Order steeped in animus and directed at a single religious group. "The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J. concurring). We therefore conclude that enjoining Section 2(c) promotes the public interest of the highest order. And because Plaintiffs have satisfied all the requirements for securing a preliminary injunction, we find that the district court did not abuse its discretion in enjoining Section 2(c) of EO-2.

V.

Lastly, having concluded that Plaintiffs are entitled to a preliminary injunction, we address the scope of that injunction. The Government first argues that the district court erred by enjoining Section 2(c) nationwide, and that any injunctive relief should be limited solely to Plaintiffs.

It is well-established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). Nevertheless, "their powers are not boundless." *Id.* The district court's choice of relief "should be carefully addressed to the circumstances of the case," *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Courts may issue nationwide injunctions consistent with these principles. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308–09 (4th Cir. 1992).

The district court here found that a number of factors weighed in favor of a nationwide injunction, and we see no error. First, Plaintiffs are dispersed throughout the United States. *See* J.A. 263, 273; *see also Richmond Tenants Org.*, 956 F.2d at 1308–09 (upholding nationwide injunction where challenged conduct caused irreparable harm in myriad jurisdictions across the country). Second, nationwide injunctions are especially appropriate in the immigration context, as Congress has made clear that "the immigration laws of the United States should be enforced vigorously and *uniformly*." *Texas v. United*

*States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (quoting Immigration Reform and Control Act of 1996, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384); *see also Arizona v. United States*, 132 S. Ct. 2492, 2502 (2015) (describing the "comprehensive and unified system" of "track[ing] aliens within the Nation's borders"). And third, because Section 2(c) likely violates the Establishment Clause, enjoining it only as to Plaintiffs would not cure the constitutional deficiency, which would endure in all Section 2(c)'s applications. Its continued enforcement against similarly situated individuals would only serve to reinforce the "message" that Plaintiffs "are outsiders, not full members of the political community." *Santa Fe*, 530 U.S. at 309 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)). For these reasons, we find that the district court did not abuse its discretion in concluding that a nationwide injunction was "necessary to provide complete relief." *Madsen*, 512 U.S. at 778.

Finally, the Government argues that the district court erred by issuing the injunction against the President himself. Appellants' Br. 55 (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) (finding that a court could not enjoin the President from carrying out an act of Congress)). We recognize that "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,'" *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (opinion of O'Connor, J.) (quoting *Johnson*, 71 U.S. at 501), and that a "grant of injunctive relief against the President himself is extraordinary, and should . . . raise[] judicial eyebrows," *id.* at 802. In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction

against the President himself. We therefore lift the injunction as to the President only. The court's preliminary injunction shall otherwise remain fully intact.

To be clear, our conclusion does not "in any way suggest[] that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment). Even though the President is not "directly bound" by the injunction, we "assume it is substantially likely that the President . . . would abide by an authoritative interpretation" of Section 2(c) of the Second Executive Order. *Id.* at 803 (opinion of O'Connor, J.).

## VI.

For all of these reasons, we affirm in part and vacate in part the preliminary injunction awarded by the district court. We also deny as moot Defendants' motion for a stay pending appeal.

*AFFIRMED IN PART, VACATED IN PART*

TRAXLER, Circuit Judge, concurring in the judgment:

I concur in the judgment of the majority insofar as it affirms the district court's issuance of a nationwide preliminary injunction as to Section 2(c) of the Executive Order against the officers, agents, and employees of the Executive Branch of the United States, and anyone acting under their authorization or direction, who would attempt to enforce it, because it likely violates the Establishment Clause of the United States Constitution.  I also concur in the judgment of the majority to lift the injunction as to President Trump himself.

BARBARA MILANO KEENAN, Circuit Judge, with whom JUDGE THACKER joins except as to Part II.A.i., concurring in part and concurring in the judgment:

I concur in the majority opinion's analysis with respect to its conclusions: (1) that the stated "national security purpose" of the Second Executive Order[1] likely fails *Mandel*'s "bona fide" test and violates the Establishment Clause, *see Kleindienst v. Mandel*, 408 U.S. 753 (1972); and (2) that the record before us supports the award of a nationwide injunction.[2] I write separately to express my view that although the plaintiffs are unlikely to succeed on the merits of their claim under Section 1152(a)(1)(A), their request for injunctive relief under the INA nevertheless is supported by the failure of Section 2(c) to satisfy the threshold requirement of Section 1182(f) for the President's lawful exercise of authority.[3]

---

[1] Exec. Order No. 13,780, *Protecting the Nation from Foreign Terrorist Entry Into the United States*, 82 Fed. Reg. 13,209 (Mar. 6, 2017).

[2] Based on my view that the Second Executive Order does not satisfy the threshold requirement of 8 U.S.C. § 1182(f) for exercise of a president's authority under that statute, I would conclude that the Second Executive Order is not "facially legitimate" within the meaning of *Mandel*, 408 U.S. at 770. Nevertheless, I join in the majority opinion's holding that the plaintiffs are likely to succeed on the merits of their Establishment Clause claim, based on my further conclusion that the Second Executive Order likely fails *Mandel*'s "bona fide" test. In reaching this conclusion, I additionally note that I do not read the majority opinion as holding that a plausible allegation of bad faith alone would justify a court's decision to look behind the government's proffered justification for its action. Rather, in accordance with Justice Kennedy's concurrence in *Din*, a plaintiff must make an affirmative showing of bad faith to satisfy the "bona fide" requirement of *Mandel*. *See Kerry v. Din*, 135 S. Ct. 2128, 2140–41 (2015) (Kennedy, J., concurring in the judgment).

[3] We may consider this facial deficiency not raised by the plaintiffs because this defect is apparent from the record. *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (Continued)

I.

As an initial matter, I conclude that John Doe #1 has standing to raise a claim that the Second Executive Order violates the INA.[4] To establish standing under Article III, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). A plaintiff seeking "to enjoin a future action must demonstrate that he is immediately in danger of sustaining some direct injury as the result" of the challenged conduct, which threat of injury is "both real and immediate." *Beck v. McDonald*, 848 F.3d 262, 277 (4th Cir. 2017) (internal quotation marks omitted) (quoting *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012)).

Prolonged separation from one's family members constitutes a cognizable injury-in-fact. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) (per curiam). As the government concedes, by barring entry of nationals from the six identified countries, Section 2(c) of the Second Executive Order operates to delay, or ultimately to prevent, the issuance of visas to nationals from those countries.

_____

(4th Cir. 2014) (explaining that the Court may affirm on any grounds apparent from the record).

[4] Because only one plaintiff must have standing for the Court to consider a particular claim, I do not address whether the other plaintiffs also have standing to challenge the Second Executive Order under the INA. *See Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014).

Before the President issued the Second Executive Order, John Doe #1 filed a visa application on behalf of his Iranian national wife, and took substantial steps toward the completion of the visa issuance process. However, his wife's request for a visa is still pending. It is self-evident from the language and operation of the Order that the 90-day "pause" on entry, which the government may extend, is likely to delay the issuance of a visa to John Doe #1's wife and her entry into the United States, a likelihood that is not remote or speculative.[5] Accordingly, I conclude that John Doe #1 has established the existence of an injury-in-fact that is fairly traceable to the Second Executive Order, and which is likely to be redressed by a favorable decision in this case.

## II.

I turn to consider whether the plaintiffs are entitled to a preliminary injunction based on the likelihood that the Second Executive Order violates the INA. This Court evaluates a district court's decision to grant a preliminary injunction based on an abuse-of-discretion standard. *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012). Under this standard, we review the district court's factual findings for clear error and review its legal conclusions de novo. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

---

[5] For the same reasons, I reject the government's contention that the plaintiffs' claims are not ripe for review. The harm to the plaintiffs caused by separation from their family members is imminent and concrete, and is not ameliorated by the hypothetical possibility that the plaintiffs might receive a discretionary waiver under Section 3(c) of the Second Executive Order at some point in the future.

A preliminary injunction is an "extraordinary remedy," which may be awarded only upon a "clear showing" that a plaintiff is entitled to such relief. *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345–46 (4th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)), *vacated on other grounds*, 559 U.S. 1089 (2010). Preliminary relief affords a party before trial the type of relief ordinarily available only after trial. *Id*. at 345. A preliminary injunction must be supported by four elements: (1) a likelihood of success on the merits; (2) that the plaintiff likely will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities weighs in the plaintiff's favor; and (4) that a preliminary injunction is in the public interest. *Id*. at 346.

## A.

I begin by considering whether the plaintiffs are likely to succeed on the merits of a claim that the Second Executive Order fails to comply with the requirements of the INA. In interpreting a statute, courts first must consider the plain meaning of the statutory language. *United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010). A statute's plain meaning derives from consideration of all the words employed, rather than from reliance on isolated statutory phrases. *Id.* (citing *United States v. Mitchell*, 518 F.3d 230, 233–34 (4th Cir. 2008)).

### i.

Initially, I would reject the plaintiffs' contention that 8 U.S.C. § 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the issuance of immigrant visas, operates as a limitation on the President's authority under 8 U.S.C. § 1182(f) to

84

"suspend the entry of all aliens or any class of aliens" if he finds that the entry of such aliens "would be detrimental to the interests of the United States." Section 1152(a)(1)(A) provides that:

> [N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

Thus, the plain language of Section 1152(a)(1)(A) addresses an alien's ability to obtain an immigrant visa. Section 1182(f), on the other hand, explicitly addresses an alien's ability to *enter* the United States, and makes no reference to the issuance of visas. *See* 8 U.S.C. § 1182(f). I am unpersuaded by the plaintiffs' attempt to read into Section 1152(a)(1)(A) terms that do not appear in the statute's plain language.

Sections 1152(a)(1)(A) and 1182(f) address two distinct actions in the context of immigration, namely, the issuance of a visa and the denial of an alien's ability to enter the United States. Indeed, the fact that an alien possesses a visa does not guarantee that person's ability to enter the United States. For example, an alien who possesses a visa may nonetheless be denied admission into the United States for a variety of reasons set forth elsewhere in the INA. *See* 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [sic] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law."). For these reasons, I would reject the plaintiffs' assertion that Section 1152(a)(1)(A) provides a basis for affirming the preliminary injunction issued by the district court.

Nevertheless, I would conclude that the plaintiffs' request for injunctive relief is supported by the President's failure to comply with Section 1182(f). In issuing his proclamation under Section 2(c), the President relied exclusively on two provisions of the INA. The President stated in material part:

> I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

82 Fed. Reg. at 13,213.

Section 1185(a), however, does not confer any authority on a president. Instead, that statute imposes certain requirements on persons traveling to and from the United States, and renders unlawful their failure to comply with the requirements of the statute.

In contrast, Section 1182(f) addresses a president's authority to impose restrictions on the entry of aliens into the United States. Section 1182(f) states, in relevant part: "Whenever the [p]resident finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," the president may "suspend the entry [into the United States] of all aliens or any class of aliens." Although this language provides broad discretion to a president to suspend the entry of certain aliens and classes of aliens, that discretion is not unlimited.

The plain language of Section 1182(f) permits a president to act only if he "finds" that entry of the aliens in question "*would be* detrimental to the interests of the United States" (emphasis added). In my view, an unsupported conclusion will not satisfy this "finding" requirement. Otherwise, a president could act in total disregard of other material provisions of the INA, thereby effectively nullifying that complex body of law enacted by Congress.

Here, the President's "finding" in Section 2(c) is, in essence, a non sequitur because the "finding" does not follow from the four corners of the Order's text. In particular, the text fails to articulate a basis for the President's conclusion that entry by any of the approximately 180 million[6] individuals subject to the ban "would be detrimental to the interests of the United States."

I reach this conclusion by examining the Order's relevant text. In Section 1(a) of the Order, the President declares that the policy of the United States is "to protect its citizens from terrorist attacks, including those committed by foreign nationals," and "to improve the screening and vetting protocols and procedures" involved in issuing visas and in the administration of the United States Refugee Admissions Program. 82 Fed.

---

[6] *See* Cent. Intelligence Agency, *The World Factbook*, *Country Comparison: Population*, https://www.cia.gov/library/publications/the-world-factbook/rankorder/2119rank.html (last visited May 19, 2017) (saved as ECF opinion attachment) (listing populations of the six identified countries, in the total amount of more than 180 million). Notably, the class of banned "nationals" potentially includes citizens of one of the six identified countries whether or not those citizens have ever been physically present in one of these countries. *See* Cent. Intelligence Agency, *The World Factbook*, *Field Listing: Citizenship*, https://www.cia.gov/library/publications/the-world-factbook/fields/2263.html (last visited May 19, 2017) (saved as ECF opinion attachment).

Reg. at 13,209. The Order explains that such screening and vetting procedures are instrumental "in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States." *Id.*

The Order further states that the governments of Iran, Libya, Somalia, Sudan, Syria, and Yemen are unlikely to be willing or able "to share or validate important information about individuals seeking to travel to the United States," because these countries: (1) have porous borders facilitating "the illicit flow of weapons, migrants, and foreign terrorist fighters"; (2) have been compromised by terrorist organizations; (3) contain "active conflict zones"; or (4) are state sponsors of terrorism. *Id.* at 13,210–11. In light of these conditions, the Second Executive Order proclaims that "the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high." *Id.* at 13,211.

Significantly, however, the Second Executive Order does not state that any *nationals* of the six identified countries, *by virtue of their nationality*, intend to commit terrorist acts in the United States or otherwise pose a detriment to the interests of the United States. Nor does the Order articulate a relationship between the unstable conditions in these countries and any supposed propensity of the nationals of those countries to commit terrorist acts or otherwise to endanger the national security of the United States. For example, although the Order states that several of the six countries permit foreigners to establish terrorist safe havens within the countries' borders, the Order does not assert that any *nationals* of the six countries are likely to have joined

88

terrorist organizations operating within those countries, or that members of terrorist organizations are likely to pose as *nationals* of these six countries in order to enter the United States to "commit, aid, or support acts of terrorism." *See id.* at 13,210–12 (noting, among other things, that the Syrian government "has allowed or encouraged extremists to pass through its territory to enter Iraq," and that "ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States").

The text of the Second Executive Order therefore does not identify a basis for concluding that entry of any member of the particular class of aliens, namely, the more than 180 million nationals of the six identified countries, would be detrimental to the interests of the United States. In the absence of any such rationale articulating the risks posed by this class of foreign nationals, the President's proclamation under Section 2(c) does not comply with the "finding" requirement of the very statute he primarily invokes to issue the ban imposed by Section 2(c).

The government asserted at oral argument in this case that the Second Executive Order nevertheless can stand on the rationale that the President is "not sure" whether any of the 180 million nationals from the six identified countries present a risk to the United States. Oral Arg. 38:04–40:11. I disagree that this rationale is sufficient to comply with the specific terms of Section 1182(f). Although this statute does not require the President to find that the entry of any alien or class of aliens would present a danger to the United States, the statutory text plainly requires more than vague uncertainty regarding whether their entry might be detrimental to our nation's interests. Indeed, given the scope of

89

Section 2(c), the President was required under Section 1182(f) to find that entry of any members of the identified class *would be* detrimental to the interests of the United States.

Instead of articulating a basis why entry of these foreign nationals "would be detrimental" to our national interests, the Order merely proposes a process under which the executive branch will study the question. *See* 82 Fed. Reg. at 13,212–13. This "study" proposal is an implicit acknowledgement that, presently, there is no affirmative basis for concluding that entry of nationals from these six countries "*would be* detrimental to the interests of the United States." 8 U.S.C. § 1182(f) (emphasis added).

The government likewise fails in its attempt to justify the Second Executive Order by relying on the prior exclusion of individuals from the Visa Waiver Program who had certain connections to the six countries identified in the Order. *See* 82 Fed. Reg. at 13,209. Generally, the Visa Waiver Program allows nationals of specific countries to travel to the United States without a visa for purposes of tourism or business for up to 90 days. *See generally* 8 U.S.C. § 1187. Based on modifications to the Program made by Congress in 2015 and by the Secretary of Homeland Security in 2016, people with certain connections to the six named countries no longer were permitted to participate in the Program.[7] As a result, those newly ineligible aliens became subject to the *standard*

---

[7] *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, § 203, 129 Stat. 2242, 2989–91; Department of Homeland Security, U.S. Customs and Border Protection-009 Electronic System for Travel Authorization System of Records, 81 Fed. Reg. 39,680, 39,682 (June 17, 2016).

procedures required for the issuance of visas.[8] Thus, exclusion from the Visa Waiver Program merely reimposed for such aliens the customary requirements for obtaining a visa, and did not impose any additional conditions reflecting a concern that their entry "would be detrimental to the interests of the United States." Further, the above-described limitations of the Visa Waiver Program underscore the fact that, currently, the relevant class of aliens does not enjoy "*unrestricted* entry" into the United States as incorrectly stated in Section 2(c) of the Second Executive Order. *See* 82 Fed. Reg. at 13,213 (emphasis added).

Accordingly, I would hold that the text of Section 2(c) fails to meet the statutory precondition for the lawful exercise of a president's authority under Section 1182(f). I thus conclude that the plaintiffs likely would succeed on the merits of this particular statutory issue. *See Winter*, 555 U.S. at 20.

### B.

I also would conclude with respect to Section 1182(f) that the plaintiffs would satisfy the remaining *Winter* factors, because they are "likely to suffer irreparable harm in the absence of preliminary relief," the balance of the equities would resolve in their favor, and an injunction would be in the public interest. *Id.* First, at a minimum, plaintiff John Doe #1 has shown that absent an injunction, he likely will be subject to imminent and

---

[8] *See* U.S. Customs & Border Prot., *Visa Waiver Program Improvement and Terrorist Travel Prevention Act Frequently Asked Questions*, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/visa-waiver-program-improvement-and-terrorist-travel-prevention-act-faq (last visited May 19, 2017) (saved as ECF opinion attachment).

irreparable harm based on the prolonged separation from his wife that will result from enforcement of the Second Executive Order. *See Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc). And, based on my conclusion that Section 2(c) is invalid on its face, I would hold that an injunction should be issued on a nationwide basis.

Next, the balance of harms weighs in favor of granting a preliminary injunction. *See Winter*, 555 U.S. at 24. The government's interest in enforcing laws related to national security as a general matter would be a strong factor in its favor. *See Haig v. Agee*, 453 U.S. 280, 307 (1981). However, because the Second Executive Order does not comply with the threshold requirement for a president's lawful exercise of authority under Section 1182(f), the government's interest cannot outweigh the real harms to the affected parties. *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (reviewing the First Executive Order, dismissing the government's claim of irreparable injury, and noting that "the Government has done little more than reiterate" its general interest in combating terrorism).

Finally, the public interest also strongly favors a preliminary injunction, because the public has an interest "in free flow of travel" and "in avoiding separation of families." *Id.* at 1169. And, most importantly, the public interest is served by ensuring that any actions taken by the President under Section 1182(f) are lawful and do not violate the only restraint on his authority contained in that statute.

## III.

Accordingly, in addition to affirming the district court's judgment with respect to the plaintiffs' Establishment Clause claim and the issuance of a nationwide injunction, I would affirm the court's judgment and award of injunctive relief on the separate basis that the Second Executive Order is invalid on its face because it fails to comply with the "finding" requirement of Section 1182(f).

WYNN, Circuit Judge, concurring:

Invidious discrimination that is shrouded in layers of legality is no less an insult to our Constitution than naked invidious discrimination. We have matured from the lessons learned by past experiences documented, for example, in *Dred Scott* and *Korematsu*. But we again encounter the affront of invidious discrimination—this time layered under the guise of a President's claim of unfettered congressionally delegated authority to control immigration and his proclamation that national security requires his exercise of that authority to deny entry to a class of aliens defined solely by their nation of origin. Laid bare, this Executive Order is no more than what the President promised before and after his election: naked invidious discrimination against Muslims. Such discrimination contravenes the authority Congress delegated to the President in the Immigration and Nationality Act (the "Immigration Act"), 8 U.S.C. § 1101 *et seq.*, and it is unconstitutional under the Establishment Clause.

To that end, I concur fully in the majority opinion, including its analysis and conclusion that Section 2(c) of the Executive Order, which suspends entry of nationals from six predominantly Muslim countries, likely violates the Establishment Clause. In particular, I agree that even when the President invokes national security as a justification for a policy that encroaches on fundamental rights, our courts must not turn a blind eye to statements by the President and his advisors bearing on the policy's purpose and constitutionality. Those statements characterized Section 2(c) as the realization of the

President's repeated promise, made before and after he took office, to ban Muslims.[1] And I agree that "the Government's asserted national security interest in enforcing Section 2(c) appears to be a post hoc, secondary justification for an executive action rooted in religious animus and intended to bar Muslims from this country."[2] *Ante* at 75.

I write separately because I believe Plaintiffs' claim that Section 2(c) exceeds the President's authority under the Immigration Act also is likely to succeed on the merits. That statute authorizes the President to suspend the "entry of any aliens or of any class of aliens" that he finds "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Because the Executive Order here relies on national origin as a proxy for discrimination based on religious animus, the Government's argument that Section 2(c)'s suspension on entry "falls squarely within the President's broad authority"

---

[1] The answer to the rhetorical question of whether the President will be able to "free himself from the stigma" of his own self-inflicted statements, *post* at 189, lies in determining whether the Executive Order complies with the rule of law. That requires us to consider, in each instance, how the character, temporality, and nature of the President's repeated, public embrace of an invidiously discriminatory policy offensive to the Constitution bear on a challenged policy.

[2] It strains credulity to state that "the security of our nation is indisputably *lessened* as a result of the injunction." *Post* at 188 (emphasis added). Rather, the district court's order only enjoined implementation of Section 2(c) of the Executive Order—a provision that the President maintained would *increase* national security. Indeed, two reports released by the Department of Homeland Security in February 2017 and March 2017 found that citizenship is an "unlikely indicator" of whether an individual poses a terrorist threat to the United States and that most of the individuals who have become U.S.-based violent extremists have been radicalized after living in the United States for a period of years. J.A. 233. The Government has not provided any information suggesting, much less establishing, that the security risks facing our country are any different today than they were when the President first sought to impose this temporary ban only seven days into his presidency.

under Section 1182(f) essentially contends that Congress delegated to the President virtually unfettered discretion to deny entry to any class of aliens, including to deny entry solely on the basis of nationality and religion. Appellants' Br. at 28. Not so.

To the contrary, the Immigration Act provides no indication that Congress intended the "broad generalized" delegation of authority in Section 1182(f) to allow the President "to trench . . . heavily on [fundamental] rights."[3] And even if the plain language of Section 1182(f) suggested Congress had given the President such unfettered discretion to invidiously discriminate based on nationality and religion—which it does not—a statute delegating to the President the authority to engage in such invidious discrimination would raise grave constitutional concerns. Indeed, imposing burdens on individuals solely on the basis of their race, national origin, or religion—"a classification of persons undertaken for its own sake . . . inexplicable by anything but animus towards the class it affects"[4]—is "odious to a free people whose institutions are founded upon the doctrine of equality."[5] That is why—even when faced with a congressional delegation of seemingly unbridled power to the President or his appointees—the Supreme Court repeatedly "ha[s] read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation" when the delegation provides no explicit

---

[3] *Kent v. Dulles*, 357 U.S. 116, 129–30 (1958).

[4] *Romer v. Evans*, 517 U.S. 620, 636, 632 (1996).

[5] *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).

96

statement that Congress intended for the executive to use the delegated authority in a manner in conflict with constitutional protections.[6]

Accordingly, I conclude that Section 2(c)'s suspension on entry likely exceeds the President's authority under the Immigration Act to deny entry to classes of aliens.

## I.

The majority opinion does not reach the merits of Plaintiffs' claim that Section 2(c)'s suspension on entry violates the Immigration Act, and Section 1182(f), in particular. *Ante* at 28–31. The district court, however, concluded that the Executive Order likely violates the Immigration Act insofar as Section 2(c) effectively prohibits the issuance of immigrant visas to aliens from the six countries based on their nationalities. *Int'l Refugee Assistance Project v. Trump*, -- F. Supp. 3d --, 2017 WL 1018235, at *10 (D. Md. Mar. 16, 2017). And the Government has argued, both on appeal and before the district court, that the suspension on entry falls within the President's delegated power under Section 1182(f). Appellants' Br. at 28–30. Accordingly, the question of whether Section 2(c) complies with Section 1182(f) is squarely before this Court.[7]

---

[6] *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

[7] The Government also asserts that Section 2(c)'s suspension on entry is authorized by Section 1185(a) of the Immigration Act, which "authorizes the President to prescribe 'reasonable rules, regulations, and orders,' as well as 'limitations and exceptions,' governing the entry of aliens." Appellants' Brief at 29 (quoting 8 U.S.C. § 1185(a)). The Government does not argue that Sections 1182(f) and 1185(a) confer meaningfully different powers on the President. Because Section 1182(f) is specifically tailored to the suspension on entry, and because there is no reason to believe that the (Continued)

Section 1182(f) provides, in relevant part, that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Like the district court, the majority opinion finds, and I agree, that Plaintiffs are likely to establish—based on statements by the President and his advisors—that in promulgating Section 2(c), the President relied on one suspect classification (national origin) as a proxy to purposely discriminate against members of another suspect class (adherents to a particular religion) solely on the basis of their membership in that class. *Ante* at 58. Thus, in considering Plaintiffs' statutory claim, we confront the following question: Did Congress, in enacting Section 1182(f),

_____

analysis would be different under Section 1185(a), my analysis will proceed under Section 1182(f).

Additionally, because the Executive Order cites the Immigration Act as the sole statutory basis for the President's authority to proclaim Section 2(c)'s suspension on entry, I need not, and thus do not, take any position on the scope of the President's delegated power to deny entry to classes of aliens under other statutes. Likewise, because the claim at issue relates only to Section 2(c)'s compliance with the Immigration Act, I do not address whether, and in what circumstances, the President may deny entry to classes of aliens under his inherent powers as commander-in-chief, even absent express congressional authorization. *See The Prize Cases*, 67 U.S. 635 (1862).

Finally, I agree with Judge Keenan's analysis and conclusion that, at a minimum, John Doe #1 has standing to pursue Plaintiffs' Immigration Act claim. *Ante* at 82–83.

authorize the President to deny entry to a class of aliens on the basis of invidious discrimination?

## A.

Two related canons of statutory construction bear directly on this question. First, under the "constitutional avoidance canon," "when an Act of Congress raises 'a serious doubt' as to its constitutionality, '[courts must] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible' [courts] are obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (citation omitted) (quoting *Crowell*, 285 U.S. at 62). This canon "rest[s] on the reasonable presumption that Congress did not intend [an interpretation] which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Put differently, "[t]he courts will . . . not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

The Supreme Court has applied the constitutional avoidance canon on several occasions to narrow facially broad statutes relating to immigration and national security. For example, in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court assessed whether Section 1231(a)(6) of the Immigration Act—which provides that certain

categories of aliens who have been ordered removed "may be detained beyond the removal period"—authorized the detention of such categories of aliens indefinitely. 533 U.S. at 689. Notwithstanding that Section 1231(a)(6) placed no express limitation on the duration of such detentions, the Supreme Court "read an implicit limitation into the statute . . . limit[ing] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* Explaining that "permitting indefinite detention of an alien would raise a serious constitutional problem" and noting the absence of "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed," the Supreme Court concluded that the constitutional avoidance canon required adoption of the "implicit limitation." *Id.* at 690, 697.

The Supreme Court also relied on the constitutional avoidance canon in *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001). In that case, the Supreme Court rejected the Government's arguments that two statutes amending the Immigration Act (1) deprived the judiciary of jurisdiction to review habeas petitions filed by certain aliens subject to removal orders and (2) retroactively deprived certain aliens who had pled guilty to criminal offenses— which convictions rendered such aliens removable—the opportunity to pursue a discretionary waiver of removal, notwithstanding that such aliens had been entitled to pursue such a waiver at the time of their plea. *Id.* at 292–93, 297. In reaching these conclusions, the Supreme Court acknowledged that Congress, at least in certain circumstances, has the constitutional authority to repeal habeas jurisdiction and to make legislation retroactive. *Id.* at 298–99, 315–16. Nonetheless, because (1) the

100

Government's proposed constructions would require the Supreme Court to hold that Congress intended to exercise "the outer limits of [its] power" under the Constitution and (2) the legislation included no "clear, unambiguous, and express statement of congressional intent" indicating that Congress intended to exercise the "outer limits" of its power, the Supreme Court rejected the Government's positions. *Id.* at 299, 313–26.

The second applicable canon of construction—which is a corollary to the constitutional avoidance canon—requires an even clearer indication of congressional intent regarding the infringement on constitutional rights due to the absence of direct action by Congress. That canon forbids courts from construing a "broad generalized" delegation of authority by Congress to the executive as allowing the executive to exercise that delegated authority in a matter that "trench[es]" upon fundamental rights, *Kent v. Dulles*, 357 U.S. 116, 129 (1958), absent an "explicit" statutory statement providing the executive with such authority, *Greene v. McElroy*, 360 U.S. 474, 507 (1959). Under this canon, which I will refer to as the "delegation of authority canon," courts must "construe narrowly all delegated powers that curtail or dilute" fundamental rights. *Kent*, 357 U.S. at 129; *see also United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring) ("The area of permissible indefiniteness [in a delegation] narrows, however, when the regulation . . . potentially affects fundamental rights . . . . This is because the numerous deficiencies connected with vague legislative directives . . . are far more serious when liberty and the exercise of fundamental rights are at stake."). The Supreme Court requires that delegations that potentially authorize the executive to encroach on fundamental rights "be made explicitly not only to assure that individuals are not

deprived of cherished rights under procedures not actually authorized, but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting *and* implementing our laws." *Greene*, 360 U.S. at 507 (emphasis added) (citation omitted).

As with the constitutional avoidance canon, the Supreme Court has applied the delegation of authority canon to statutes involving immigration and national security. For example, in *United States v. Witkovich*, 353 U.S. 194 (1957), the Supreme Court interpreted Section 242(d)(3) of the Immigration and Nationality Act of 1952, which provided that the Attorney General could require any alien subject to a final order of deportation that had been outstanding for more than six months "to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper." 353 U.S. at 195 (quoting 8 U.S.C. § 1252(d)(3) (1952)). The Government asserted that the plain language of the provision afforded the Attorney General near unfettered discretion to demand information from such aliens. *Id.* at 198. Although the Supreme Court acknowledged that "[t]he language of [Section] 242(d)(3), if read in isolation and literally, appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of [such] aliens," the Supreme Court limited the Attorney General's authority under Section 242(d)(3) to "questions reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue." *Id.* at 199, 202. In rendering this narrowing construction, the Supreme Court emphasized, first, that

the broad reading proposed by the Government would call into question the statute's constitutional validity and, second, that the context and legislative history did not provide unambiguous evidence that Congress intended to give the Attorney General the unbridled authority the Government claimed. *Id.* at 199–200.

The Supreme Court also applied the delegation of authority canon in *Kent v. Dulles*, 357 U.S. 116 (1958). There, the Supreme Court was asked to construe a statute providing that "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 357 U.S. at 123 (internal quotation marks omitted) (quoting 22 U.S.C. § 211a (1952)). Pursuant to that authority, the executive branch promulgated a regulation authorizing the Secretary of State to demand an affidavit from any passport applicant averring whether the applicant had ever been a Communist and barring issuance of passports to Communists. *Id.* at 118 & n.2. Under that regulation, the Department of State denied a passport to an applicant on grounds he refused to submit such an affidavit. *Id.* at 118–19. Thereafter, the applicant sought a declaratory judgment that the regulation was unconstitutional. *Id.* at 119. Despite the breadth of the plain language of the delegating statute, the Supreme Court "hesitate[d] to impute to Congress . . . a purpose to give [the Secretary of State] unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." *Id.* at 128. Emphasizing (1) that the authority to deny a passport necessarily involved the power to infringe on the fundamental right to travel and (2) that the statutory delegation provision's "broad generalized" terms were devoid of any "explicit" indication Congress had intended to

103

"give[] the Secretary authority to withhold passports to citizens because of their beliefs or associations," the Supreme Court refused "to find in this broad generalized power an authority to trench so heavily on the rights of the citizen." *Id.* at 129–30.

Taken together, the two canons reflect the basic principle that "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *St. Cyr*, 533 U.S. at 299; *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 548 (1950) (Frankfurter, J., dissenting) (explaining that legislation potentially encroaching on fundamental rights "should not be read in such a decimating spirit unless the letter of Congress is inexorable"). Although closely related, the two canons are analytically distinct. In particular, the constitutional avoidance canon involves *direct actions* by Congress that potentially encroach upon fundamental rights. By contrast, the delegation of authority canon governs *delegations* by Congress that potentially allow a delegatee to exercise congressional power to encroach on fundamental rights. Because Congress does not itself decide when or how its delegated authority will be exercised, any encroachment on individual rights by Congress's delegatee must be supported by an "explicit" statement that Congress intended to permit such encroachment, *Greene*, 360 U.S. at 507—a more stringent requirement than the "clear indication" necessary when Congress acts directly, *Zadvydas*, 533 U.S. 696–97.

### B.

The constitutional avoidance canon and the delegation of authority canon bear directly on the scope of authority conferred on the President by Congress under Section

1182(f) because, if construed broadly, Section 1182(f) could authorize the President to infringe on fundamental constitutional rights. In particular, the Supreme Court has "consistently repudiated '(d)istinctions between citizens solely because of their ancestry' [or race] as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'" *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). "[T]he imposition of special disabilities" upon a group of individuals based on "immutable characteristic[s] determined solely by the accident of birth," like race and national origin, runs contrary to fundamental constitutional values enshrined in the Fifth and Fourteenth Amendments because it "violate[s] 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility.'" *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (quoting *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972)). Accordingly, the Constitution forbids "[p]referring members of any one group for no reason other than race or ethnic origin." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (Powell, J., concurring in judgment). Or, more simply, the Constitution prohibits "discrimination for its own sake." *Id.*

Although religion, unlike race and national origin, is not an immutable characteristic, the Constitution treats classifications drawn on religious grounds as equally offensive. The First Amendment "mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). To that end, the Constitution forbids both discriminating

105

against "those who embrace[] one religious faith rather than another" and "preferring some religions over others—an invidious discrimination that would run afoul of the [Constitution]." *United States v. Seeger*, 380 U.S. 163, 188 (1965) (Douglas, J., concurring).

If, as the Government's argument implies, Congress delegated to the President the authority to deny entry to an alien or group of aliens based on invidious discrimination against a race, nationality, or religion, then Section 1182(f) would encroach on the core constitutional values set forth in the First, Fifth, and Fourteenth Amendments: The President could deny entry to aliens of a particular race solely based on the color of their skin. The President could deny entry to citizens of a particular nation solely on the basis of their place of birth. The President could deny entry to adherents of a particular religion solely because of their subscription to that faith. Or, as this Court concludes the President likely did here, the President could rely on one form of invidious discrimination—discrimination based on national origin—to serve as pretext for implementing another form of invidious discrimination—discrimination based on religion.

The President justified his use of this layered invidious discrimination on grounds that citizens of the six predominantly Muslim countries subject to the suspension on entry pose a special risk to United States security. Revised Order § 1(e). In particular, the Executive Order generally points to "the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations." *Id.* § 1(d). The order also cites, as the sole example of an act of terrorism by a native of one

106

of the six countries, a native of Somalia who was brought to the United States as a refugee at the age of two and was convicted, as an adult, of "attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon." *Id.* § 1(h).

Accordingly, the President relies on the acts of *specific* individuals and groups of individuals (*i.e.*, "terrorist organizations" and "their members") within the six countries to establish that *all* citizens of those countries pose a danger to the United States. Dissenting from the Supreme Court's sanctioning of the forced internment of Japanese Americans during World War II, Justice Murphy explained the danger such rationales pose to the core constitutional value of equality:

> [T]o infer that examples of individual [misconduct] prove group [misconduct] and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights. Moreover, this inference . . . has been used in support of the abhorrent and despicable treatment of minority groups by the dictatorial tyrannies which this nation is now pledged to destroy. To give constitutional sanction to that inference . . . is to adopt one of the cruelest of the rationales used by our enemies to destroy the dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow.

*Korematsu v. United States*, 323 U.S. 214, 240 (1944) (Murphy, J., dissenting).

To be sure, the Supreme Court has recognized that, particularly in times of war,[8] Congress has broad authority to control immigration, including the power to authorize the

---

[8] Congress's constitutional power to control immigration—and authority to delegate that control—fundamentally differs in a time of war. *Korematsu v. United States*, 323 U.S. 214, 224 (1944) (Frankfurter, J., concurring) ("[T]he validity of action under the war power must be judged wholly in the context of war. That action is not to (Continued)

President to establish policies restricting the entry of aliens. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (stating that "the power to admit or exclude aliens is a sovereign prerogative" entrusted almost exclusively to Congress). And "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Mathews v. Diaz*, 426 U.S. 67, 80 (1976)).

But the Supreme Court also has long, and repeatedly, held that Congress's power to create immigration laws remains "subject to important constitutional limitations." *Zadvydas*, 533 U.S. at 695; *see also, e.g.*, *I.N.S. v. Chadha*, 462 U.S. 919, 940–41 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power."); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889) (holding that Congress's constitutionally devised powers to control immigration, among other powers, are "restricted in their exercise only by the

---

be stigmatized as lawless because like action in times of peace would be lawless."). The Supreme Court's broadest statements regarding the scope of the President's delegated powers over immigration—which are relied upon by the Government—are in cases in which Congress expressly declared war and authorized the President to deny entry to aliens as part of his prosecution of the conflict. *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 & n.7 (1953) ("Congress expressly authorized the President to impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife [including] *the present emergency* [the Korean War]." (emphasis added)); *Knauff*, 338 U.S. at 543 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country *during a time of national emergency* [World War II]." (emphasis added)).

108

constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). That is particularly true when the discriminatory burdens of an immigration policy fall not just on aliens who have no claim to constitutional rights, but also on citizens and other individuals entitled to constitutional protections. *Cf. Zadvydas*, 533 U.S. at 693–94 (surveying the Supreme Court's immigration jurisprudence and finding that whether a plaintiff alien could lay claim to constitutional protections "made all the difference").

Here, aliens who are denied entry by virtue of the President's exercise of his authority under Section 1182(f) can claim few, if any, rights under the Constitution. But when the President exercises that authority based solely on animus against a particular race, nationality, or religion, there is a grave risk—indeed, likelihood—that the constitutional harm will redound to *citizens*. For example, we hold today that the denial of entry to a class of aliens solely based on their adherence to a particular religion likely violates the Establishment Clause by sending "a state-sanctioned message that foreign-born Muslims . . . are 'outsiders, not full members of the political community.'" *Ante* at 38 (quoting *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012)). Likewise, were the President to deny entry to a class of aliens solely based on their race, *citizens* of that race would be subjected to a constitutionally cognizable "feeling of inferiority as to their status in the community." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 494 (1954). And denying entry to classes of aliens based on invidious discrimination has the potential to burden the fundamental right of *citizens* to marry the partner of their choice based on nothing more than the partner's race,

109

nationality, or religion.[9] *Loving*, 388 U.S. at 12 ("There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause."). Put simply, when the Government engages in invidious discrimination—be it against aliens or citizens—individuals whose rights the Constitution protects face substantial harm.

Because construing Section 1182(f) as authorizing the President to engage in invidious discrimination is plainly inconsistent with basic constitutional values and because the violation of those values implicates the rights of citizens and lawful permanent residents, not just aliens, the Government's proposed construction "raise[s] serious constitutional problems." *St. Cyr*, 533 U.S. at 299–300.

## C.

Having concluded that the Government's broad reading of Section 1182(f) raises serious constitutional concerns, we must reject that construction absent a "clear indication of congressional intent" to allow the President to deny the entry of classes of aliens on invidiously discriminatory bases. *Zadvydas*, 533 U.S. at 696–97. And because Section 1182(f) involves a delegation of congressional authority, not a direct action by Congress, the indication of congressional intent to authorize the President, as delegatee, to encroach on fundamental rights must be "explicit." *Greene*, 360 U.S. at 507.

---

[9] *See Kerry v. Din*, 135 S. Ct. 2128, 2142 (2015) (Breyer, J., dissenting) (stating that a United States citizen and resident has a procedural due process interest in knowing the Government's grounds for denying a visa application by her husband, an Afghan citizen with no claim to rights under the Constitution); *id.* at 2139 (Kennedy, J., concurring in judgment) (recognizing that a United States citizen may have "a protected liberty interest in the visa application of her alien spouse").

To ascertain congressional intent, we look to the "plain meaning" of Section 1182(f). *Ross v. R.A. North Dev., Inc. (In re Total Realty Mgmt.)*, 706 F.3d 245, 251 (4th Cir. 2013). "To determine a statute's plain meaning, we not only look to the language itself but also the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (internal quotation marks omitted); *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (holding that in ascertaining congressional intent, courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy" (internal quotation marks omitted)). Here, neither the language of Section 1182(f), nor the context in which the language is used, nor the "object and policy" underlying the Immigration Act "explicitly" state, much less "clear[ly] indicat[e]," that Congress intended to authorize the President to deny entry to aliens based on invidious discrimination.

1.

Beginning with the plain language, Section 1182(f) permits the President to suspend the entry of "any aliens or of any class of aliens" *only* when he "finds that the entry of [such aliens] would be detrimental to the interests of the United States." Accordingly, the plain language of Section 1182(f) does not explicitly authorize the President to deny entry to a class of aliens solely defined by religion or by race, national origin, or other immutable characteristic.

Nonetheless, in arguing that Section 1182(f) authorizes the Executive Order's suspension on entry, the Government focuses on that statute's use of the (concededly

111

broad) term "any class of aliens." Appellants' Br. at 28–29. But the Government's argument omits the crucial limitation Congress imposed by requiring that the President may bar entry *only* upon a finding that entry of a class of aliens "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). That restriction requires a substantive connection between an alien's membership in a particular class and the likelihood that her entry would be detrimental to the interests of the United States.

Detrimental is defined as "harmful" or "damaging." Webster's Third New International Dictionary (2002). Accordingly, Section 1182(f) authorizes the President to deny entry to an alien if the President has reason to believe that, by virtue of the alien being a member of a particular class, her entry is more likely to damage or harm the interests of the United States. But the Constitution forbids imposing legal burdens on a class of individuals solely based on race or national origin precisely because those immutable characteristics bear no "relationship to individual responsibility." *Weber*, 406 U.S. at 175. Because an alien's race or national origin bears no "relationship to individual responsibility," those characteristics, by themselves, cannot render it more likely that the alien's entry will damage or harm the interests of the United States. *Cf. Romer*, 517 U.S. at 632, 636 (holding that "a classification of persons undertaken for its own sake" is "inexplicable by anything but animus towards the class it affects[, has no] relationship to legitimate state interests," and therefore violates the Fourteenth Amendment). Likewise, the Constitution's prohibition on discriminating against "those who embrace[] one religious faith rather than another," *Seeger*, 380 U.S. at 188 (Douglas, J., concurring), means that an alien's adherence to a particular religion alone also

112

provides no constitutionally cognizable basis for concluding that her entry is disproportionately likely to harm or damage the interests of the United States.

Because race, national origin, and religion bear no factual or constitutionally cognizable relationship to individual responsibility, courts have long interpreted delegation provisions in the Immigration Act as barring executive officials from engaging in invidious discrimination. For example, in *United States ex rel. Kaloudis v. Shaughnessy*, 180 F.2d 489 (2d Cir. 1950) (Hand, J.), the Second Circuit recognized "implied limitations" on Congress's facially broad delegation of authority to the Attorney General to suspend the deportation of any alien unlawfully present in the country. 180 F.2d at 490. Writing for the court, Judge Hand suggested that denying suspension of deportation based on "irrelevant" reasons having no bearing on whether the "alien's continued residence [was] prejudicial to the public weal"—such as "becom[ing] too addicted to attending baseball games, or ha[ving] bad table manners"—would exceed the Attorney General's congressionally delegated authority. *Id.* Factors like these, Judge Hand explained, are "considerations that Congress *could not have intended to make relevant*" to a determination of whether an alien could permissibly remain in the United States.[10] *Id.* at 491 (emphasis added). Under the dictates of equality established by the Constitution, an alien's race, nationality, or religion is as irrelevant to the potential for his

---

[10] Notably, *Kaloudis* found a basis for this clear outer limit on congressional delegations of discretionary authority to the executive branch in the Immigration Act well before Congress made explicit, in comprehensively amending the Immigration Act, that discrimination on the basis of race, sex, ethnicity, and nationality has no place in controlling immigration. *See infra* Part I.C.3.

entry to harm the interests of the United States as is the alien's addiction to baseball or his poor table manners.

Judge Friendly made this point clear in *Wong Wing Hang v. I.N.S.*, 360 F.2d 715 (2d Cir. 1966) (Friendly, J.). There, the Second Circuit again confronted a question regarding the scope of the Attorney General's authority—delegated by Congress—to suspend an alien's deportation. 360 F.2d at 716–17. Judge Friendly concluded that "the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or *rested on an impermissible basis such as an invidious discrimination against a particular race or group*." *Id.* at 719 (emphasis added). Like addiction to baseball and poor table manners, invidious discrimination is a "consideration[] that Congress could not have intended to make relevant" to decisions regarding whether to allow an alien residence in the United States, Judge Friendly held. *Id.* (internal quotation marks omitted) (quoting *Kaloudis*, 180 F.2d at 491).

Just as Congress "could not have intended to make" considerations like "invidious discrimination against a particular race or group" relevant to the Attorney General's discretionary decision to suspend an alien's deportation from the United States, *id.*, Congress "could not have intended to make" invidious discrimination relevant to the President's discretionary determination regarding whether the entry of a particular alien or class of aliens is "detrimental to the interests of the United States," 8 U.S.C. § 1182(f). That is because invidious discrimination has no connection to whether an alien's residence in the United States would be harmful or damaging to the nation or its interests.

114

Accordingly, not only does the plain language of Section 1182(f) fail to "explicitly" authorize the President to use invidious discrimination in determining whether to deny entry to a class of aliens, *see Greene*, 360 U.S. at 507, it does not even provide a "clear indication" that Congress intended to delegate to the President the power to invidiously discriminate, *see Zadvydas*, 533 U.S. at 696–97.

2.

Nor does the broader context of the Immigration Act, and Section 1182(f)'s place within it, suggest that Congress intended Section 1182(f) to allow the President to suspend the entry of a class of aliens based on invidious discrimination. In Section 1182(a), Congress enumerates numerous specific classes of aliens who are ineligible for visas or admission. These categories encompass, for example, classes of individuals who pose a variety of health, safety, and security risks, or are likely to become public charges. *See generally* 8 U.S.C. § 1182(a). Many of the categories are quite specific, providing particularized reasons why individual aliens may be deemed inadmissible. For example, aliens who have been convicted of certain crimes, served as foreign government officials and committed "particularly severe violations of religious freedom," or participated in the commission of torture are inadmissible. 8 U.S.C. § 1182(a)(2)(A), (G); *id.* § 1182(a)(3)(E)(iii). Likewise, Section 1182(a) deems inadmissible aliens who have been members of a totalitarian or Communist party, abused their status as student visa holders, or "engaged in the recruitment or use of child soldiers." *Id.* § 1182(a)(3)(D); *id.* § 1182(a)(6)(G); *id.* § 1182(a)(3)(G).

115

Importantly, most of the categories of inadmissible classes of aliens Congress sets forth in Section 1182(a) relate to past *conduct* by an alien that renders the alien particularly dangerous to the interests of the United States. *E.g.*, § 1182(a)(2); § 1182(a)(3); § 1182(a)(6)(E); § 1182(a)(8)(B); § 1182(a)(9)(A). And, in accordance with Congress's decision to define categories of inadmissible aliens largely based on individual conduct and responsibility rather than considerations over which aliens have no control, none of the Section 1182(a) categories render a class of aliens inadmissible solely on the basis of religion or of race, national origin, or other immutable characteristic.

Notwithstanding Congress's enumeration of the many general and specific categories and classes of aliens that the executive branch may or must deem inadmissible—and its failure to include any category defined by race, national origin, or religion alone—the Government argues that, in enacting Section 1182(f), Congress delegated to the President the authority to deny entry to any class of aliens for any reason whatsoever, necessarily including for invidiously discriminatory reasons. Appellants' Br. at 28–29. But in construing a statutory provision, we must, if at all possible, avoid a construction "that would render another provision [in the same statute] superfluous." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010). And reading Section 1182(f) as conferring on the President the unbridled authority to deny entry to any class of aliens would impermissibly render superfluous the numerous specific classes of inadmissible aliens that Congress has enumerated in Section 1182(a).

The District of Columbia Circuit reached an identical conclusion in *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) (Ginsburg, J.). There, the court considered 8 U.S.C. § 1182(a)(27) ("Subsection (27)"), which required the Attorney General to exclude an alien if the Attorney General had reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest or endanger the welfare, safety, or security of the United States." 785 F.2d at 1047 (internal quotation marks omitted) (quoting 8 U.S.C. § 1182(a)(27) (1982)). The question at issue was whether Subsection (27) allowed the Attorney General to "exclude aliens whose entry might threaten [United States'] foreign policy objectives simply because of their membership in Communist organizations," *id.* at 1057, when an adjacent provision in the statute, 8 U.S.C. § 1182(a)(28) ("Subsection (28)"), specifically dealt with exclusion of aliens who were or previously had been members of any Communist party, *Abourezk*, 785 F.2d at 1048. Then-Judge (now Justice) Ginsburg concluded that reading the Attorney General's vague and generalized delegated authority under Subsection (27) to allow exclusion on such a basis would impermissibly render Subsection (28) "superfluous." *Id.* at 1057.

"To preserve the significance of both sections, and the congressional intent that guided their adoption," the court held that the Attorney General could not rely on Subsection (27) to exclude aliens who were or had been members of a Communist party unless "the reason for the threat to the 'public interest[,] . . . welfare, safety, or security'" that the Attorney General put forward as a basis for barring entry under Subsection (27) was "*independent of* the fact of membership in or affiliation with the proscribed

117

organization." *Id.* at 1058 (alterations in original) (quoting 8 U.S.C. § 1182(a)(27)). Put differently, the court prohibited the executive branch from using the general exclusionary authority conferred by Congress in Subsection (27) to circumvent the more specific provision in Subsection (28) dealing with exclusion of aliens affiliated with the Communist party. *Id.* at 1057–58.

For the same reason, the President's reliance on Section 1182(f) as a basis for Section 2(c)'s suspension on entry also is inconsistent with Section 1182(a)(3)(B), which includes "specific criteria for determining terrorism-related inadmissibility." *See Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring). Recall that the Executive Order justified the President's suspension on entry, in part, on grounds that certain nationals of the six countries were members of terrorist organizations or previously had engaged in acts of terrorism and, therefore, that admitting aliens from those countries would be detrimental to the interests of the United States. *See supra* Part I.B.

Section 1182(a)(3)(B) renders inadmissible aliens who have been, are, or may in the future be connected to or engaged in terrorist activity, including aliens who have "engaged in a terrorist activity"; those whom government officials know or have reasonable cause to believe are "likely to engage after entry in any terrorist activity"; those who have "incited terrorist activity"; and those who "endorse[] or espouse[] terrorist activity or persuade[] others to" do so or who "support a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i). That subsection also provides detailed definitions of "terrorist activity," "terrorist organization," the act of "engag[ing] in terrorist activity," and "representative" of a terrorist organization. *Id.* § 1182(a)(3)(B)(iii)–(vi).

118

Congress established these "specific criteria for determining terrorism-related inadmissibility," *Din*, 135 S. Ct. at 2140, against the backdrop of the executive branch's exclusion of aliens based on "mere membership in an organization, some members of which have engaged in terrorist activity" even when there was no indication that *the alien seeking admission* was himself engaged in such activity. H.R. Rep. No. 100-882, at 19 (1988). By enacting specific provisions regarding the inadmissibility of aliens who are or have been engaged in terrorist activity, Congress sought to make clear that "the definitions of 'terrorist activity' and 'engages in terrorist activity' must be applied on a case by case basis" and that "simple membership in any organization . . . is not *per se* an absolute bar to admission to the United States"—whether under the President's general authority to bar entry or otherwise. *Id.* at 30.

If Congress has deemed it unlawful for the President to absolutely bar the entry of aliens who *are members of an organization* that includes some members who engage in terrorism, it defies logic that Congress delegated to the President in Section 1182(f) the far broader power to absolutely bar the entry of aliens who *happen to have been born in a particular country*, within the borders of which some individuals have engaged in terrorism. Indeed, this is precisely why courts apply the canon of statutory construction "that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (internal quotation marks omitted). When, as here, a statute includes "a general authorization [Section 1182(f)] and a more limited, specific authorization [Section 1182(a)(3)(B)] . . . side-by-side" that canon requires that "[t]he terms of the specific authorization must be complied with" in order to avoid "the

119

superfluity of a specific provision that is swallowed by the general one." *Id.* Accordingly, Section 1182(a)(3)(B), not Section 1182(f), is the congressionally authorized mechanism for the President to deny entry to aliens whom he concludes are detrimental to the United States because they pose a threat of engaging in terrorist activities. *See Abourezk*, 785 F.2d at 1049 n.2 ("The President's sweeping proclamation power [under Section 1182(f)] thus provides a safeguard against the danger posed by any particular case or class of cases *that is not covered by one of the categories in section 1182(a).*" (emphasis added)).

Interpreting Section 1182(f) to allow the President to suspend the entry of aliens based solely on their race, nationality, or other immutable characteristics also would conflict with 8 U.S.C. § 1152(a), which provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." Congress passed Section 1152(a) in 1965, more than a decade after it enacted Section 1182(f), as part of a comprehensive revision to the Immigration Act intended to eliminate nationality-based discrimination in the immigration system. *See infra* Part I.C.3.

Section 1152(a) deals with issuance of *immigrant visas*, rather than entry, which is governed by Section 1182. Nonetheless, reading Section 1182(f) as authorizing the President to deny entry based on invidious discrimination would place Section 1182(f) in conflict with Section 1152(a), which prohibits invidious discrimination in the issuance of visas. In particular, the Immigration Act authorizes the executive branch to refuse to issue a visa to any alien who "is ineligible to receive a visa or such other documentation

under section 1182." 8 U.S.C. § 1201(g). As the Government concedes, the President's exercise of his authority under Section 1182(f) to deny entry to aliens from the six predominantly Muslim countries, were it lawful, also would bar, by virtue of Section 1201(g), such aliens from obtaining visas, including *immigrant* visas. This would be the very result Congress sought to avoid in ending nationality-based discrimination in the issuance of immigrant visas through its passage of Section 1152(a).

Accordingly, Section 1182(f)'s function within the Immigration Act does not clearly indicate that Congress intended to delegate to the President the authority to suspend the entry of aliens based on invidious discrimination. On the contrary, construing Section 1182(f) as broadly authorizing the President to engage in invidious discrimination in denying entry would render superfluous the numerous categories of inadmissible aliens Congress took pains to identify in Section 1182(a), including the provisions directly addressing aliens who pose a risk of engaging in terrorist activities, and conflict with Section 1152(a)'s prohibition on discrimination based on race, nationality, and other immutable characteristics.

3.

Reading Section 1182(f) as allowing the President to deny entry to classes of aliens based on invidious discrimination also would contradict the "object and policy" underlying the Immigration Act. *See U.S. Nat'l Bank of Or.*, 508 U.S. at 455. Although the specific language of Section 1182(f) dates to 1952, Congress "comprehensive[ly] revis[ed]" the Immigration Act in 1965 (the "1965 Revisions"). *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on*

121

*Immigration & Naturalization Vol. 2*, 88th Cong. 78 (1964) (statement of Sen. Fong). Those revisions were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights movement with the express purpose of "eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States." H.R. Rep. No. 89-745, at 8 (1965); *see also S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 3*, 88th Cong. 107 (1964) (statement of Sen. Hart) ("A law that says that one man is somewhat less than another simply because of accident of his place of birth is not tolerable in the year 1964. A formula based on equality and fair play must be enacted. Selection should be based primarily on questions of our own national interest.").

Prior to the 1965 Revisions, the Immigration Act employed nationality-based quotas, limiting the number of immigrants admissible to the nation each year based on nation of birth. President Kennedy called on Congress to repeal the nationality-based quota system, condemning it as a system "without basis in either logic or reason" that "neither satisfie[d] a national need nor accomplishe[d] an international purpose" but instead "discriminate[d] among applicants for admission into the United States on the basis of accident of birth." Letter to the President of the Senate and to the Speaker of the House on Revision of the Immigration Laws, 1963 PUB. PAPERS 594, 595 (July 23, 1963). After President Kennedy's assassination, President Johnson renewed Kennedy's request for "the elimination of the national origins quota system," which he described as "incompatible with our basic American tradition" and "our fundamental belief that a man

is to be judged—and judged exclusively—on his worth as a human being." Special Message to the Congress on Immigration, 1965 PUB. PAPERS 37, 37, 39 (Jan. 13, 1965).

The 1965 Revisions answered President Kennedy's and President Johnson's calls. Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system in order to "firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman." *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1*, 88th Cong. 4 (1964) (statement of Sen. Kennedy). Time and again Congress connected the need to eliminate the nationality-based quota system to American "tenets of equality irrespective of race, creed, or color" and emphasized that abolishing nationality-based quotas "demonstrat[ed] to the whole world that we practice what we preach, and that all men are equal under law." *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2*, 88th Cong. 100–01 (1964) (statement of Sen. Fong); *see also id. Vol. 1*, at 9 (statement of Sen. Hart) (explaining that the 1965 Revisions abolished the "irrational . . . national origins concept, which said in clear and echoing words that the people of some nations [we]re more welcome to America than others" based on "[a]rbitrary ethnic and racial barriers").

Upon signing the bill into law at Liberty Island, New York, President Johnson lauded the end of the nationality-based discrimination that previously defined the American system of immigration, describing the 1965 Revisions as abolishing "the harsh

123

injustice of the national origins quota system," which "violated the basic principle of American democracy—the principle that values and rewards each man on the basis of his merit as a man." 1965 PUB. PAPERS 1037, 1038–39 (Oct. 3, 1965). As a result of the 1965 Revisions, immigrants would be permitted to come to America "because of what they are, and *not because of the land from which they sprung*." *Id.* at 1039 (emphasis added).

To effect its purpose of eliminating discrimination in the immigration system, Congress stripped the Immigration Act of all provisions expressly authorizing national origin-based invidious discrimination and added Section 1152(a)(1)'s prohibition on discrimination in the issuance of visas based on nationality and other immutable characteristics, such as race. As evidenced by Section 1152(a)(1), disregarding national origin in selecting which immigrants to admit to the United States remains a core principle of United States immigration policy. Far from evidencing "any clear indication" that Congress intended the President to have the authority to exercise his Section 1182(f) powers based on invidious discrimination, the "object and policy" of the Immigration Act suggest that Congress *did not* intend to grant the President unbridled authority to engage in invidious discrimination when deciding whether and to what extent to suspend alien entry.[11]

---

[11] The Government points to a number of orders promulgated by Presidents pursuant to their authority under Section 1182(f) as evidence that that statutory provision authorizes the President to engage in national origin-based discrimination. But the previous orders the Government cites materially differ from Section 2(c), in that they did not suspend the entry of classes of aliens based on national origin alone, let alone use (Continued)

\* \* \* \* \*

In sum, the language of Section 1182(f), related provisions in the Immigration

Act, and the "object and policy" of the statute do not "explicitly" state, much less provide

---

national origin as a proxy to suspend the entry of a class of aliens based on another invidiously discriminatory basis, such as religion. *See* Proclamation 8693 (July 24, 2011) (suspending the entry of aliens subject to travel bans issued by the United Nations Security Council's resolution barring member nations from permitting the entry of individuals who threaten peace in various nations); Proclamation 8342 (Jan. 22, 2009) (suspending the entry of senior government officials "who have impeded their governments' antitrafficking efforts, have failed to implement their governments' antitrafficking laws and policies, or who otherwise bear responsibility for their governments' failures to take steps recognized internationally as appropriate to combat trafficking in persons"); Proclamation 6958 (Nov. 22, 1996) (suspending the entry of "members of the Government of Sudan, officials of that Government, and members of the Sudanese armed forces" based on the Sudanese government's harboring of individuals who attempted to assassinate the Egyptian President in Ethiopia, in violation of Ethiopian sovereignty); Executive Order No. 12,807 (May 24, 1992) (suspending the entry of "undocumented aliens [entering the United States] by sea" during the mass exodus of Haitian nationals fleeing a military coup, often in dangerous and overcrowded sea vessels); Proclamation 5887 (Oct. 22, 1988) (suspending the entry of "officers and employees" of the Nicaraguan government as nonimmigrants to the United States based on the Nicaraguan government's "unjustified expulsion" of American diplomats and "long-standing . . . suppression of free expression and press and support of subversive activities throughout Central America"); Proclamation 5829 (June 10, 1988) (suspending the entry of "Panamanian nationals . . . who formulate or implement the policies of Manuel Antonio Noriega and Manuel Solis Palma" due to those officials' act of "preventing the legitimate government . . . from restoring order and democracy" to Panama).

Of the executive orders cited by the government, President Reagan's suspension on the entry of Cuban nationals *as immigrants* comes closest to a nationality-based suspension on alien entry. Proclamation 5517 (Aug. 22, 1986). But that executive action was not challenged as a violation of either Section 1182(f) or Section 1152(a)(1), and therefore the judiciary never had the opportunity to address whether the order complied with those provisions or the Constitution. Nor does a single, unchallenged executive action "demonstrate the kind of consistent administrative interpretation necessary to give rise to a presumption of congressional acquiescence." *Abourezk*, 785 F.2d at 1056.

a "clear indication," that Congress intended to delegate to the President wholly unconstrained authority to deny entry to any class of aliens, including based on invidiously discriminatory reasons. *See Zadvydas*, 533 U.S. at 697. Accordingly, Section 2(c)—which this Court finds was likely borne of the President's animus against Muslims and his intent to rely on national origin as a proxy to give effect to that animus—exceeds the authority Congress conferred on the President in Section 1182(f). As Judge Friendly put it, "Congress could not have intended to make relevant" to the President's exercise of his delegated authority to suspend the entry of aliens "invidious discrimination against a particular race or group." *Wong Wing Hang*, 360 F.2d at 719 (internal quotation marks omitted).

## II.

Invidious "discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life. It is unattractive in any setting but it is utterly revolting among a free people who have embraced the principles set forth in the Constitution of the United States." *Korematsu*, 323 U.S. at 242 (Murphy, J., dissenting). Yet the Government asks this Court to hold that, in enacting Section 1182(f), Congress intended to delegate to the President the power to deny entry to a class of aliens based on nothing more than such aliens' race, national origin, or religion.

One might argue, as President Trump seemed to suggest during the campaign, *ante* at 18–21, that *as a matter of statistical fact*, Muslims, and therefore nationals of the six predominantly Muslim countries covered by the Executive Order, disproportionately

126

engage in acts of terrorism, giving rise to a *factual* inference that admitting such individuals would be detrimental to the interests of the United States. Indeed, viewing the Executive Order in its most favorable light, that is the precisely the rationale underlying Section 2(c). Setting aside the question of whether that *factual finding* is true, or even reasonable—which is, at best, highly debatable given the 180 million people in the countries subject to the suspension on entry and the 1.6 million Muslims worldwide—that is precisely the inference that the Framers of the Constitution and the Reconstruction Amendments concluded was impermissible as a matter of *constitutional law*.[12] *Korematsu*, 323 U.S. at 240 (Murphy, J., dissenting). In particular, classifying individuals based solely on their race, nationality, or religion—and then relying on those classifications to discriminate against certain races, nationalities, or religions—necessarily results in placing special burdens on individuals who lack any moral responsibility, a result the Framers deemed antithetical to core democratic principles and destabilizing to our Republic. *Id.*

Even though the Constitution affords greater latitude to the political branches to draw otherwise impermissible distinctions among classes of aliens, the harm to core

---

[12] Our country adheres to the rule of law in preserving core constitutional protections. Thus, when the President can identify no change in circumstances justifying an invidious encroachment on constitutional rights, a simple claim of potential harm to national security does not provide the President with unfettered authority to override core constitutional protections. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (holding that a claim of potential harm to national security does not provide the executive branch with unconstrained authority to override the freedom of the press). Indeed, even the invocation of Congressional war powers to protect national defense do "not remove constitutional limitations safeguarding essential liberties." *Robel*, 389 U.S. at 264–67 (internal quotation marks omitted).

constitutional values associated with governmental sanctioning of invidious discrimination—and the harm to citizens stemming from the abridgement of those values—demands evidence of "careful and purposeful consideration by those responsible for *enacting **and** implementing* our laws" before such discrimination should be sanctioned by the judiciary. *Greene*, 360 U.S. at 507 (emphasis added). Because Congress did not provide any indication—let alone the requisite "explicit" statement— that it intended to delegate to the President the authority to violate fundamental constitutional values of equality in exercising his authority to deny entry to classes of aliens, I reject the Government's proposed construction of Section 1182(f).

In emphasizing the larger constitutional problems raised by construing Section 1182(f) as a delegation of authority to engage in invidious discrimination, we must not forget that the Constitution embraces equality in order to forestall highly personal harms. Plaintiff John Doe #1, a lawful permanent resident, seeks to be reunited with his wife, an Iranian national, whom Section 2(c) bars from entering the United States. As Justice Jackson explained when confronted with another broad delegation of congressional authority over immigration, "Congress will have to use more explicit language than any yet cited before I will agree that it has authorized [the President] to break up the family of [a lawful permanent resident] or force him to keep his wife by becoming an exile." *Knauff*, 338 U.S. at 551–52 (Jackson, J., dissenting).

128

THACKER, Circuit Judge, concurring:

I concur in the majority's opinion but write separately for three reasons: (1) I would not consider remarks made by candidate Trump before he took his presidential oath of office; (2) I would nonetheless find that Appellees have demonstrated a likelihood of success on the merits of their argument that Section 2(c) of the Second Executive Order ("EO-2") violates the Establishment Clause, based solely on remarks made or sentiments expressed after January 20, 2017; and (3) I would conclude Appellees have demonstrated a likelihood of success on the merits of their argument that Section 2(c), as it applies to immigrant visas, violates 8 U.S.C. § 1152(a)(1)(A) of the Immigration and Nationality Act ("INA").

I.

I agree with the majority's conclusion that Appellees have standing to challenge the constitutionality of § 2(c) of EO-2 and that EO-2 likely violates the Establishment Clause. However, in my view, we need not -- and should not -- reach this conclusion by relying on statements made by the President and his associates before inauguration.

While on the campaign trail, a non-incumbent presidential candidate has not yet taken the oath to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, and may speak to a host of promises merely to curry favor with the electorate. Once a candidate becomes President, however, the Constitution vests that individual with the awesome power of the executive office while simultaneously imposing constraints on that power. Thus, in undertaking the Establishment Clause analysis, I believe we should

129

focus our attention on conduct occurring on President Trump's inauguration date, January 20, 2017, and thereafter. Indeed, for the reasons below, looking to pre-inauguration conduct is neither advisable nor necessary.

A.

In confining my analysis to post-inauguration statements and actions, I do not draw on a blank slate. To begin, "the Establishment Clause protects religious expression from *governmental interference*." *Mellen v. Bunting*, 327 F.3d 355, 376 (4th Cir. 2003) (emphasis supplied). To this end, Establishment Clause jurisprudence has focused on government action rather than "a[] judicial psychoanalysis" of individuals. *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005). We have neither the right nor the ability to peer inside an official's "heart of hearts"; indeed, we will "not look to the veiled psyche of government officers" -- much less that of *candidates* for public office -- to divine the purpose of a law. *Id.* at 862–63.

The Government relies on the doctrines of executive privilege and presidential immunity to contend that EO-2 is essentially unreviewable, arguing that courts "should not second-guess the President's stated purpose by looking beyond the policy's text and operation," and that we should instead apply a "presumption of regularity" to his actions. Appellants' Br. 45 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). While I do not agree with this proposition for the reasons ably set forth by Chief Judge Gregory, I do believe the Supreme Court's decisions in the executive privilege and immunity context support confining our review to statements by the President and his administration made after the inauguration, once the President began operating pursuant

130

to Article II. Those decisions explain that the judiciary's ability to probe official, presidential conduct is related to his discharge of *official* power. *See Clinton v. Jones*, 520 U.S. 681, 703 (1997) ("[W]e have long held that when the President takes *official action*, the Court has the authority to determine whether he has acted within the law." (emphasis supplied)); *cf. Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 381 (2004) ("It is well established that 'a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any *ordinary individual*.'" (quoting *United States v. Nixon*, 418 U.S. 683, 715 (1974)) (emphasis supplied)). Indeed, the executive privilege -- and, by that token, the separation of powers -- applies where the President operates within the executive's core constitutional powers. *See Nixon*, 418 U.S. at 708–09. It follows that a president's conduct after he takes office, but not before, carries the imprimatur of official "government" action, and can only then be considered "government interference" under the Establishment Clause. *Mellen*, 327 F.3d at 376.

B.

For more practical reasons, we should also hesitate to attach constitutional significance to words a candidate utters on the campaign trail. Campaign speeches are inevitably scattered with bold promises, but once the dust settles after an election -- when faced with the reality of the office and with benefit of wise counsel -- a newly inducted public official may act with a different philosophy. Presidents throughout history have

131

dialed back or even reversed campaign promises.[1] To be sure, the President's statements regarding Islam before assuming office reveal religious animus that is deeply troubling. *See, e.g.*, J.A. 346 ("Donald J. Trump Statement on Preventing Muslim Immigration," dated December 7, 2015).[2] Nonetheless, I do not adhere to the view that we should magnify our analytical lens simply because doing so would support our conclusion, particularly when we need not do so.

## II.

Even without focusing on any campaign rhetoric, the record in this case amply demonstrates the primary purpose of EO-2 was to ban Muslims from entering the United States in violation of the Establishment Clause. I would thus base our Establishment Clause analysis on the morphing of the First Executive Order ("EO-1") into EO-2, the statements of presidential representatives and advisors, the lack of evidence supporting a

---

[1] Indeed, many might argue that this President has repeatedly and regularly dialed back or reversed course on his campaign promises. *See, e.g.*, Priya Krishnakumar et al., *Tracking President Trump's Campaign Promises*, L.A. Times (Apr. 26, 2017), http://www.latimes.com/projects/la-na-pol-trump-100-days-promises/(reporting President Trump has "scaled back" or "abandoned" 9 out of 31 campaign promises) (saved as ECF opinion attachment).

[2] Given that they were made on the campaign trail, I do not consider as part of my analysis the President's campaign website's archived statements about the plan to ban all Muslims from entering the United States. However, I must note it is peculiar that those statements were removed shortly before we began hearing arguments in this case. *See* Dan Merica, *Trump campaign removes controversial Muslim ban language from website*, CNN (May 8, 2017, 3:37 PM), http://www.cnn.com/2017/05/08/politics/trump-muslim-ban-campaign-website/ (saved as ECF opinion attachment).

purported national security purpose, and the text of and logical inconsistencies within EO-2.

The Government argues that we should simply defer to the executive and presume that the President's actions are lawful so long as he utters the magic words "national security." But our system of checks and balances established by the Framers makes clear that such unquestioning deference is not the way our democracy is to operate. Although the executive branch may have authority over national security affairs, *see Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citing *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)), it may only exercise that authority within the confines of the law, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645–46, 654–55 (1952) (Jackson, J., concurring); and, of equal importance, it has always been the duty of the judiciary to declare "what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

A.

The President issued EO-1 on January 27, 2017. *See* Exec. Order 13,769, Protecting the Nation From Foreign Terrorist Entry Into the United States, 82 Fed. Reg. 8977 (Jan. 27, 2017). EO-1 banned citizens of seven majority Muslim nations -- Libya, Iran, Iraq, Somalia, Syria, Sudan, and Yemen -- from entering the United States. The ban applied to over 180 million Muslims, or just over 10% of the world Muslim population, and was executed without input from relevant cabinet officials. Indeed, the President actively shielded certain officials from learning the contents of EO-1: per then-acting Attorney General Sally Yates, the administration advised "the Office of Legal Counsel

133

. . . not to tell the attorney general about [EO-1] until after it was over." *Full Transcript: Sally Yates and James Clapper testify on Russian election interference*, Wash. Post (May 8, 2017), https://www.washingtonpost.com/news/post-politics/wp/2017/05/08/full-transcript-sally-yates-and-james-clapper-testify-on-russian-election-interference (saved as ECF opinion attachment).

As Rudy Giuliani, an advisor to the President, explained on January 28, 2017, EO-1 did all this with the *purpose* of discriminating against Muslims. Giuliani was quite clear that the President wanted to enact a "Muslim ban" and had assembled a commission to study how to create a "Muslim ban" legally. J.A. 508. Per Giuliani, EO-1 was the President's attempt at a legal "Muslim ban." *Id.*[3]

To further this goal, EO-1 suspended the entry of refugees for 120 days but directed the Secretary of State "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." EO-1, § 5(b). The President explained that this exception was designed to give Christians priority in entering the United States as refugees. He said that in Syria,

---

[3] Giuliani is purportedly a member, and claims to be chairman, of an expert legal commission assembled to study how to create a lawful way to ban Muslims from entering the country and an acknowledged advisor to the President. *See* J.A. 508–09. Courts routinely analyze statements and reports from presidential commissions such as the one of which Giuliani is a member. *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001) (citing and quoting President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967) to demonstrate importance of privacy in communications); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) (citing Attorney General's Commission on Pornography to establish state's interest in punishing child pornography possession).

If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the *Christians*. And I thought it was very, very unfair. So we are going to help *them*.

J.A. 462 (emphases supplied).[4] The statements of the President, his advisor, and the text of EO-1 made crystal clear a primary purpose of disfavoring Islam and promoting Christianity.

After the Ninth Circuit upheld the stay of EO-1, the President set about to issue a new executive order. But significantly, in revising the order, the executive branch did not attempt to walk away from its previous discriminatory order. Instead, it simply attempted to effectuate the same discrimination through a slightly different vehicle -- the proverbial wolf in sheep's clothing. Indeed, Press Secretary Sean Spicer confirmed that "[t]he principles of the executive order remain the same," J.A. 379,[5] and the President's Senior Policy Advisor, Stephen Miller, described the changes in the new order as "mostly minor technical differences," *id.* at 339.

---

[4] Presidential statements necessarily shed light on executive policy. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2081 (2015) (using presidential statement to show United States' position on status of Jerusalem); *Clinton v. City of New York*, 524 U.S. 417, 495–96 (1998) (Breyer, J., dissenting) (relying on presidential statements to demonstrate effect of Line Item Veto Act).

[5] When relevant, the press secretary and other White House Official's statements can represent official government position. *See, e.g.*, *Reynolds v. United States*, 123 S. Ct. 975, 984 (2012) (citing to the Office of the Press Secretary to show President's position on registration of sex offenders who committed offenses before enactment of the Adam Walsh Child Protection and Safety Act of 2006); *Hamdi v. Rumsfeld*, 542 U.S. 507, 549 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (relying on Office of the White House Press Secretary's statement to identify official executive policy).

B.

The President issued EO-2 on March 6, 2017. *See* Exec. Order 13,780, Protecting the Nation From Foreign Terrorist Entry Into the United States, 82 Fed. Reg. 13209 (Mar. 6, 2017). Like its predecessor, EO-2 lacks evidentiary support, is logically inconstant, and evinces an intent to discriminate against Muslims.

1.

First, the Government offers very little evidence in an attempt to support the President's ban of approximately 180 million people. EO-2 claims, "hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States" but cites only two such examples, each of which is weakly related, if at all, to the purported purpose of EO-2. EO-2, § 1(h). One example is from Iraq, but, as Iraq is not part of EO-2, it does not support *this* ban at all. The other example involves a child brought to the United States as a two-year-old. As this two-year-old was ultimately radicalized in the United States and not abroad, this case is unrelated to better screening and vetting -- the purported purpose of EO-2. *See* Br. for Cato Institute as Amicus Curiae Supporting Appellees at 12–13, *Int'l Refugee Assistance Project v. Trump*, No. 17-1351 (4th Cir. argued May 8, 2017; filed Apr. 19, 2017), ECF No. 185; EO-2, § 1(a), (h).

In sharp contrast to the dearth of evidence to support the purported purpose of EO-2, 42 bipartisan former national security officials concluded EO-2 "bear[s] no rational relation to the President's stated aim of protecting the nation from foreign terrorism." Corrected Br. for Former National Security Officials as Amici Curiae Supporting Appellees at 4, *Int'l Refugee Assistance Project v. Trump*, No. 17-1351 (4th Cir. argued

136

May 8, 2017; filed Apr. 13, 2017), ECF No. 126. In addition, since the issuance of EO-1, a report by the Department of Homeland Security has found that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity," likewise undermining any purported security justification for the Order. J.A. 419.

2.

The Government's untenable position is made even worse by the fact that the Government's purported justification for EO-2 does not logically support the ban it created. EO-2 reasoned that people coming from the six banned countries posed an increased risk of committing terrorist acts because, according to the Department of State's Country Reports on Terrorism 2015 (the "Country Reports"), "each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," and were unwilling or unable "to share or validate important information about individuals seeking to travel to the United States." EO-2, § 1(d); *see* § 1(e) (citing Country Reports). However, given these conditions as the reason for the ban, and based on the Country Reports, two other majority Christian countries -- Venezuela and the Philippines -- should have logically been included. *See* U.S. Dep't of State, Bureau of Counterterrorism and Countering Violent Extremism, Country Reports on Terrorism 2015 78–85, 297–98, 308–09, 314–15, 352, 380 (June 2016), https://www.state.gov/documents/organization/258249.pdf (excerpts saved as ECF opinion attachment). Neither country is willing and able to help the Government verify information about people attempting to travel to the United States, and both countries have terrorist organizations operating within their boundaries.

137

Therefore, applying the Government's logic, the potential of a terrorist act from a national of Venezuela or the Philippines would also justify a blanket ban on all nationals from these countries. Interestingly, however, the CIA World Factbook reports that Venezuelan population is, at most, 2% Muslim, and the Philippine population is 5% Muslim. *See* Cent. Intelligence Agency, *Field Listings: Religions*, World Factbook, https://www.cia.gov/library/publications/the-world-factbook/fields/2122.html (last visited May 23, 2017) (saved as ECF opinion attachment). Thus, the Government has not consistently applied the criteria it claims it used, and the reason seems obvious -- and inappropriate.

Moreover, if the conditions in the six countries subject to EO-2 truly motivated the Government's travel ban, the Government would have based its ban on *contact* with the listed countries, not *nationality*. Under EO-2, a person who is a citizen of Syria would not be allowed to enter the United States even if they had never set foot in Syria. However, a person who lived his or her whole life in Syria but never obtained Syrian citizenship, and had even recently lived near terrorist-controlled regions of Syria, would be unaffected and freely allowed to enter the United States.[6] As a result, EO-2 is at once both overinclusive and underinclusive and bears no logical relationship to its stated objective.

---

[6] Syrian citizenship is not based on country of birth. *See* Legislative Decree 276 - Nationality Law [Syrian Arab Republic], Legislative Decree 276, 24 November 1969. Therefore, a person can have Syrian citizenship without ever setting foot in the country and a person who lives in Syria for their entire lifetime may not have Syrian citizenship.

138

Last, but by no means least, EO-2 identifies and discriminates against Muslims on its face. It identifies only Muslim majority nations, thus banning approximately 10% of the world's Muslim population from entering the United States. It discusses only Islamic terrorism. And, it seeks information on honor killings -- a stereotype affiliated with Muslims[7] -- even though honor killings have no connection whatsoever to the stated purpose of the Order.[8]

C.

All of this evidence -- arising after January 20, 2017 -- leads to only one conclusion: the principal motivation for the travel ban was a desire to keep Muslims from entering this country. EO-2 does not pass constitutional muster. Our constitutional system creates a strong presumption of legitimacy for presidential action; however, this deference does not require us to cover our eyes and ears and stand mute simply because a president incants the words "national security." The Constitution and our system of democracy requires that we ensure that any and every action of the President complies with the protections it enshrines.

---

[7] Honor killings, in which family members kill one of their own (usually a woman) under the belief that the murder is necessary to vindicate the family's honor, occur within societies of many faiths and, notably, in countries that were not subject to either Executive Order. *See* Kimberly Winston, *Activists: Trump Call for Honor Killings Report Targets Muslims*, USA Today (March 7, 2017, 3:06 PM), https://www.usatoday.com/story/news/2017/03/07/activists-trump-call-honor-killings-report-targets-muslims/98861230/ (saved as ECF opinion attachment).

[8] EO-1 also sought information on honor killings. *See* EO-1 § 10(a)(iii).

## III.

Finally, I would conclude Appellees have demonstrated a likelihood of success on the merits of their argument that Section 2(c) of EO-2, as it applies to immigrant visas, violates 8 U.S.C. § 1152(a)(1)(A) of the INA.[9]

Section 1182(f) of Title 8 states that the President may "suspend the entry of all aliens or any class of aliens" "for such period as he shall deem necessary" when the President finds that such entry "would be detrimental to the interests of the United States." However, § 1152(a)(1)(A), which was promulgated after § 1182(f), states that no person seeking an immigrant visa[10] "shall . . . be discriminated against" on the basis of "nationality." To be sure, EO-2 discriminates on the basis of nationality, suspending entry of "nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen" (the "Designated Countries"). EO-2, § 2(c). The crux of the Government's argument, however, is that § 1152(a)(1)(A) does not prevent the President, acting pursuant to his § 1182(f) authority, from suspending *entry* based on nationality, even if that suspension necessarily mandates the denial of immigrant visas based on nationality. This is nonsensical. I find this

---

[9] I join in Part I of Judge Keenan's opinion, concluding that the plaintiffs possess standing to bring a claim under the INA.

[10] Immigrant visas are issued to persons seeking admission to the United States with the goal of obtaining lawful permanent residence status. *See* 8 U.S.C. §§ 1101(a)(15), (20), 1201(a)(1)(A). Those seeking admission for other purposes, such as business, study, or tourism, typically receive nonimmigrant visas. *See id.* §§ 1101(a)(15), 1201(a)(1)(B). I would decline Appellees' invitation to extend § 1152(a)(1)(A) to nonimmigrant visas.

argument to contravene longstanding canons of statutory construction as well as the text and effect of EO-2 itself.

A.

Our jurisprudence gives ample guidance for a situation in which two statutes conflict with one another.  But the Government believes § 1182(f) and § 1152(a)(1)(A) do not conflict at all.  Instead, the Government posits that the two statutes "address different activities handled by different government officials."  Appellants' Br. 31 (internal quotation marks omitted).  The Government thus believes the specific visa denial warranted by EO-2 falls squarely within the broad ambit of § 1182(f).

I will first address whether we are faced with any real conflict between these provisions.  "When two acts touch upon the same subject, both should be given effect if possible."  *United States v. Mitchell*, 39 F.3d 465, 472 (4th Cir. 1994) (citation omitted).  And "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks omitted).  We must "fit, if possible, all parts into an harmonious whole."  *Id.* (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)).  In this vein, 8 U.S.C. § 1201(g) provides, "No visa . . . shall be issued to an alien . . . ineligible to receive a visa . . . under section 1182 . . . ."  Thus, when a President suspends entry to a national from a Designated Country and renders him inadmissible under § 1182(f), there is a strong argument that the alien *must be* denied a visa.  *See generally* 8 U.S.C. § 1182

141

(titled "Inadmissible aliens"). To conclude that the two statutes operate independently and deal with totally separate executive functions would be to ignore this link.

Furthermore, although the Government contends the provisions at issue do not touch upon the same subject -- asserting that the visa issuance process is a "different activity" than suspension of entry -- its own arguments and the text and operation of EO-2 belie this notion.

EO-2 directs that the entry of nationals of the Designated Countries be suspended, but the Government admits the Department of State will "implement th[e] suspension [of entry] by *declining to issue visas* to aliens who are covered by the Order and who are not found eligible for a waiver." Appellants' Br. 34 n.12 (emphasis supplied); *see also* J.A. 729 (Government counsel admitting immigrant visa applicants "will be denied a visa if they are a national from the listed country"). EO-2 also delineates who is entitled to or restricted from entry *based on* one's visa status. *See* EO-2, § 3(a) (defining the scope of entry suspension to those outside the United States on the effective date of the order who "did not have a valid visa" on the date of the now-revoked first executive order; and "do not have a valid visa" as of the effective date of EO-2). Further, the Government offers the precarious justification that "when an alien subject to [EO-2] is denied an immigrant visa, he is not suffering discrimination on the basis of nationality of the sort prohibited by Section 1152(a)(1)(A); instead, he is being denied a visa because he has been validly barred from entering the country." Appellants' Br. 33. Following this circular logic, an alien is barred from entry because he does not have and cannot attain a visa, but he is

denied a visa because he is barred from entry. It is clear that in EO-2, the visa issuance and entry concepts are intertwined to the point of indistinguishability.[11]

The Government also contends it would be a "fruitless exercise" and would "make no sense" to enable issuances of immigrant visas pursuant to § 1152(a)(1)(A), when those aliens receiving the visas would nonetheless be barred from entering the United States once they reach our borders. Appellants' Br. 31, 35. I fail to see how permitting a national of one of the Designated Countries to continue with her immigrant visa process would be fruitless, unless, of course, the Government intends to use the ban as a gateway to a much more permanent ban, ultimately sweeping in those nationals whose processes were halted by the order. *See* Section 1(a) (stating that a "Policy and Purpose" of the EO-2 is to improve the protocols and procedures "associated with the visa-issuance process"). Moreover, being a visa holder, even if one may be temporarily inadmissible, carries with it a certain status with regard to EO-2. *See, e.g.*, EO-2, § 3(c) (suggesting that one receiving a visa from U.S. Customs and Border Protection during the protocol review period could gain entry to the United States).

I likewise fail to see how allowing one to continue with her incipient visa process would "make no sense," when that national could be one step closer to ultimately reuniting with her loved ones. For example, in the case of John Doe #1, his wife could conceivably proceed with her visa application interview, obtain her visa, and once the

---

[11] Indeed, Section 3 of EO-1, the predecessor to EO-2's Section 2, was entitled "Suspension of *Issuance of Visas* and Other Immigration Benefits to Nationals of Countries of Particular Concern."

protocol review period has ended, join her husband in the United States as soon as possible thereafter, quickly redressing John Doe #1's constitutionally cognizable injury of being separated from an immediate family member.

For all of these reasons, I would reject the Government's argument that § 1152(a)(1)(A) and § 1182(f) operate in separate statutory spheres. I believe § 1152(a)(1)(A)'s prohibition limits the President's § 1182(f) authority in the issuance of EO-2. As the Government itself mentioned in its opening brief, "courts judge the legitimacy of a law by what it says and does." Appellants' Br. 2. Here, the ultimate effect of what EO-2 actually *does* is require executive agencies to deny visas based on nationality.

Therefore, I next turn to the traditional canons of statutory construction to determine how to resolve this tension between § 1182(f) and § 1152(a)(1)(A). I approach this analysis mindful that the executive branch's authority over immigration affairs is conferred and cabined by Congress. *See Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (The Executive's "broad discretion over the admission and exclusion of aliens . . . extends only as far as the statutory authority conferred by Congress.").

B.

When faced with provisions that apparently conflict, we must give effect to each provision, with a later enacted, more specific statute trumping an earlier, more general one. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976); *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("[A] specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."); *Weinberger v.*

144

*Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973) ("[A]ll parts of a statute, if at all possible, are to be given effect.").

First, § 1152(a)(1)(A) must be given effect. Reading § 1182(f) as bestowing upon the President blanket authority to carry out a suspension of entry, which involves rejecting a particular country's immigrant visa applications as a matter of course, would effectively nullify the protections in § 1152(a)(1)(A) and create an end-run around its prohibitions against discrimination. It would collapse the statutory distinction between entry and visa issuance, *see* 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law."), and ultimately allow the chief executive to override any of Congress's carefully crafted visa criterion or grounds for inadmissibility.

Second, § 1182(f) was enacted in 1952, but § 1152(a)(1) was enacted in 1965 as part of a sweeping amendment of the INA. We assume that "when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010). Thus, we must accept that Congress knew about the President's broad authority in § 1182(f) when it enacted § 1152(a)(1)(A), and the latter lists several exceptions, none of which include the former. *See* § 1152(a)(1)(A) (exempting §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153). Section 1152(a)(1)(A) is also more specific, applying to demarcated types of discrimination and a certain type of visa. *See*

145

*Radzanower*, 426 U.S. at 153 (preference should be given to statute involving a "narrow [and] precise . . . subject").

Finally, the Government's suggestions of potential statutory discord are unconvincing. For example, the Government relies on 8 U.S.C. § 1185(a)(1), which makes it unlawful for any alien to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations" prescribed by the President. But this provision merely acts as an implementation provision flowing from § 1182(f), which, as stated above, is limited by § 1152(a)(1)(A). In addition, § 1152(a)(1)(B) is of no concern to this analysis given that it applies to the Secretary of State, and § 2(c) of EO-2 bars visa issuance to nationals of the Designated Countries, rather than regulating visa processing locations.

C.

For these reasons, I find Appellees' statutory argument that EO-2 violates § 1152(a)(1)(A) because it requires the denial of immigrant visas on the basis of nationality the more compelling argument. Therefore, I would conclude that Appellees have shown a likelihood of success on the merits on this point. I otherwise join Judge Keenan's opinion, with the exception of Part II.A.i.

IV.

In conclusion, I believe the district court's injunction should be affirmed based on the majority's Establishment Clause conclusion, although I would do so based only on consideration of post-inauguration conduct. I also believe that the plaintiffs will likely

146

succeed on the merits of their argument that EO-2 violates the INA for the reasons stated

by Judge Keenan and set forth in Part III of this opinion.

NIEMEYER, CIRCUIT JUDGE, with whom JUDGE SHEDD and JUDGE AGEE join, dissenting:

The district court issued a nationwide preliminary injunction against Executive Order No. 13,780 issued by President Donald Trump on March 6, 2017, to suspend temporarily, while vetting procedures could be reviewed, the entry of aliens from six countries, reciting terrorism-related concerns. While the court acknowledged the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a) to enter the Order and also acknowledged that the national security reasons given on the face of the Order were legitimate, the court refused to apply *Kleindienst v. Mandel*, 408 U.S. 753 (1972), which held that courts are precluded from "look[ing] behind" "facially legitimate and bona fide" exercises of executive discretion in the immigration context to discern other possible purposes, *id*. at 770. Relying on statements made by candidate Trump during the presidential campaign, the district court construed the Executive Order to be directed against Muslims because of their religion and held therefore that it likely violated the Establishment Clause of the First Amendment.

I conclude that the district court seriously erred (1) by refusing to apply the Supreme Court's decision in *Mandel*; (2) by fabricating a new proposition of law — indeed, a new rule — that provides for the consideration of campaign statements to recast a later-issued executive order; and (3) by radically extending Supreme Court Establishment Clause precedents. The district court's approach is not only unprecedented, it is totally unworkable and inappropriate under any standard of analysis.

148

The majority reworks the district court's analysis by applying *Mandel*, albeit contrary to its holding, to defer only to the facial *legitimacy* of the Order but not to its facial *bona fides*, despite the *Mandel* Court's holding that "when the Executive exercises this power negatively on the basis of a *facially legitimate and bona fide reason*, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests" of the plaintiffs. *Mandel*, 408 U.S. at 770 (emphasis added). In addition, the majority, after violating *Mandel*, then adopts the same new rule of law adopted by the district court to consider candidate Trump's campaign statements to find the Executive Order's stated reasons "pretext[ual]," *ante* at 51, and then to rewrite the Order to find it in violation of the Establishment Clause. This too is unprecedented and unworkable.

Accordingly, I respectfully dissent. I would vacate the district court's injunction.

I

A

The Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, requires that an alien, to obtain admission into the United States, must normally both possess a visa and be admissible upon his or her arrival at a port of entry, *id.* §§ 1181, 1182(a)(7), 1201(h).

Exceptions exist which allow for entry without a visa. For instance, Congress has established a Visa Waiver Program, which allows nationals of certain countries to seek temporary admission into the United States for 90 days or less. 8 U.S.C. § 1187. In December 2015, however, Congress excluded aliens from admission under this program

149

who are dual nationals of or have recently visited Iraq, Syria, any country designated by the Secretary of State to be a state sponsor of international terrorism, or any country that the Secretary of Homeland Security has deemed to be a country or area of concern. Pub. L. No. 114-113, div. O, tit. II, § 203, 129 Stat. 2988, 2989–91 (2015) (codified at 8 U.S.C. § 1187(a)(12)). At all times relevant to this litigation, the countries designated by the Secretary of State to be state sponsors of international terrorism have been Iran, Sudan, and Syria. U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 4, 299–302 (June 2016), https://perma.cc/KJ4B-E4QZ. Also, in February 2016, the Department of Homeland Security ("DHS") excluded recent visitors to and nationals of Libya, Somalia, and Yemen from the Program. DHS, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://perma.cc/87CZ-L4FU.

Even when an alien possesses a visa, the alien must also be *admissible* to the United States when arriving at a port of entry. Congress has accorded the President broad discretion over the admission of aliens, providing in 8 U.S.C. § 1182(f):

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

In addition, Congress has specified that the entry of aliens is governed by "such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." *Id*. § 1185(a)(1).

B

On January 27, 2017, the President issued Executive Order 13,769, 89 Fed. Reg. 8977, which was challenged in several courts. A district court in Washington enjoined nationally the enforcement of several provisions of that order, *see Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), and the Ninth Circuit declined to stay the district court's injunction pending appeal, *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam).

Rather than challenge that decision further, the President issued a revised order — Executive Order 13,780 — on March 6, 2017, entitled, "Protecting the Nation From Foreign Terrorist Entry Into the United States," 82 Fed. Reg. 13,209, which is the Order before us. This Order revoked the earlier order and rendered moot the challenge to the earlier order.

The first Section of the revised Executive Order announces the policy goals of "protect[ing] the Nation from terrorist activities by foreign nationals" by "improv[ing] the screening and vetting protocols and procedures associated with the visa-issuance process and the [United States Refugee Admissions Program]" that "play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States." Order Preamble, § 1(a).

The Order then recites the previous Administration's response to terrorist activities in the countries covered by the current Order:

> Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen . . . had [during the prior Administration] already been identified as presenting heightened concerns about terrorism and travel to the United States. . . . [And] [i]n

151

2016, the Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern for travel purposes, based on consideration of . . . statutory factors related to terrorism and national security . . . . Additionally, Members of Congress have expressed concerns about screening and vetting procedures following recent terrorist attacks in this country and in Europe.

Order § 1(b)(i). Describing further the threats posed generally by these nations, the Order states:

Nationals from the countries previously identified . . . warrant additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats. Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States.

Order § 1(d). Finally, the Order describes as follows "the conditions in six of the previously designated countries that demonstrate why their nationals continue to present heightened risks to the security of the United States," relying on the Department of State's *Country Reports of Terrorism 2015*:

(i) Iran. Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and . . . al Qa'ida . . . . Iran does not cooperate with the United States in counterterrorism efforts.

(ii) Libya. Libya is an active combat zone . . . . In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions. Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country. . . . The United States Embassy in Libya suspended its operations in 2014.

152

(iii)  Somalia.  Portions of Somalia have been terrorist safe havens.  Al-Shabaab, an al-Qa'ida-affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries.  Somalia has porous borders, and most countries do not recognize Somali identity documents. . . .

(iv)  Sudan.  Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas . . . [and it] provided safe havens for al-Qa'ida and other terrorist groups to meet and train. . . .  [E]lements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country.

(v)  Syria.  Syria has been designated as a state sponsor of terrorism since 1979.  [Although] [t]he Syrian government is engaged in an ongoing military conflict against ISIS[,] . . . ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States.  The United States Embassy in Syria suspended its operations in 2012.  Syria does not cooperate with the United States' counterterrorism efforts.

(vi)  Yemen.  . . .  Both ISIS and a second group, al-Qa'ida in the Arabian Peninsula (AQAP), have exploited [internal] conflict to expand their presence in Yemen and to carry out hundreds of attacks.  Weapons and other materials smuggled across Yemen's porous borders are used to finance AQAP and other terrorist activities.  In 2015, the United States Embassy in Yemen suspended its operations . . . .

Order § 1(e).  Based on this collection of information, the Order concludes that, "[i]n light of the conditions in these six countries, until [an] assessment of current screening and vetting procedures . . . is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high."  Order § 1(f).

The operative provisions, as relevant here, are stated in Section 2 of the Order, which directs the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign

153

country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." Order § 2(a). The Secretary of Homeland Security is then directed to present a report with his findings to the President. Order § 2(b). And finally, pending the review, the Order prohibits the entry of certain nationals from the six countries, as follows:

> To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

Order § 2(c).

The referenced limitations in Section 3 specify that the suspension does not apply to nationals of the designated countries who are inside the United States on the effective date of the Order (March 16, 2017) or who had a valid visa at 5:00 p.m. on January 27, 2017 or on the effective date of the Order. Order § 3(a). The Section goes on to create exceptions that allow the entry of lawful permanent residents of the United States, foreign nationals with valid travel documents that are not visas, dual nationals traveling on passports issued by a non-designated country, foreign nationals traveling on diplomatic visas, foreign nationals granted asylum, refugees already admitted to the United States,

154

and any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture. Order § 3(b). Finally, Section 3 allows consular officers or the Commissioner of U.S. Customs and Border Protection to "decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest." Order § 3(c).

In sum, nationals of the designated countries who lack visas were, prior to the Order, unable to enter the United States under the Visa Waiver Program, 8 U.S.C. § 1187. Nationals who possess visas are exempted from the Order, as are most other nationals who have the ability to enter the United States through another travel document. *See* Order §§ 2, 3. The Order thus affects nationals of the designated countries who, lacking visas, were already unable to enter the United States but who had hoped to obtain a visa and to enter the United States within the 90 day period of the Order.[1]

C

The plaintiffs are three organizations and six individuals. Two of the organizations, the International Refugee Assistance Project ("IRAP") and HIAS, Inc., provide legal assistance and aid to refugees, while the third organization, the Middle East

---

[1] Other portions of the Order, not at issue here, suspend adjudication of applications under the Refugee Program for 120 days, subject to case-by-case waivers, and limit to 50,000 the number of refugees admitted in fiscal year 2017. Order § 6(a)–(c).

155

Studies Association ("MESA"), is an organization of students and scholars of Middle Eastern studies. The six individual plaintiffs are U.S. citizens or lawful permanent residents who alleged that the Order would prevent or delay foreign-national family members from entering the United States.

On March 10, 2017, after Executive Order 13,780 was issued but before it went into effect, the plaintiffs filed their operative complaint, as well as a motion for a preliminary injunction to enjoin enforcement of the Order. They alleged, as relevant here, that the Order violates the Establishment Clause of the First Amendment and 8 U.S.C. § 1152(a), which prohibits discrimination based on nationality in issuing immigrant visas. After expedited briefing and argument, the district court entered a nationwide preliminary injunction that barred enforcement of Section 2(c) of the Order.

The district court began its analysis by concluding that at least three of the individual plaintiffs had standing.

On the merits, the court concluded that the plaintiffs were likely to succeed on their claim that the Order violated the Establishment Clause. Although the court acknowledged that "the Second Executive Order is facially neutral in terms of religion" and that "national security interests would be served by the travel ban," it nonetheless looked behind the Order to statements made during the presidential campaign by candidate Trump and concluded, based on these statements, that the Order was likely motivated by anti-Muslim animus. In looking behind the Order, the court refused to apply *Mandel*, stating as its reason that *Mandel* applied to the review of decisions by

156

immigration officers denying visas and "does not apply to the promulgation of a sweeping immigration policy at the highest levels of the political branches."

The district court also found that the plaintiffs were likely to succeed on a small portion of their statutory claim, concluding that the Order conflicted with federal law insofar as it had "the specific effect of halting the issuance of [immigrant] visas to nationals of the Designated Countries." Otherwise, it found that "an executive order barring entry to the United States based on nationality pursuant to the President's authority under § 1182(f) [did] not appear to run afoul of the provision in § 1152(a) barring discrimination in the issuance of immigrant visas." (Internal quotation marks omitted).

From the entry of the preliminary injunction, the government filed this appeal.

II

In affirming the district court's ruling based on the Establishment Clause, the majority looks past the face of the Order's statements on national security and immigration, which it concedes are neutral in terms of religion, and considers campaign statements made by candidate Trump to conclude that the Order denigrates Islam, in violation of the Establishment Clause. This approach (1) plainly violates the Supreme Court's directive in *Mandel*; (2) adopts a *new rule of law* that uses campaign statements to recast the plain, unambiguous, and religiously neutral text of an executive order; and (3) radically extends the Supreme Court's Establishment Clause holdings. I address these legal errors in turn.

157

# A

I begin with the majority's failure faithfully to apply *Mandel*.

In *Mandel*, Ernest Mandel, a Belgian citizen, was denied a nonimmigrant visa to enter the United States to participate in conferences and to give speeches. In denying his admission to the United States, the Attorney General relied on 8 U.S.C. §§ 1182(a)(28)(D), (G)(v) and 1182(d)(3)(A), which provided that aliens who advocate or publish "the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship" shall be excluded from admission to the United States unless granted a waiver by the Attorney General. Mandel admitted that he was a Marxist who advocated the economic, governmental, and international doctrines of world communism, and the Attorney General refused to grant him a waiver. *Mandel*, 408 U.S. at 756, 759. University professors in the United States, who had invited Mandel to the United States to speak, as well as Mandel himself, filed an action challenging the constitutionality of the relevant statutory provisions and the Attorney General's exercise of his authority under those provisions. *Id.* at 759–60. They alleged that the relevant statutory provisions and the Attorney General's denial of a waiver were unconstitutional because they deprived the American plaintiffs of their First Amendment rights to hear and meet with Mandel. *Id.* at 760.

Despite its conclusion that the professors' First Amendment rights were well-established, the Supreme Court held that Mandel's exclusion was lawful. At the outset, the Court explicitly accepted that Mandel's exclusion implicated the First Amendment. It

158

found, however, that its "[r]ecognition that First Amendment rights are implicated . . . [was] not dispositive of [its] inquiry." *Mandel*, 408 U.S. at 765. The Court stated that, based on "ancient principles of the international law of nation-states," Congress could categorically bar those who advocated Communism from entry, explaining that "the power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers — a power to be exercised exclusively by the political branches of government." *Id.* The Court repeated Justice Harlan's holding that the government's power "to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." *Id*. at 766 (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)).

The Court then rejected the argument that the Attorney General's denial of a waiver violated the First Amendment. The Court forbade judges from interfering with the executive's "facially legitimate and bona fide" exercise of its immigration authority or balancing that exercise against constitutional rights. *Mandel*, 408 U.S. at 770. Specifically, it recognized that "Congress has delegated conditional exercise of this power [of exclusion] to the Executive" and declined to apply more scrutiny to executive exercise of that power than it would to Congress's own actions. *Id*. It concluded:

> We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, *the courts will neither look behind the exercise of that discretion, nor test it by balancing its*

159

*justification against the First Amendment interests* of those who seek personal communication with the applicant.

*Id*. (emphasis added).

The holding of *Mandel* ineluctably requires that we vacate the district court's preliminary injunction. The similarities between *Mandel* and this case are numerous and significant. In both cases, Congress delegated power to the executive to prohibit the entry of a certain class of foreign nationals. 8 U.S.C. § 1182(a)(28)(D), (d)(3)(A) (1970); 8 U.S.C. § 1182(f) (2016). The plaintiffs in each case challenged the executive's exercise of that statutory discretion as violative of their individual First Amendment rights. The court in *Mandel* rejected this challenge because, even assuming a constitutional violation lurked beneath the surface of the executive's implementation of his statutory authority, the reasons the executive had provided were "facially legitimate and bona fide." We must thus reject this similar challenge today.

The Court has consistently reaffirmed and applied *Mandel*'s holding. In *Fiallo v. Bell*, 430 U.S. 787 (1977), the Court declined to scrutinize a statute that gave different immigration status to a child born out of wedlock depending on whether it was the child's mother or father who was a citizen or lawful permanent resident. Although that statute involved two suspect classifications — gender and legitimacy — the Court, citing *Mandel*, nonetheless concluded that "it is not the judicial role in cases of this sort to probe and test the justifications" of immigration policies. *Id*. at 799. Accordingly, in response to the plaintiffs' arguments that the distinction was based "on an overbroad and

outdated stereotype," the Court indicated that "this argument should be addressed to the Congress rather than the courts." *Id*. at 799 n.9.

And both *Mandel* and *Fiallo* were reaffirmed more recently in Justice Kennedy's opinion in *Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in the judgment). In *Din*, the Court considered a suit by a United States citizen who alleged that the government deprived her of a liberty interest protected under the Due Process Clause by denying her husband's visa application without adequate explanation, providing only a citation to the provision under which the visa was denied. Justice Kennedy, writing for himself and Justice Alito to provide the fourth and fifth votes in favor of the government, stated that "[t]he reasoning and the holding in *Mandel* control here" and that the reasoning of *Mandel* "has particular force in the area of national security." *Id*. at 2140. He concluded that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that, because the government had provided Din with a facially legitimate and bona fide reason for its action, Din had no viable constitutional claim. *Id*. at 2141.

The plaintiffs can provide no coherent basis for their assertion that this case is not controlled by *Mandel* and its progeny. They do argue that the holding of *Mandel* does not apply to claims under the Establishment Clause, but they are unable to point to any case in which the Supreme Court has ever suggested the existence of such a limitation, or, indeed, any case in which it has suggested that some areas of law are not governed by the rule laid out in *Mandel*. Absent such a case, we are not now at liberty to craft — out of whole cloth — exceptions to controlling Supreme Court precedents.

161

To reach its conclusion, the majority does not adopt the plaintiffs' broad argument that *Mandel* does not even apply. Instead, in its attempt to escape *Mandel*'s clear holding, it asserts that "[w]here plaintiffs have seriously called into question whether the stated reason for the challenged action was provided in good faith," the court may "step away from our deferential posture and look behind the stated reason for the challenged action" to attempt to discern the action's purpose. *Ante* at 50. This approach, which totally undermines *Mandel*, is the foundation of its new rule that campaign statements may be considered to recast an unambiguous, later-adopted executive order on immigration. The majority states that even though the Order is on its face legitimate and provides reasons rooted in national security, because the plaintiffs "have more than plausibly alleged" bad faith, "we no longer defer" to the Order's stated purpose "and instead may 'look behind' [the Order]" in an attempt to discern whether the national security reason was *in fact* provided as a pretext for its religious purpose. *Ante* at 52. This approach casually dismisses *Mandel*, *Fiallo*, and *Din*.

If the majority's understanding had been shared by the Supreme Court, it would have compelled different results in each of *Mandel*, *Fiallo*, and *Din*, as in each of those cases the plaintiffs alleged bad faith with at least as much particularity as do the plaintiffs here. In *Mandel*, the allegations were such that Justice Marshall, writing in dissent, observed that "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver in this case would reveal that it is a sham." *Id.* at 778 (Marshall, J., dissenting). In *Fiallo*, Justice Marshall, again writing in dissent, pointed to the fact that the statute in question relied on "invidious classifications." *Fiallo*, 430 U.S. at 810 (Marshall, J.,

162

dissenting). And in *Din*, the plaintiffs argued that the consular decision should be reviewed because it fell within the "limited circumstances where the government provides no reason, or where the reason on its face is illegitimate." Brief for Respondent at 31, *Din*, 135 S. Ct. 2128 (No. 13-1402), 2015 WL 179409. But, as those cases hold, a lack of good faith must appear on the face of the government's action, not from looking behind it.

As support for its dramatic departure from Supreme Court precedent, the majority relies on a scattershot string of quotations drawn out of context from one sentence in *Din*. The carelessness of the majority's presentation is demonstrated simply by a comparison of its characterization of *Din* and the actual language of *Din* taken in context. Here is how the majority characterizes *Din*:

> Justice Kennedy explained that where a plaintiff makes "**an affirmative showing of bad faith**" that is "**plausibly alleged with sufficient particularity**," courts may "**look behind**" the challenged action to assess its "facially legitimate" justification.

*Ante* at 50. And here is what Justice Kennedy in *Din* actually said, with the language quoted by the majority in bold:

> Absent **an affirmative showing of bad faith** on the part of the consular officer who denied Berashk a visa — which Din has not **plausibly alleged with sufficient particularity** — *Mandel* instructs us not to "**look behind**" the Government's exclusion of Berashk for additional factual details beyond what its express reliance on § 1182(a)(3)(B) encompassed.

*Din*, 135 S. Ct. at 2141 (emphasis added).

More problematic is the majority's misunderstanding of *Din*'s actual holding, which the majority tries to reshape for its own ends. In *Din*, when the plaintiff refused to

163

accept the curt explanation of why her husband was denied a visa, she claimed that due process required that the government disclose the factual basis for its determination. Faced with Din's request for these underlying facts, the Supreme Court declined, instead applying *Mandel*'s requirement that the plaintiff must show that the government's reasons were not *facially* legitimate and not *facially* bona fide. As Justice Kennedy explained:

> Din claims due process requires she be provided with the facts underlying this determination, arguing *Mandel* required a similar factual basis.
>
> * * *
>
> Din perhaps more easily could mount a challenge to her husband's visa denial if she knew the specific subsection on which the consular office relied.
>
> * * *
>
> [But] the notice given was constitutionally adequate, particularly in light of the national security concerns the terrorism bar addresses. [Citing *Fiallo*, 430 U.S. at 795–96]. And even if Din is correct that sensitive facts could be reviewed by courts *in camera*, the dangers and difficulties of handling such delicate security material further counsel against requiring disclosure in a case such as this.
>
> * * *
>
> For these reasons, my conclusion is that the Government satisfied any obligation it might have had to provide Din with a *facially legitimate and bona fide reason* for its action when it provided notice that her husband was denied admission to the country under § 1182(a)(3)(B). *By requiring the Government to provide more, the Court of Appeals erred* in adjudicating Din's constitutional claims.

*Din*, 135 S. Ct. at 2140–41 (Kennedy, J., concurring in judgment) (emphasis added) (citations omitted). Nowhere did the *Din* Court authorize going behind the government's notice for the purpose of showing bad faith. The plaintiff had to show *facially* that the

164

notice was in bad faith, *i.e.*, not bona fide. The majority's selective quotations from *Din*, which conceal *Din*'s faithful application of *Mandel*, are simply misleading. Indeed, the impetus for the majority's approach is revealed when it states, "If we limited our purpose inquiry to review of the operation of a *facially neutral* order, we would be caught in an analytical loop, where the order would always survive scrutiny." *Ante* at 62 (emphasis added). That consequence — that facially neutral executive orders survive review — is precisely what *Mandel* requires.

In looking behind the face of the government's action for facts to show the alleged bad faith, rather than looking for bad faith on the face of the executive action itself, the majority grants itself the power to conduct an extratextual search for evidence suggesting bad faith, which is exactly what three Supreme Court opinions have prohibited. *Mandel*, *Fiallo*, and *Din* have for decades been entirely clear that courts are not free to look behind these sorts of exercises of executive discretion in search of circumstantial evidence of alleged bad faith. The majority, now for the first time, rejects these holdings in favor of its politically desired outcome.

B

Considering the Order on its face, as we are required to do by *Mandel*, *Fiallo*, and *Din*, it is entirely without constitutional fault. The Order was a valid exercise of the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a) to suspend the entry of "any aliens" or "any class of aliens" and to prescribe "reasonable rules, regulations, and orders" regarding entry, so long as the President finds that the aliens' admission would be "detrimental to the interests of the United States." And Executive Order No. 13,780 was

165

not the first to be issued under this authority. Such orders were entered by Presidents Reagan, George H.W. Bush, Clinton, George W. Bush, and Obama.[2] Moreover, the particular reasons given for the issuance of the Executive Order respond directly to the described risk of terrorism from six countries, justifying the imposition of a 90-day pause in the admission of nationals from those countries while the Administration determines whether existing screening and vetting procedures are adequate.

The Executive Order begins by noting that the previous Administration, in conjunction with Congress, identified seven countries — Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen — "as presenting heightened concerns about terrorism and travel to the United States," specifically noting that the previous Administration's Secretary of Homeland Security designated Libya, Somalia, and Yemen as countries of concern for travel purposes based on terrorism and national security. Order § 1(b)(i). And finally it notes that Members of Congress had expressed concerns about "screening and vetting procedures" following terrorist attacks in 2016 in Europe, as well as in this country. *Id.*

Adding to the historical assessment of those risks, the Executive Order continues with its conclusions, based on additional data, that the conditions in the countries

---

[2] *See, e.g.*, Exec. Order 12,324, 46 Fed. Reg. 48,109 (Sept. 29, 1981) (Reagan); Proclamation 5,517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) (Reagan); Exec. Order 12,807, 57 Fed. Reg. 23,133 (May 24, 1992) (George H.W. Bush); Proclamation 6,958, 61 Fed. Reg. 60,007 (Nov. 22, 1996) (Clinton); Proclamation 7,359, 65 Fed. Reg. 60,831 (Oct. 10, 2000) (Clinton); Executive Order 13,276, 67 Fed. Reg. 69,985 (Nov. 15, 2002) (George W. Bush); Exec. Order 13,692, 80 Fed. Reg. 12,747 (Mar. 8, 2015) (Obama); Exec. Order 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016) (Obama).

previously identified had worsened, at least with respect to six of the seven countries (excepting Iraq), noting that some of those countries were state sponsors of terrorism or were significantly compromised by terrorist organizations. Several of the countries were unwilling or unable to share or validate information about nationals seeking to travel to the United States, and in some, the conditions increasingly enabled "terrorist operatives or sympathizers to travel to the United States." Order § 1(d).

Finally, the Order addresses the particular circumstances of each of the six countries covered by the Order, noting for example, that Iran, Sudan, and Syria were state sponsors of terrorism; that the governments in Libya, Somalia, and Syria were rendered partially or entirely unable to resist terrorist organizations because of the organizations' activities; and that Iran, Libya, Syria, and Yemen either were not cooperating with the United States in its counterterrorism efforts or were unable to do so.

*None of the facts or conditions recited as reasons for the issuance of the Executive Order have been challenged as untrue or illegitimate.* Indeed, the plaintiffs conceded during oral argument that if another candidate had won the presidential election in November 2016 and thereafter entered this same Executive Order, they would have had no problem with the Order. As counsel for the plaintiffs stated, "I think in that case [the Order] could be constitutional." Similarly, the district court found the face of the Order to be neutral in terms of religion. And the majority too so concludes. *Ante* at 52, 59.

Moreover, these reasons amply support the modest action taken by the Executive Order, which imposes only a temporary pause of 90 days to assess whether the screening and vetting procedures that are applied to nationals from these high-risk countries are

167

adequate to identify and exclude terrorists. Even this pause is accompanied by an authorization to issue waivers designed to limit any harmful impact without compromising national security.

While the legitimate justifications for the Order are thoroughly established, its supposed ills are nowhere present on its face. Far from containing the sort of religious advocacy or disparagement that can violate the Establishment Clause, the Order contains no reference to religion whatsoever. Nor is there any trace of discriminatory animus. In short, under *Mandel* and its progeny, Executive Order 13,780 comfortably survives our review.[3]

## C

The majority's new rule, which considers statements made by candidate Trump during the presidential campaign to conclude that the Executive Order does not mean what it says, is fraught with danger and impracticability. Apart from violating all established rules for construing unambiguous texts — whether statutes, regulations, executive orders, or, indeed, contracts — reliance on campaign statements to impose a new meaning on an unambiguous Executive Order is completely strange to judicial analysis.

---

[3] The opinions in support of affirmance betray an object beyond a disciplined analysis. Judge Gregory states, for example, that the Executive Order "drips with religious intolerance, animus, and discrimination," *ante* at 12, and Judge Wynn states similarly, "this Executive Order is no more than . . . naked invidious discrimination against Muslims," *ante* at 94. These statements flatly mischaracterize an order that undisputedly contains no facial reference to religion.

The Supreme Court has repeatedly warned against "judicial psychoanalysis of a drafter's heart of hearts." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005). And consistent with that warning, the Court has never, "in evaluating the legality of executive action, deferred to comments made by such officials to the media." *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52 (2006). The Court's reluctance to consider statements made in the course of campaigning derives from good sense and a recognition of the pitfalls that would accompany such an inquiry.

Because of their nature, campaign statements are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often ambiguous. A court applying the majority's new rule could thus have free reign to select whichever expression of a candidate's developing ideas best supports its desired conclusion.

Moreover, opening the door to the use of campaign statements to inform the text of later executive orders has no rational limit. If a court, dredging through the myriad remarks of a campaign, fails to find material to produce the desired outcome, what stops it from probing deeper to find statements from a previous campaign, or from a previous business conference, or from college?

And how would use of such statements take into account intervening acts, events, and influences? When a candidate wins the election to the presidency, he takes an oath of office to abide by the Constitution and the laws of the Nation; he appoints officers of the government and retains advisors, usually specialized in their field. Is there not the

169

possibility that a candidate might have different intentions than a President in office? And after taking office, a President faces new external events that may prompt new approaches altogether. How would a court assess the effect of these intervening events on presidential intent without conducting judicial psychoanalysis?

The foibles of such a rule are unbounded and its adoption would have serious implications for the democratic process. As Judge Kozinski said well when he wrote about the Ninth Circuit's use of the same campaign statements:

> Even if a politician's past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result — namely, that the policies of an elected official can be forever held hostage by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all ("just kidding!") and try again? Or would we also need a court to police the sincerity of that mea culpa — piercing into the public official's "heart of hearts" to divine whether he really changed his mind, just as the Supreme Court has warned us not to? *See McCreary*, 545 U.S. at 862.

*Washington v. Trump*, No. 17-35105 (9th Cir. March 17, 2017) (Kozinski, J., dissenting from the denial of reconsideration en banc).

The danger of the majority's new rule is that it will enable any court to justify its decision to strike down any executive action with which it disagrees. It need only find one statement that contradicts the stated reasons for a subsequent executive action and thereby pronounce that reasons for the executive action are a pretext. This, I submit, is precisely what the majority opinion does.

Moreover, the unbounded nature of the majority's new rule will leave the President and his Administration in a clearly untenable position for future action. It is

undeniable that President Trump will need to engage in foreign policy regarding majority-Muslim nations, including those designated by the Order. And yet the majority now suggests that at least some of those future actions might also be subject to the same challenges upheld today. Presumably, the majority does not intend entirely to stop the President from creating policies that address these nations, but it gives the President no guidelines for "cleansing" himself of the "taint" they have purportedly identified.

Finally, the new rule would by itself chill political speech directed at voters seeking to make their election decision. It is hard to imagine a greater or more direct chill on campaign speech than the knowledge that any statement made may be used later to support the inference of some nefarious intent when official actions are inevitably subjected to legal challenges. Indeed, the majority does not even deny that it employs an approach that will limit communication to voters. Instead, it simply opines remarkably that such chilling is "a welcome restraint." *Ante* at 68.

The Supreme Court surely will shudder at the majority's adoption of this new rule that has no limits or bounds — one that transforms the majority's criticisms of a candidate's various campaign statements into a constitutional violation.

D

Finally, it is readily apparent that the plaintiffs' attempt to use campaign statements to transform a facially neutral executive action into an Establishment Clause violation would, in any event, be unlikely to succeed on the merits.

The thrust of the plaintiffs' argument, which the majority adopts, is that the Order violates the Establishment Clause's requirement of religious neutrality because it was

171

enacted "primarily for the purpose of targeting Muslims." To be sure, courts must ensure that government action is indeed motivated by a secular, rather than religious, purpose. *See Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971). And while the government's "stated reasons" for an action "will generally get deference," it is true that "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. "The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." *Id.* at 862 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).

But these generic standards are all of the doctrinal support that the plaintiffs and the majority can muster. For one, the Supreme Court has never applied the Establishment Clause to matters of national security and foreign affairs. And of the few government actions that the Supreme Court has invalidated based on a religious purpose, *McCreary*, 545 U.S. at 859 (remarking that the Court had "found government action motivated by an illegitimate purpose only four times since *Lemon*"), each is manifestly distinguishable from the Order here.

First, for all of the weight that the majority places on *McCreary*, it ignores that the Court there confronted a *facially religious* government action — the display of the Ten Commandments in two county courthouses. The Court in *McCreary* thus began with a *presumption* that the display was intended to promote religion. *See* 545 U.S. at 867–69. When it examined the legislative history surrounding the displays, it did so only to reject the government's attempt to overcome that presumption with a secular, pedagogical

172

purpose — a purpose that the Court declined to accept because it was adopted "only as a litigating position," *id.* at 871, "without a new resolution or repeal of the old [and expressly religious] one," *id.* at 870; *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223–24 (1963) (holding that schools' policy of required Bible study and recitation of the Lord's Prayer violated Establishment Clause). In stark contrast, the district court here concluded, and the majority agrees, that nothing on the face of the Executive Order speaks to religion. *Ante* at 59–60. Under *McCreary*, we should therefore begin with the presumption that the Order is neutral toward religion.

To be sure, the Supreme Court in "unusual cases" will find a religious purpose even where the government action contains no facial reference to religion. *McCreary*, 545 U.S. at 865. The majority, quoting selectively from these cases, invokes them to justify its searching inquiry into whether the Order's secular justifications were subordinate to a religious purpose that it has gleaned only from extrinsic statements. The majority's approach, however, in no way accords with what the Court actually *did* in those cases. In each case, the Court found the government action inexplicable *but for* a religious purpose, and it looked to extrinsic evidence only to confirm its suspicion, prompted by the face of the action, that it had religious origins. *See Santa Fe*, 530 U.S. at 315–16 (invalidating school policy of allowing student-led "invocation" before football games because the policy's language and context showed that religious prayer was the "preferred message"); *Edwards v. Aguillard*, 482 U.S. 578, 585–86 (1987) (invalidating state law that required creationism to be taught with evolution because the law did nothing to accomplish its stated secular purpose of "protect[ing] academic freedom");

173

*Wallace v. Jaffree*, 472 U.S. 38, 56–61 (1985) (invalidating state law that provided for one minute of "meditation or voluntary prayer" at the start of each school day because bill's sponsor stated that sole purpose was to encourage school prayer and prior statute already provided for student meditation).

The Executive Order in this case fits nowhere within this line. It is framed and enforced without reference to religion, and the government's proffered national security justifications, which are consistent with the stated purposes of the Order, withstand scrutiny. Conflicting extrinsic statements made prior to the Order's enactment surely cannot supplant its facially legitimate national security purpose. *See McCreary*, 545 U.S. at 865 ("[T]he Court often . . . accept[s] governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims"); *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983) (referring to the Court's "reluctance to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute"). Indeed, to hold otherwise would fly in the face of the Court's decisions upholding government actions with connections to religion far more obvious than those here. *See Lynch v. Donnelly*, 465 U.S. 668, 681 (1984) (city's inclusion of crèche in Christmas display justified by "legitimate secular purposes," namely "to celebrate the Holiday and to depict the origins of that Holiday"); *McGowan v. Maryland*, 366 U.S. 420, 444–46 (1961) (upholding state's requirement that businesses be closed on Sundays because, while Sunday laws had obvious religious origins, their religious purpose had dissipated in favor of a secular one).

174

The decision in *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), on which the majority also relies, is similarly inapposite. The state law at issue in that case "carved out" a new school district that included only "a religious enclave of Satmar Hasidism, practitioners of a strict form of Judaism." *Id.* at 690. In *Kiryas Joel*, however, the government did not dispute that the lines were drawn with religion in mind. *Id.* at 699. Rather than searching for extrinsic statements as evidence of a religious purpose, the Court took the government at its word and treated as corroborative of its religious purpose the fact that "the district's creation ran uniquely counter to state practice." *Id.* at 702; *see also id.* at 729 (Kennedy, J., concurring in the judgment) ("There is no serious question that the legislature configured the school district, with purpose and precision, along a religious line. This *explicit* religious gerrymandering violates the First Amendment Establishment Clause" (emphasis added)).

The government here, by contrast, provides ample nonreligious justification for the Order and actively contests that it has any religious purpose. Far from running "counter" to typical national security practice, each of the Order's six affected countries was previously designated as "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." Order § 1(d). And an Order that affects all nationals of six countries, irrespective of their religion, is not so precisely hewn to religious lines that we can infer, based on its operation alone, a predominantly religious purpose.

175

Undeterred, the majority, pursuing its objective despite the costs, opens *Lemon*'s already controversial purpose inquiry even wider.[4] It engages in its own review of the national security justifications supporting the Order and concludes that protecting national security could not be the President's "primary purpose." As evidence, the majority points to the President's level of consultation with national security agencies before issuing the Order; the content of internal Department of Homeland Security reports; the comments of former national security officials made in an *amicus* brief; and its own assessment of the national security threats described in the Order. *Ante* at 60–62.

This intense factual scrutiny of a facially legitimate purpose, of course, flies in the face of *Mandel*, *Fiallo*, and *Din*. But even within traditional Establishment Clause doctrine, it is an unprecedented overreach. It goes far beyond the Court's inquiry in *McCreary*, where the government offered a secular "litigating position" for a *facially religious* action, 545 U.S. at 871, or in *Wallace*, where the government's proffered secular purpose for a statute that provided for "meditation or voluntary prayer" was belied by the fact that a previous law already provided for a minute of meditation, 472

---

[4] While there is no question that it binds us, *Lemon*'s test, and particularly its inquiry into government purpose, has repeatedly been criticized as open-ended and manipulable. *See McCreary*, 545 U.S. at 902 (Scalia, J., dissenting) ("By shifting the focus of *Lemon*'s purpose prong from the search for a genuine, secular motivation to the hunt for a predominantly religious purpose, the Court converts what has in the past been a fairly limited inquiry into a rigorous review of the full record"); *see also*, *e.g.*, *Santa Fe*, 530 U.S. at 319–20 (Rehnquist, C.J., dissenting); *Kiryas Joel*, 512 U.S. at 720 (O'Connor, J., concurring in part and concurring in the judgment); *Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 655–57 (1989) (Kennedy, J., concurring in the judgment in part and dissenting in part). Should the majority not be wary of jumping when on thin ice?

U.S. at 59–61 (finding that the bill's "sole purpose" was religious). In those cases, the Court concluded that the government's secular purpose did not hold up even on its own terms — that is, even accepting the *soundness* of the secular purpose, undisputed historical facts made clear that the secular purpose was not primary. The Court emphatically did not, however, question the *factual bases* underlying the government's proffered secular purpose.

The majority's intense factual inquiry is particularly inappropriate where the government's secular purpose is related to national security — a subject, as the majority recognizes, on which we owe the executive significant deference. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (explaining that, where the executive had concluded that material support to terrorist organizations "will ultimately inure to the benefit of their criminal, terrorist functions," "[t]hat evaluation of the facts by the Executive . . . is entitled to deference" because it "implicates sensitive and weighty interests of national security and foreign affairs").

Unless corrected by the Supreme Court, the majority's new approach, which is unsupported by any Supreme Court case, will become a sword for plaintiffs to challenge facially neutral government actions, particularly those affecting regions dominated by a single religion. Government officials will avoid speaking about religion, even privately, lest a court discover statements that could be used to ascribe a religious motivation to their future actions. And, in the more immediate future, our courts will be faced with the unworkable task of determining when this President's supposed religious motive has sufficiently dissipated so as to allow executive action toward these or other majority-

177

Muslim countries. The Establishment Clause demands none of these unfortunate and unprecedented results.

* * *

For all of the foregoing reasons, I would reject the plaintiffs' and the district court's Establishment Clause arguments and vacate the district court's injunction.

SHEDD, Circuit Judge, with whom Judge NIEMEYER and Judge AGEE join, dissenting[1]:

National security is a complex business with potentially grave consequences for our country. Recognizing this fact, the Supreme Court has observed that "it is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981).[2] This observation is especially true in today's world, where we face threats from radical terrorists who seek to cross our borders for the purpose of harming us and destroying our way of life. Although we often are quick to forget the fact, "the real risks, the real threats, of terrorist attacks are constant and not likely soon to abate," *Boumediene v. Bush*, 553 U.S. 723, 793 (2008); therefore, "the Government's interest in combating terrorism is an urgent objective of the highest order," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Given the multitude of critical factors involved in protecting national security, including the delicacy of foreign relations and the worldwide intelligence information that is constantly generated, combined with the ever-changing threatening circumstances, "questions of national security . . . do not admit of easy answers, especially not as products of the necessarily limited analysis undertaken in a single case," *Lebron v. Rumsfeld*, 670 F.3d 540, 549 (4th Cir. 2012), and "they are and should be undertaken only by those directly responsible to

---

[1]Though I fully join Judge Niemeyer's and Judge Agee's well-reasoned dissenting opinions, I offer the following additional comments to explain why I believe the district court further abused its discretion in entering the preliminary injunction. Judge Niemeyer and Judge Agee have authorized me to state that they join in this dissenting opinion.

[2]I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

the people whose welfare they advance or imperil," *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

Every President has the "constitutional responsibility for the security of the Nation as the Chief Executive and as Commander in Chief of our Armed forces." *El-Masri v. United States*, 479 F.3d 296, 304 (4th Cir. 2007). In this role, a President and his national security advisors (unlike federal judges at all levels, lawyers, and commentators) have constant access to information "that may describe new and serious threats to our Nation and its people." *Boumediene*, 553 U.S. at 797. For these reasons and more, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dept. of Navy v. Egan*, 484 U.S. 518, 530 (1988).

This case involves the President's attempt to impose a *temporary pause* on the entry of nationals from six countries that indisputably present national security concerns. "It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). Along this line, the Supreme Court has noted that "the Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), and has explained that the President is not obligated to disclose his reasons "for deeming nationals of a particular country a special threat . . . and even if [he] did disclose them a court would be

180

ill equipped to determine their authenticity and utterly unable to assess their adequacy," *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999).

One thing is certain: to whatever extent it is permissible to examine the President's national security decision in this case, where the President has acted "pursuant to an express or implied authorization from Congress," the President's decision is entitled to "the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981). This is especially true when, as here, plaintiffs seek preliminary injunctive relief to stop the President from executing a national security policy, for in even the most routine cases, which this certainly is not, a preliminary injunction "is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

The obvious rationale underlying these important principles has been discussed many times by the Supreme Court, this Court, and others, but the district court totally failed to respect them. Rather than giving any deference to the President (or his national security advisors) regarding his national security assessment, or imposing a heavy burden on the plaintiffs to overcome the President's decision, or showing any sense of restraint in wielding the extraordinary remedy of injunctive relief, the district court simply cast aside the President's decision as nothing more than a sham based on its own ideas concerning the wisdom of the Executive Order. In doing so, the district court made the extraordinary finding - based on a *preliminary* evidentiary record - that the President exercised his otherwise lawful authority to effect the temporary pause primarily because

181

he bears animus towards Muslims and wants to impose a "Muslim ban." Remarkably, the district court made this finding while also acknowledging that the Executive Order is facially neutral, that there are heightened security risks with the countries listed in the Executive Order, and that national security interests would be served by the travel pause.

The shortcomings inherent in the district court's fact-finding are obvious. It is primarily based on the district court's selectively negative interpretation of political campaign statements made before the President swore his oath of office,[3] its acceptance of the national security assessment of *former* government officials (many of whom openly oppose this President), its failure to account for the national security assessment of the *current* Attorney General and Secretary of Homeland Security, its misplaced conclusion regarding the President's decision not to submit the Executive Order to the Executive bureaucracy for "inter-agency review," and the purported novelty of the temporary travel pause. Moreover, despite its express recognition of the dangers posed by the designated countries and the national security interests served by the temporary travel

---

[3]Ironically, courts are sensitive in defending their own integrity and often use the judicial oath of office as a shield against claims of bias. *See generally Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 891 (2009) (Roberts, C.J., dissenting) ("There is a presumption of honesty and integrity in those serving as adjudicators. All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise."). Certainly**,** the President, who takes a similar oath of office, should be accorded the same trust. *See, e.g.*, *N.L.R.B. v. Enterprise Leas. Co. SE, LLC*, 722 F.3d 609, 671 (4th Cir. 2013) (Diaz, J., concurring in part and dissenting in part) ("The majority also gives short shrift to the fact that the President too swears an oath to uphold the Constitution, and that when he acts under its express authority, his actions should be accorded a presumption of constitutionality.").

pause, the district court - with no access to intelligence information[4] - criticized the President for failing to identify any instances of individuals who came from the designated countries having engaged in terrorist activity in the United States, faulted the President for not explaining why the temporary travel pause is the necessary response to the existing risks, and ultimately found that the President failed to prove that national security cannot be maintained without the temporary travel pause. As if all of this is not enough, the President's supposed goal of "banning Muslims" from the United States is not remotely served by the temporary travel pause, a fact that makes the district court's factual finding even more dubious.[5]

The district court's questionable fact-finding is sufficient (among other reasons) to vacate the injunction, but there is ultimately a more obvious fatal flaw in the injunction order: the court's complete failure to actually account for the public interest. In addition to the general restraint courts must show when considering injunctive relief, courts "should be particularly cautious when contemplating relief that implicates public

---

[4]In *Waterman S.S. Corp.*, 333 U.S. at 111, the Court made the following apt observation: "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."

[5]The limited temporal and geographical scope of the Executive Order, coupled with the designated categorical exclusions and case-by-case waiver process, strongly supports the President's stated national security rationale rather than the district court's bias finding. Even without those exclusions and waivers, the temporary travel pause would only potentially affect approximately 10% of Muslims worldwide.

183

interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).[6] Although the public interest generally favors the protection of constitutional rights, that interest must sometimes yield to the public interest in national security, *see, e.g., Defense Distrib. v. U.S. Dept. of State*, 838 F.3d 451, 458-60 (5th Cir. 2016), because "unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning," *Wayte v. United States*, 470 U.S. 598, 612 (1985). This is such a case.

The circumstances of this case are similar in material respects to those presented in *Winter*, and a straightforward application of that case warrants reversal here. The *Winter* plaintiffs complained that the United States Navy's sonar-training program harmed marine mammals and that the Navy should have prepared an environmental impact statement before conducting certain training exercises. The district court agreed and preliminarily enjoined the Navy from using sonar in certain circumstances during training exercises. The Ninth Circuit affirmed the injunction, but the Court reversed. Applying the standard four-part preliminary injunction test, the Court acknowledged the importance of plaintiff's ecological, scientific, and recreational interests in marine mammals and accepted for purposes of discussion that they had shown irreparable injury from the Navy's training exercises. However, the Court concluded that these factors were "outweighed by the public interest and the Navy's interest in effective, realistic training

---

[6]To obtain a preliminary injunction, a plaintiff must establish: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Counc., Inc.*, 555 U.S. 7, 20 (2008).

184

of its sailors." *Id.* at 23. In the Court's view: "A proper consideration of these factors alone require[d] denial of the requested injunctive relief." *Id.*

The Court explained that the lower courts "significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense." *Id.* at 24. In reaching this conclusion, the Court noted that the case involved complex professional military decisions regarding training and control of a military force, to which "great deference" is ordinarily given, *id.*, and it observed that the record contained declarations from senior Navy officials that underscored the threat posed by enemy submarines and the need for extensive sonar training to counter the threat, as well as a declaration from the President that training with sonar was essential to national security. The Court emphasized that the lower courts "failed properly to defer" to senior Navy officers' judgment about the effect that a preliminary injunction would have on the effectiveness of the training. *Id.* at 27. Additionally, the Court pointed out that "despite the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction, the District Court addressed these considerations in only a cursory fashion." *Id.* at 26. Ultimately, while acknowledging that "military interests do not always trump other considerations," the Court determined that "the proper determination of where the public interest lies does not strike us as a close question." *Id.*

As in *Winter*, the district court's public interest analysis misses the mark. Here, the facially neutral Executive Order explains in detail the President's underlying reasoning

185

for the temporary travel pause. Additionally, the record contains a joint letter from the Attorney General and Secretary of Homeland Security in which they detail their concerns "about weaknesses in our immigration system that pose a risk to our Nation's security," and in which they assert that "*it is imperative that we have a temporary pause on the entry of nationals from certain countries to allow this review to take place – a temporary pause that will immediately diminish the risk we face from application of our current vetting and screening programs for individuals seeking entry to the United States from these countries.*" To be sure, the district court found that the *President's* alleged bias is the primary reason for the temporary travel pause, but it found no such bias on the part of his Cabinet officials.[7] Moreover, the district court acknowledged that national security is in fact a secondary reason for the temporary travel pause, and it found that the countries designated in the Executive Order present heightened security risks and that national security interests would be served by the temporary travel pause.

Despite this record, the district court – with no meaningful analysis - simply dismissed the public's interest in national security with the specious conclusion that "Defendants . . . have not shown, or even asserted, that national security cannot be maintained without an unprecedented six-country travel ban, a measure that has not been deemed necessary at any other time in recent history." *I.R.A.P. v. Trump*, 2017 Westlaw

---

[7]Similarly, plaintiffs' counsel admitted during oral argument that he has no basis to challenge the integrity of the Attorney General and Secretary of Homeland Security. The apparent good-faith of these officials, which is an inconvenient fact for the plaintiffs, leads inexorably to the unanswered question of why the district court essentially ignored or rejected their detailed national security advice to the President.

1018235, *17 (D. Md. 2017). As noted, national security is the most compelling of public interests, and the question of how best to protect public safety in this area does not, as the district court implies, boil down to a least-restrictive means test, *Padilla v. Hanft*, 423 F.3d 386, 395 (4th Cir. 2005) ("We believe that the district court ultimately accorded insufficient deference to that determination, effectively imposing upon the President the equivalent of a least-restrictive-means test. To subject to such exacting scrutiny the President's determination that criminal prosecution would not adequately protect the Nation's security at a very minimum fails to accord the President the deference that is his when he acts pursuant to a broad delegation of authority from Congress."), or require a danger that satisfies the court's "independent foreign policy analysis," *Regan v. Wald*, 468 U.S. 222, 242 (1984). Therefore, the relevant point is not whether the temporary travel pause is the *only* way, or even the best way, to protect national security. The simple fact of the matter is that regardless of any ulterior motive one might ascribe to the President, the record still conclusively establishes that the temporary travel pause will in fact promote an important national security objective.

Undoubtedly, protection of constitutional rights is important, but there are often times in the federal system when constitutional rights must yield for the public interest. As we have explained, for example, in applying the state secrets doctrine, a plaintiff with a plausibly viable constitutional claim can be barred from pursuing it "not through any fault of his own, but because his personal interest in pursuing his civil claim is subordinated to the collective interest in national security." *El-Masri*, 479 F.3d at 313. In my view, the very serious national security interest served by the temporary travel pause

187

(as determined by those who are duly empowered to make the decision and who have access to current intelligence information) greatly outweighs the alleged temporary and relatively minor harm that will befall these few plaintiffs. The district court abused its discretion by failing to strike this balance. *See, e.g.*, *Sarsour v. Trump*, 2017 Westlaw 1113305, *15 (E.D.Va. 2017) ("Based on the record now before the Court, the parties' respective interests described above, the subject matter of EO–2, and the protections to the public that EO–2 is intended to provide, Plaintiffs have not established that the public interest favors issuance of immediate relief in this action.").

Today's decision may be celebrated by some as a victory for individual civil rights and justice, and by others as a political defeat for this President. Yet, it is shortsighted to ignore the larger ramifications of this decision. Regrettably, at the end of the day, the real losers in this case are the millions of individual Americans whose security is threatened on a daily basis by those who seek to do us harm. Even if the district court's instinct is correct and no tangible harm directly results from its order enjoining the President from attempting to protect American citizens, the injunction prohibits the government from addressing a serious risk identified by the Attorney General and Homeland Security Secretary; therefore, the security of our nation is indisputably lessened as a result of the injunction. Moreover, the President and his national security advisors (and perhaps future

188

Presidents) will be seriously hampered in their ability to exercise their constitutional duty

to protect this country.[8]

---

[8]At oral argument, several judges (including myself) questioned when, if ever, the President could free himself from the stigma of bias that the district court has enshrined by its *preliminary* "factfinding." Notably, no one has provided a satisfactory response.

AGEE, Circuit Judge, with whom Judge NIEMEYER and Judge SHEDD join, dissenting:

In their haste to reach the merits of the plaintiffs' Establishment Clause claim, my colleagues in the majority neglect to follow the longstanding and well-defined requirements of Article III of the United States Constitution. They err, as did the district court, in holding that the plaintiffs had standing to bring an Establishment Clause claim. For that reason, I respectfully dissent from the majority's decision to uphold the district court's preliminary injunction. The plaintiffs do not have standing to bring the current action.[1]

I.

A.

Article III limits the federal judiciary's authority to adjudicate only "cases" and "controversies." U.S. Const. art. III, § 2. "[S]tanding is an integral component of the case or controversy requirement." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").[2] A plaintiff must satisfy three elements to

---

[1] I join the well-written dissents of Judge Niemeyer and Judge Shedd in full. But, for the reasons stated herein, I would find it unnecessary to reach the merits of the plaintiffs' Establishment Clause claim.

[2] I have omitted internal alterations, citations, and quotation marks here and throughout this dissent, unless otherwise noted.

establish standing: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 560–61. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Due to the difficulty of determining injury in Establishment Clause cases, "rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable." *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997); *see also Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 605 (4th Cir. 2012) ("Many of the harms that Establishment Clause plaintiffs suffer are spiritual and value-laden, rather than tangible and economic."). However, "a mere abstract objection to unconstitutional conduct is not sufficient to confer standing." *Suhre*, 131 F.3d at 1086; *see also Moss*, 683 F.3d at 605 ("Nonetheless, we must guard against efforts to use this principle to derive standing from the bare fact of disagreement with a government policy, even passionate disagreement premised on Establishment Clause principles. Such disagreement, taken alone, is not sufficient to prove spiritual injury."). For example, "a citizen of Omaha, Nebraska who finds a religious symbol in the Haywood County Courthouse [in North Carolina] to be offensive in the abstract would

191

not have standing to challenge it. The injury to our hypothetical Omaha plaintiff partakes of a generalized grievance, based on nothing more than each citizen's shared individuated right to a government that shall make no law respecting the establishment of religion." *Suhre*, 131 F.3d at 1086; *accord Defenders of Wildlife*, 504 U.S. at 575 ("[T]o entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public."). Conversely, "direct contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen's general grievance against unconstitutional government conduct." *Suhre*, 131 F.3d at 1086.

## B.

The district court determined that three of the individual plaintiffs (Meteab, John Doe #1, and John Doe #3) had sufficiently pleaded that they had suffered stigmatization due to the Executive Order. *See* J.A. 780 (finding that the plaintiffs claimed "the anti-Muslim animus underlying the Second Executive Order inflicts *stigmatizing injuries* on them all" (emphasis added)). Because Section 2(c) also allegedly prevents the family members of these plaintiffs from entering the country, the district court held that they had asserted injuries sufficient to confer standing to pursue their Establishment Clause claim.

Doe #1 is a lawful permanent resident and "non-practicing Muslim[]." J.A. 213, 305. His wife, also a non-practicing Muslim and Iranian national, has applied for an immigrant visa. She is currently awaiting an embassy interview, a condition precedent to

192

the determination of whether to grant a visa. *See* 22 C.F.R. § 42.62(b) ("Every alien executing an immigrant visa application must be interviewed by a consular officer who shall determine on the basis of the applicant's representations and the visa application and other relevant documentation—(1) The proper immigrant classification, if any, of the visa applicant, and (2) The applicant's eligibility to receive a visa."). Doe #1 alleges that the Executive Order has caused him and his wife to experience "significant fear, anxiety and insecurity . . . regarding their future." J.A. 246. He argues that because he is afraid that he will not be allowed to reenter the United States if he travels to Iran, Section 2(c) "forces [him] to choose between [his] career and being with [his] wife." J.A. 306. Doe #1 maintains that "the anti-Muslim views that are driving the Executive Order, as well as the Order itself, have caused [him] significant stress and anxiety." J.A. 306. He is allegedly concerned for his safety.

Like Doe #1, Doe #3 is a lawful permanent resident, although nothing in the record indicates his religious preference.[3] In any event, Doe #3 applied for an immigrant visa on behalf of his wife, an Iranian national. In May 2016, the United States Embassy "informed [her] that her documentation was complete and she needed to wait for administrative processing, but that she should be able to join her husband in two to three months." J.A. 246. With his wife in Iran, Doe #3 maintains that "[t]heir continued separation has placed extraordinary stress on John Doe #3 and his wife, and their

---

[3] The pleadings make only one religious reference with respect to Doe #3: "The anti-Muslim attitudes that are driving this Executive Order have caused me stress and anxiety and made me question whether I even belong in this country despite everything I have sacrificed and invested in making a life here." J.A. 310.

relationship." J.A. 247. He "feel[s] as though they've been unable to start their lives together because of the delays and uncertainty caused by the Executive Order." J.A. 247. Doe #3 asserts that he and his wife "are being torn apart by this situation and the uncertainty and delay." J.A. 310. He believes that the anti-Muslim message of the Executive Order has caused him stress and anxiety and to feel like an outsider.

Meteab is also a lawful permanent resident and Muslim. His wife and children are here in the United States. However, Meteab has three brothers who wish to resettle in North America as refugees. Two of the three have received approval for resettlement in the United States but have not yet obtained travel documents. The remaining brother has been approved for resettlement in Canada. Meteab contends that, as a result of the Executive Order, he "and his wife have experienced anti-Muslim sentiment and felt very uncomfortable and insecure in their community, causing them acute mental stress." J.A. 250. The couple "ha[s] experienced hostility in public, with people staring at Mr. Meteab's wife, who wears a hijab, and refusing to stop for them at crosswalks." J.A. 250.

## C.

The district court held that, "where the [allegedly anti-Muslim] Executive Order was issued by the federal government, and the three Individual Plaintiffs have family members who are directly and adversely affected in that they are barred from entry to the United States as a result of the terms of the Executive Orders, these Individual Plaintiffs have alleged a personal injury as a consequence of the alleged Establishment Clause violation." J.A. 787. However, as the record reflects, the district court clearly erred in finding that Meteab had standing to challenge Section 2(c) of the Executive Order.

194

Meteab's brothers are refugees, and Section 2(c) does not apply to refugees. The district court recognized in its opinion that "[t]he Plaintiffs' Establishment Clause . . . arguments focused primarily on the travel ban for citizens of the six Designated Countries in Section 2(c) of the Second Executive Order." J.A. 809. The court elaborated that the plaintiffs had "not sufficiently develop[ed] . . . argument[s relating to refugees] to warrant an injunction on those sections at this time." J.A. 810. Therefore, Meteab cannot base standing to challenge Section 2(c) on any "prolonged separation" from his refugee brothers, who are covered by a different section of the Executive Order. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Allen v. Wright*, 468 U.S. 737, 752 (1984) ("Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ___, 134 S. Ct. 1377 (2014). Thus, Meteab can show Establishment Clause standing only if his alleged stigmatization is a cognizable injury for standing purposes.

As for Doe #3, his wife was granted a visa during the pendency of this appeal, so he, too, is left with only stigma to make his Establishment Clause claim of standing. For the reasons stated below, such a stigma claim alone is insufficient to confer standing under the record in this case.

Perhaps recognizing these deficits, the majority bases its affirmation of the district court's standing determination only on Doe #1. But Doe #1 does not have standing either

195

because the stigma that he alleges to have suffered and the potential denial of a visa to his wife are two distinct harms, neither of which meet basic standing requirements. Setting aside Doe #1's allegation that he experienced stigmatization himself, the imagined future denial of a visa to his wife is simply too vague and speculative to meet the constitutional standard of a concrete and "actual or imminent, not conjectural or hypothetical" injury. *Defenders of Wildlife*, 504 U.S. at 560. The majority's conception of "injury-in-fact" by Doe #1 is conjectural and hypothetical; he had no reasonable expectation that his wife would join him in the United States at any particular time either prior to the drafting of the Executive Order or at any time during the suspension period.

1.

The plaintiffs' pleadings show that their alleged injuries consist solely of their personal perception of stigmatization. In the complaint, they allege, "The March 6 Order also contains language that associates Muslims with violence, terrorism, bigotry, and hatred, inflicting *stigmatic and dignitary harms*." J.A. 207 (emphasis added). Despite the majority's holding, the stigma that plaintiffs claim to have suffered is not a cognizable injury because it is simply a subjective disagreement with a government action. To allow these plaintiffs to pursue their claims based on an idiosyncratic projection of stigmatization is to grant every would-be Establishment Clause plaintiff who develops negative feelings in response to some action by the Government a court proceeding in which to vent his subjective reactions as a legal claim. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 489 (1982) ("Were we to accept respondents' claim of standing in this case, there would

196

be no principled basis for confining our exception to litigants relying on the Establishment Clause.").  Indeed, to find standing here is to find standing for not only all Muslims in America, but *any* American who may find the Executive Order (or any other Government action) personally disagreeable, which is "beyond all reason."  *See Defenders of Wildlife*, 504 U.S. at 566.

The Supreme Court "ha[s] consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."  *Id.* at 573–74; *accord Valley Forge*, 454 U.S. at 482–83 (stating that the Supreme Court "repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law").  The Court has rejected a generalized finding of standing based on "the need for an available plaintiff, without whom the Establishment Clause would be rendered virtually unenforceable by the judiciary."  *Valley Forge*, 454 U.S. at 470.  The plaintiffs here "fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees."  *Id.* at 485.  The majority does not provide any principled instruction on how its sweeping standing ruling is cabined to this particular case, and thus its holding far oversteps the bounds of traditional judicial authority.  *See id.* at 471 (stating that Article III is a limitation on "judicial power"); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) ("The

command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake."), *abrogated on other grounds by Lexmark*, 134 S. Ct. 1377; *Defenders of Wildlife*, 504 U.S. at 576 ("Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.").

The majority relies heavily on two Fourth Circuit cases, *Suhre* and *Moss*, but these cases are inapposite.[4]  In *Suhre*, local officials displayed the Ten Commandments in the county courthouse where the plaintiff, a resident of the county, often visited.  131 F.3d at 1084–85.  Suhre, an avowed atheist and serial litigant, took offense to the display and "aver[red] that contact with the display cause[d] him distress."  *Id.* at 1085.  We ultimately found that Suhre had alleged a "cognizable injury caused by personal contact with a public religious display."  *Id.* at 1090.

In *Moss*, a school district "adopted a policy allowing public school students to receive two academic credits for off-campus religious instruction offered by private educators."  683 F.3d at 601.  The plaintiffs, including two students and their parents, urged the Court to "adopt a per se rule that students and parents always have standing to bring suit against policies at their school when they allege a violation of the Establishment Clause, regardless of whether they allege or can prove personal injury."

---

[4] *Suhre* is a religious display case, a type of Establishment Clause claim that arguably belongs in its own category.  *See* 131 F.3d at 1086 ("Religious display cases are an even more particularized subclass of Establishment Clause standing jurisprudence.").

198

*Id.* at 605. We rejected that argument and held that, although injuries in such cases are often intangible, plaintiffs must have been "spiritually affronted as a result of direct and unwelcome contact with an alleged religious establishment within their community." *Id.* Because one student had no "personal exposure" to the policy other than mere awareness of its existence, we held that the student lacked standing, despite that student "feel[ing] like an outsider" in the school environment. *Id.* at 606. However, we found that the other student had standing to bring a claim because she actually received a solicitation letter from a religious institution that participated in the school's program and "changed [her] conduct in adverse ways as a result of [her] perceived outsider status." *Id.* at 607.

In both of these cases, local governments took direct actions in relation to their constituents in an immediate and concrete way. All residents who entered the courthouse in *Suhre* were personally exposed to the display of the Ten Commandments, while the academic policy in *Moss* was actually sent to the student. As a consequence, the plaintiffs in those cases did come into direct contact with the alleged Establishment Clause violations.[5]

In contrast, the Executive Order here applies only to prospective immigrants. The order's focus faces outward towards the alien residents of the subject countries, not

---

[5] The out-of-circuit cases on which the majority also relies are likewise inapposite for the same reasons that distinguish *Suhre* and *Moss*. *See Awad v. Ziriax*, 670 F.3d 1111, 1116, 1122 (10th Cir. 2012) (analyzing a "proposed constitutional amendment that would prevent Oklahoma state courts from considering or using Sharia law"); *Catholic League for Religious and Civil Rights v. City and Cty. of San Francisco*, 624 F.3d 1043, 1048–53 (9th Cir. 2010) (reviewing standing in a case challenging a city resolution that ordered Catholics in San Francisco to cease discriminating against same-sex couples).

inward towards persons in the United States like the plaintiffs. That circumstance is in direct distinction to the religious display in *Suhre* or the academic policy in *Moss*. Section 2(c) of the facially-neutral Executive Order applies only to "nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen." Section 3(b)(i) explicitly exempts "any lawful permanent resident of the United States," like the plaintiffs, from the travel suspension, thus not applying to Does #1 and #3 and Meteab. The majority posits that, because the policy at issue came from the President himself that somehow metamorphosizes into the "direct contact" *Suhre* requires. Majority Op. 39. This distorts the standing inquiry as the source of the directive is irrelevant. What matters is whether the plaintiff came into direct contact with the religious establishment. And that is not the case here simply because the President is the party signing an order.

Despite the majority's giving short shrift to *In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008), the case is directly on point. There, "[a] group of Protestant Navy chaplains sued the Navy, alleging that the Navy's operation of its retirement system discriminates in favor of Catholic chaplains in violation of the Establishment Clause." *Id.* at 758.[6] The plaintiffs "conceded that the Navy did not deny them any benefits or opportunities on account of their religion." *Id.* at 760. Rather, they maintained "that *other* chaplains suffered such discrimination." *Id.* The plaintiffs contended that they had standing because "they ha[d] been subjected to the Navy's message of religious

---

[6] It is irrelevant that *In re Navy Chaplaincy* is a favoritism case as opposed to a condemnation case as alleged here, as they are two sides of the same Establishment Clause coin.

200

preference as a result of the Navy's running a retirement system that favors Catholic chaplains." *Id.* The D.C. Circuit rejected this argument and found that they did not "have standing based on their exposure to the Navy's alleged message of religious preference." *Id.* at 761. Like the Protestant Navy chaplains, the plaintiffs here claim offense to a message directed at others, who happen to be nationals of other countries. The plaintiffs' claims of stress or stigmatization are subjective reactions, not direct contact with the Executive Order, and amount to disagreements with a government policy. *See Moss*, 683 F.3d at 604–05. As a result, the plaintiffs' claim of injury by way of stigma is a general grievance, insufficient to confer standing. *Suhre*, 131 F.3d at 1086.[7]

2.

Perhaps recognizing the problems posed by basing standing only on the subjective feelings of the plaintiffs, the majority also holds that the alleged stigma suffered by Doe #1, combined with prolonged separation from his wife, is enough to support standing, thereby creating a kind of "stigma plus" standard.[8] However, the majority's construct

---

[7] Some of the plaintiffs, including Doe #1, have expressed fear that they will be denied reentry into the country if they travel to the subject countries to visit their family while the Executive Order is in effect. This fear is unfounded and contradicted by the plain terms of the Executive Order. Does #1 and 3 and Meteab are all lawful permanent residents. Section 3(b)(i) of the Executive Order exempts "any lawful permanent resident of the United States" from the temporary suspension of entry.

[8] In its attempt to distinguish *In re Navy Chaplaincy*, the majority implicitly holds that stigma alone is not enough to support standing. The majority states that, "contrary to the Government's assertion, all Muslims in the United States do not have standing to bring this suit. Only those persons who suffer direct, cognizable injuries as a result of EO-2 have standing to challenge it." Majority Op. 40 n.11. The majority avers that Doe (Continued)

erroneously conflates Doe #1's Establishment Clause standing claim with his claim under

the Immigration and Nationality Act ("INA"), which the Supreme Court has prohibited.

*See DaimlerChrysler Corp.*, 547 U.S. at 352 ("[O]ur standing cases confirm that a

plaintiff must demonstrate standing for each claim he seeks to press."). Plaintiffs are

required to "demonstrate standing *separately* for each form of relief sought." *Friends of

the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (emphasis

added). The majority haphazardly merges alleged injuries unique to two different claims,

and personal to different people, to manufacture standing. [9]

---

#1 "is feeling the direct, painful effects of the Second Executive Order—both its alleged message of religious condemnation *and* the prolonged separation it causes between him and his wife—in his everyday life." *Id.* at 40. The majority is right in that regard— stigma is not enough.

[9] Although not the focus of this dissent, I also would find that Doe #1 does not have standing to bring an INA claim; he lacks a concrete injury. It is pure speculation whether Doe #1's wife will receive a visa. Doe #1 has presented no evidence showing that his wife is likely to receive a visa, much less when, but for the operation of the executive order. Or that the executive order would tangibly affect the processing of her application in any way. *See* Opening Br. 19–20 ("Likewise, Doe #1's wife did not have her visa interview scheduled before the Revoked Order took effect, and had already been waiting roughly six weeks, making it similarly speculative whether the 90-day pause will affect her."); *see also The Immigrant Visa Process: Interview*, U.S. Dep't of State, https://travel.state.gov/content/visas/en/immigrate/immigrant-process/interview.html (last visited May 23, 2017) (saved as ECF opinion attachment) (stating that, although "[m]ost appointments are set within 60 days of [the National Visa Center's] receipt of all requested documentation[,] . . . we *cannot predict when an interview appointment will be available*," and warning that "[t]here may be a wait of *several months* for an interview date to become available" (emphasis added)). Nor has the Government denied the visa application of Doe #1's spouse.

      Any injury caused by the Executive Order is not redressable because an injunction will not establish that Doe #1's wife will receive a visa, as exemplified by her current status. *See The Immigrant Visa Process: Interview*, *supra* ("Based on U.S. law, not (Continued)

The majority reasons that Doe #1 has third-party standing to bring an Establishment Clause claim. Not so. Plaintiffs do not have standing to allege violations of the Establishment Clause on behalf of their immigrant relatives. *See Whitmore v. Arkansas*, 495 U.S. 149, 161 n.2 (1990) (restating the general rule "that a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"); *cf. Defenders of Wildlife*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish."). The relatives, in turn, do not have rights of entry or any Establishment Clause rights. *Kerry v. Din*, 576 U.S. \_\_, 135 S. Ct. 2128, 2131 (2015) ("But because Berashk is an unadmitted and nonresident alien, he has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (suggesting that "the people protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Doe #1 is "seeking to vindicate, not [his] own rights, but the rights of others." *Moss*, 683 F.3d at 606.

---

everyone who applies for a visa will be found eligible to come to the United States."). Doe #1 does not have standing under the INA.

Doe #1 has no right to, or even a reasonable expectation of, a time certain meeting with his wife in America. His alleged injury is based on a mere conjecture that his wife will have her embassy interview and obtain a discretionary visa within the ninety-day suspension period of the Executive Order when the State Department has cautioned, well before the Executive Order, that it may take an indefinite period to schedule interviews much less adjudicate visa applications. *See The Immigrant Visa Process: Interview*, *supra* note 9 (stating that, although "[m]ost appointments are set within 60 days of [the National Visa Center's] receipt of all requested documentation[,] . . . we *cannot predict when an interview appointment will be available*," and warning that "[t]here may be a wait of *several months* for an interview date to become available" (emphasis added)). Any effect of the Executive Order on that speculative possibility is simply not determinable and thus fails to meet the constitutional standard of an injury "actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560.

The majority underscores the fragility of its standing hypotheses when it avers, without any citation to precedent or evidence, that the Executive Order creates harm to the plaintiffs because "dedicating time and resources to a global review process[, for which Section 2(c) was designed to facilitate,] will further slow the adjudication of pending [visa] applications." Majority Op. 36. Nothing in the record supports this assertion or ties any nexus to Doe #1 or his spouse. Doe #1 simply fails to carry his burden as to standing under the standard required by the Supreme Court. No

204

constitutionally cognizable "harm" which is "certainly impending" to Doe #1 or to him via his spouse has been proffered. *Defenders of Wildlife*, 504 U.S. at 564 n.2.[10]

For all these reasons, Doe #1 has no "legally protected interest," *Defenders of Wildlife*, 504 U.S. at 560, and no standing to pursue his Establishment Clause claim.[11]


II.

As the plaintiffs lack standing to pursue their cause of action, I respectfully dissent and would vacate the grant of a preliminary injunction by the district court.

---

[10] Similarly, there is no feasible way to determine, except by pure speculation, how or whether the Executive Order's visa waiver process might affect a particular visa application. Nothing in the record supports the majority's conclusion that pursuing a waiver would affect any plaintiff. Rather, the majority has arbitrarily substituted its conjecture for evidence. The visa waiver process could just as likely allow Doe #1's wife to obtain her visa as not during the temporary suspension period.

[11] The district court did not determine whether other individual plaintiffs or the organizational plaintiffs have standing to bring the Establishment Clause claim. That would be a matter to be considered by the district court in the first instance in any further proceedings.